**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FOURTH CIRCUIT**

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee**

**v.** **No. 26-4392**

**THOMAS C. GOLDSTEIN,**

**Defendant-Appellant**

# UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION FOR RELEASE PENDING APPEAL

Thomas Goldstein fails to carry his heavy burden to justify release pending appeal. Following Goldstein's conviction for numerous tax and mortgage crimes, which caused over $16 million in tax loss, the district court sentenced him to 72 months' imprisonment. The court ordered Goldstein to immediately begin serving that sentence, concluding that his release request failed on every front.

That decision was correct. Goldstein is a flight risk with substantial international ties, including with a foreign billionaire who, in Goldstein's view, is indebted to Goldstein for his own freedom. Goldstein is also an ongoing danger, having continued his misconduct almost until his sentencing date. And his issues for appeal are

insubstantial; as the district court succinctly found, "this was not a close case."

## BACKGROUND

### A) Goldstein's crimes

Goldstein was a prominent Supreme Court litigator turned high-stakes poker player. (PSR ¶¶7,10-12.) In 2016, he won over $50 million. (PSR ¶¶52-53.) After accounting for gambling losses and payouts to investors, Goldstein's net winnings exceeded $6 million, which he partially offset on his tax return with $3 million in inflated deductions. (PSR ¶¶67,74). He also claimed poker-related payments as business expenses on his law firm's tax return. (PSR ¶¶84-92.)

Even with these falsities, Goldstein still admitted owing nearly $1.7 million in taxes. (PSR ¶96-97.) He had funds available, but as he wrote in an (unsent) email, he would rather use that money for poker than his taxes. (PSR ¶97.) In 2018, the IRS began collections. (PSR ¶¶98-99.) Goldstein lied to the revenue officer trying to collect. (PSR ¶¶102-03.) Later, when buying a new house, Goldstein transferred closing funds through his firm's IOLTA to avoid a possible IRS levy. (PSR ¶¶127-35.)

Goldstein also assisted in filing several other false tax returns for himself and his firm. The firm's 2017 and 2019 returns omitted income and claimed deductions for Goldstein's use of firm funds to pay poker-related debts. (PSR ¶¶146-170,194-208.) The false 2019 return was filed after Goldstein was interviewed and knew he was under criminal investigation. (PSR ¶¶206-07). Goldstein also filed false 2020 and 2021 personal returns omitting income and his use of cryptocurrency. (PSR ¶¶209-34.)

Despite the falsities on these returns, Goldstein admitted owing nearly $4 million total for 2017-2020, which he failed to pay. (PSR ¶¶235-39.) During this period, Goldstein spent extravagantly, including on luxury vacations, a Bentley, and nightclubs. (PSR ¶¶240-47.) He failed to pay despite IRS warnings and the pending criminal investigation. (PSR ¶¶109,117).

Goldstein also committed mortgage fraud when buying a home in Washington, DC. On two 2021 loan applications, he omitted $15 million in outstanding poker-related debts. (PSR ¶¶251-55.) Those applications were unsuccessful because the lender discovered tax liens on Goldstein's then-residence in Maryland. (PSR ¶254.) After closing

on the new home – using money from a litigation funder he also deceived (PSR ¶¶256-60) – Goldstein sought a refinancing mortgage, again concealing his debts. (PSR ¶¶262-63.) This application succeeded, and Goldstein received nearly $2 million. (PSR ¶262.)

### B) Procedural history

Following a 22-day trial, Goldstein was convicted on nine tax counts for five tax years: tax evasion (26 U.S.C. § 7201) (2016); four counts of aiding in the preparation of false returns (26 U.S.C. § 7206(2)) (2017, 2019-21); and four counts of willfully failing to pay taxes (26 U.S.C. § 7203) (2017, 2019-21). He was also convicted on three counts of false statements on mortgage applications (18 U.S.C. § 1014). He was acquitted on four counts of § 7206(2).

The district court denied Goldstein's new-trial motion, including his claims about deleting the 18 U.S.C. § 2 instruction after closing. (MA125-131.) As the court held, the instruction was unnecessary because the instructions' remaining "brief references" to § 2 merely explained the charges against Goldstein and did not "permit the Jury to convict" on a § 2 theory, and Goldstein was not prejudiced because his

closing, which ignored § 2 liability, would not have changed. (MA129-131.)

The court sentenced Goldstein to 72 months' imprisonment. (MA350-51.) The court revoked Goldstein's bond and denied his motion for release pending appeal, based on Goldstein's "risk of flight, danger to the community and likelihood of success on appeal." (MA379.)

## LAW GOVERNING RELEASE PENDING APPEAL

"Defendants ordinarily begin serving their sentences as soon as they are handed down by a district court, regardless of any appeal." *United States v. Jordan*, 952 F.3d 160, 172 (4th Cir. 2020). Goldstein must make three showings here to overcome that presumption. For the first two, Goldstein must prove, by clear and convincing evidence, that he is neither a flight risk nor a danger to the community. 18 U.S.C. § 3143(b)(1)(A).

Third, Goldstein must show that his appeal presents a substantial question of law or fact likely to result in a new trial. *Id.* § 3143(b)(1)(B). To be substantial, the question must be a "close question or one that very well could be decided the other way." *United States v. Steinhorn*, 927 F.2d 195, 196 (4th Cir. 1991) (cleaned up). And the question must

be "important enough to warrant reversal or a new trial on all counts for which the district court imprisoned the defendant." *Ibid.*

This Court reviews the district court's detention order deferentially, "under a clearly erroneous standard." *United States v. Clark*, 865 F.2d 1433, 1437 (4th Cir. 1989) (en banc).

## ARGUMENT

This Court should deny Goldstein's motion. Goldstein's failure to carry his burden on any one of the three bail factors requires denying the motion; his motion fails on all three.

### I. Goldstein is a flight risk and a danger to the community

The district court did not err, let alone clearly err, in concluding that Goldstein was both a flight risk and a danger to the community. Goldstein fails to show otherwise by clear and convincing evidence.

#### A) Background

##### *1) Goldstein's international ties and ongoing misconduct*

One of Goldstein's financial backers for poker was his friend, Malaysian billionaire Paul Phua, who Goldstein defended against criminal charges in Las Vegas and Macau. (PSR ¶¶11,43,204). In Goldstein's own words, he saved Phua "ten years of his life and made him tens of millions of dollars." (Doc.447 at 50). Because of this,

Goldstein asserted, Phua might loan him millions without an agreement. (Doc.447 at 51.) Goldstein also maintained a Montenegrin bank account, to which Phua sent money. (PSR ¶189.) And Goldstein once brought back nearly $1 million in cash he received from Phua in Macau. (PSR ¶185.)

Goldstein also transacted in millions in cryptocurrency. (PSR ¶¶212,230.) In 2021, he started using Binance.com, which did not allow U.S. customers, but which Goldstein accessed using virtual private networks with foreign IP addresses. (PSR ¶¶228-29.)

Goldstein's tax misdeeds continued after 2021, the latest charged tax year. He did not file 2022, 2023, or 2024 returns, nor timely pay all the taxes due, despite being indicted in January 2025. (Doc.520 at 22-23.) And Goldstein claimed on his 2025 return that his taxes were paid because of a previous credit. (MA358-59.) Using that credit required contacting the IRS, which Goldstein falsely told the probation office his representative had done. (MA359.) In fact, the representative contacted the IRS about moving the credit to his wife's return, *not* Goldstein's. (MA360-61.)

Beyond lying about his taxes and on his mortgage applications, Goldstein admitted at trial to lying to his wife about his poker debts (Doc.447 at 190), lying to a litigation funder for a loan (*id.* at 195), and lying to get investments for poker (*ibid.*).

Goldstein also sought to bribe his former office manager, who said she would resign after IRS agents visited the office. (PSR ¶ 213-14.) Goldstein repeatedly offered her things of value and told her that leaving would look suspicious to the IRS. (PSR ¶216.)

***2) Goldstein's bail history***

Before trial, the district court found that Goldstein was "a significant flight risk" with "significant ties to wealthy individuals in foreign countries." (Doc.76 at 6.) Accordingly, the court required strict release conditions, but Goldstein's compliance on pretrial release was "marginal." (MA1275.)

At sentencing, the court imposed an obstruction-of-justice enhancement based on Goldstein's lies to investigators and his effort to bribe his office manager. (MA230-33.) The court also imposed a sophisticated-means enhancement, including for Goldstein's use of the

Montenegrin account to conceal the nature of his foreign gambling winnings. (MA245-49.)

In denying release pending appeal, the court observed that while stringent release conditions had mitigated Goldstein's flight risk, as the "case proceeds, the calculu[]s" on release can change. (MA375-76.) As to danger to the community, the court noted that some of Goldstein's tax issues were still unresolved. (MA376-77.) Goldstein claimed he had filed recently but presented no evidence; the court noted skeptically, "the receipts are pretty easy to get when you file." (MA377.) With the conduct still ongoing, the court found that Goldstein had "gone too far." (MA379.)

Finally, the court found that Goldstein presented no substantial appellate issues. The court found this was not a close case. (MA378.) Moreover, the court concluded that even a successful appeal was not likely to result in a new trial and the sentence "being completely set aside." *Ibid.* Accordingly, the court ordered Goldstein to begin serving his sentence. (MA379.)

**B) Goldstein is a flight risk**

As the district court correctly found, Goldstein presents a "significant risk of flight" given his foreign ties, including with "individuals of substantial means overseas" and his regular foreign financial transactions. (MA375.) He maintained a foreign account in Montenegro (PSR ¶¶122,189), and transacted in millions in cryptocurrency (PSR ¶¶212, 230), including through an exchange platform that barred U.S. customers. (PSR ¶¶228-29.) And he has a close relationship to Phua, a Malaysian billionaire. As Goldstein said, he saved Phua "ten years of his life and made him tens of millions of dollars." (Doc.447 at 50.) That sense of indebtedness, according to Goldstein, explained why Phua would loan him millions of dollars without any paperwork, simply because Goldstein asked. (Doc.447 at 51). And while the court mitigated Goldstein's pre-trial flight risk with stringent conditions, the calculus changed after the court imposed a lengthy prison term. (MA376.)

Goldstein's contrary claims fail. He tries (Mtn.18-19) to compare his case to others who were released, but assessing flight risk is individualized and comparisons difficult. For example, in *United States*

*v. Edelman*, No. CR 24-239-1 (CKK), 2025 WL 1725957 (D.D.C. June 20, 2025), the defendant was released before sentencing despite foreign ties. But Goldstein omits that Edelman had been detained and was released after pleading guilty, suggesting "that he [was] ready to face the consequences for his crimes." *Id.* at *4. Notably, Goldstein cites no case in which an appellate court reversed a district court's fact-intensive decision on flight risk.

Goldstein also points to his U.S. ties and claims that his incentives to flee did not change after sentencing. (Mtn.19-20.) But Goldstein sought probation and received a six-year prison term. (MA279.) And his claim depends on his credibility. Goldstein asked the court to "trust [him]" not to flee because he knew "this was coming." (MA338-39,342.) But as the district court found, Goldstein obstructed justice. (MA230-33.) And, by his own admission, he had told many lies. (Doc.447 at 190,195-196.) The court's decision that Goldstein could not be trusted was right, and surely not clearly erroneous.

### C) Goldstein is a danger to the community

The district court also correctly found that Goldstein posed a "danger to the community." (MA379.) Goldstein's tax crimes continued

after he learned he was under IRS criminal investigation (PSR ¶¶206-234), after indictment (Doc.520 at 23), and even after conviction (MA358-60).

Goldstein's main response (Mtn.21-22) is that tax crimes are not dangerous. That minimization is baseless. Tax offenses affect the entire taxpaying public; taxes are "what we pay for civilized society." *Denlinger v. Brennan*, 87 F.3d 214, 215 (7th Cir. 1996) (cleaned up).

Moreover, the statute makes clear that it is not just individual harms that count, as it refers to danger to "any other person *or the community*." 18 U.S.C. § 3143(b)(1)(A) (emphasis added). The structure of Title 18's release provisions also shows that "danger to the community" refers broadly to future crimes. Even for pretrial release – for which the government, not the defendant, normally bears the burden on dangerousness – if a defendant commits *any* felony, there is a presumption of dangerousness. *See* 18 U.S.C. § 3148(b)(2) (flush language).

Goldstein also incorrectly asserts (Mtn.22) that the district court left the matter of dangerousness open. But the court expressly found that Goldstein had "gone too far," because "[t]here's a record here of a

number of concerns about what's going on with your taxes." (MA379.) The court accordingly ordered Goldstein detained, specifically citing that he was a "danger to the community." (MA379.)

While the court did not explicitly find that Goldstein had committed recent crimes, that does not help him. The court was open to receiving more information but found the existing record required detention. (MA379, 388-89.) And any uncertainty goes against him, since Goldstein has the burden of proof.

## II. Goldstein presents no substantial issue for appeal

Goldstein raises two intertwined issues, but both involve an implausible reading of the jury instructions. Regardless, at most these issues affected his mortgage-fraud convictions, which were immaterial to his 72-month sentence.

### A) Background on 18 U.S.C. § 2 and the jury instructions

1. Section 2 of Title 18 creates a liability theory "implicit in all indictments," under which "an accessory will be punished as a principal." *United States v. Rashwan*, 328 F.3d 160, 165 (4th Cir. 2003) (cleaned up). It has two parts. Section 2(a) covers one who, inter alia, "aids [or] abets" an offense. Section 2(b) covers one who "willfully

causes an act to be done" by another that would be an offense if he performed the act directly.

One key difference between the two is that § 2(a) requires a primary offender who the defendant aids, while § 2(b) imposes liability on those using "an intermediary," who could be innocent. *United States v. Richeson*, 825 F.2d 17, 20 (4th Cir. 1987) (cleaned up). Thus, § 2(a) requires two guilty parties, while § 2(b) requires only one.

These two distinct forms of liability are often lumped together under the convenient label of "aiding and abetting." *See United States v. Ruffin*, 613 F.2d 408, 416 (2d Cir. 1979). This usage, however, causes "much confusion." *Ibid.* (cleaned up).

2. The indictment charged § 2 for each count. Accordingly, the court planned to tell the jury that Goldstein was charged with § 2 and to give the government's proposed instruction (the Accessory Instruction), which defined "aiding and abetting" in terms only relevant to a § 2(a) theory. (MA766-68.)

But the government never presented a § 2(a) case at trial, as the closings demonstrated. (MA1055-1100.) Neither the government nor Goldstein referred to the anticipated instruction, even though both

parties made use of other anticipated instructions. (*E.g.,* MA1059-1060,1129,1131,1152.)

What the government had planned to argue was a § 2(b) theory on a limited issue for Count 15, one of the § 1014 false mortgage application counts. (MA12-13.). Venue was contested for this count. IP address information indicated Goldstein submitted the application from Maryland, while travel records indicated he was in the Virgin Islands. (MA1184-85.) But there was also evidence that Goldstein had his wife submit the false application, which § 2(b) would cover. (MA990.)

The preliminary instructions, without objection by Goldstein, stated that the government must prove Goldstein "made *or caused to be made* a false statement" in the application. (MA619 (emphasis added).) But Goldstein opposed that phrasing in the final instructions, and the court removed it from the instructions on the elements of § 1014 and venue. (MA989-91; MA996-97.)

During closing, when the government referred to an email that Goldstein sent his wife, Goldstein objected. (MA1097; MA1214.) The government explained that it was not trying to argue a causation theory and told the jury that the application was submitted from Maryland.

(MA1098-99; MA1215.) In rebuttal, the government argued that as to Count 15, "the IP data is clear." (MA1213.)

After closing, both Goldstein and the government proposed changes to the jury instructions. Goldstein wanted to, among other things, modify the venue instruction to say that if "Goldstein caused someone else" to make the statement from within Maryland there was no venue. (Doc.431 at 4.) The government also proposed changes, including asking the court not to read the Accessory Instruction because it was inappropriate for § 2(b) liability. (MA1231.)

Goldstein agreed to delete the Accessory Instruction only if the language referring to § 2 in the substantive counts was also removed. (MA7-8.) But the court declined to "wordsmith" the instructions at that stage. (MA8.)

The government clarified that its concern related to the "intersection" of the § 2 issue and venue. (MA11.) The government had only wanted to invoke § 2(b) for venue on Count 15, and had "never proceeded on a 2A theory," which is why the instruction should come out. (MA13.) But, the government acknowledged, it had caused the

misunderstanding by conflating § 2(a) and § 2(b), an error it had only just caught. (MA13-16.)

Goldstein contended that he understood the government's theory on the § 1014 counts (Counts 14-16) to be under § 2(a), and that it was too late to remove the instruction. (MA24.) The court, however, found that the Accessory Instruction was inapplicable given the government's case and removed it. (MA26.)

Thus, when introducing most of the offenses, the court told the jury that Goldstein was also charged with violating § 2 and read the statute. (MA55-56 (26 U.S.C. § 7201); MA60-68 (26 U.S.C. § 7206(2); MA75-82 (18 U.S.C. § 1014)). For § 7203, the court mentioned that Goldstein was also charged with aiding and abetting, but did not say he was charged with § 2 or read the statute. (MA71.) The court instructed the jury that references to the charges were not evidence, even if the court read part of them to the jury. (MA41.) The jury convicted on all but four counts. (Doc.472.)

The district court rejected Goldstein's new-trial motion, concluding that the jury instructions made "clear that the brief references to Section 2" were simply part of summarizing the

allegations. (MA129.) The court held that the instructions "did not permit the Jury to convict Mr. Goldstein based on a Section 2 liability theory." (MA129.) And the late deletion caused no prejudice, as Goldstein did not mention § 2 liability in his closing, nor did he seek additional argument when the change was made. (MA130.) The court thus found that Goldstein's closing would have been the same regardless of the court's decision on the Accessory Instruction. (MA130.)

### B) Goldstein's claim is based on a misreading of the instructions

1. Deleting the Accessory Instruction was appropriate because the jury instructions did not allow the jury to convict under § 2. There was no need to instruct the jury on a theory of liability that it was not asked to vote on.

The instructions *mentioned* § 2 when describing the indictment's allegations, but they did not provide § 2 as grounds for conviction. On Count One, for example, the court said that Goldstein was charged with tax evasion, read the statute, said that "[t]he indictment also alleges that Mr. Goldstein violated" 18 U.S.C. § 2, and then recited that statute. (MA55-56.) The jury was instructed that references to the

indictment were "not evidence" but "merely a statement of charges." (MA41.) Jurors are presumed to "carefully follow instructions." *United States v. Covington*, 180 F.4th 576, 593 (4th Cir. 2026) (cleaned up). Thus, when told the indictment alleged Goldstein violated § 2, the jury would have understood that as simply describing the allegations.

Immediately after describing Count One's allegations, the court explained what "the government must" prove for Goldstein to be guilty of tax evasion. (MA56.) The court enumerated the three elements of tax evasion and defined them in detail. (MA56-60.) This element instruction, and the similar instructions for other counts (none of which Goldstein contests) are what informed the jury of the legal test to apply when deciding whether to convict. That test was mandatory, and jurors are presumed to follow the directive that they "must" decide Goldstein's guilt based on the elements.

Goldstein's argument largely ignores the elements instructions, contrary to the requirement to read the instructions as a whole. *See*, *e.g.*, *United States v. Gentner*, 177 F.4th 519, 530 (4th Cir. 2026). Read properly, the instructions mentioned § 2 merely as part of the allegations, but the only bases for conviction were the elements

instructions for each offense.[1] Goldstein's argument requires the illogical leap that jurors would understand a mere background reference as license to ignore the legal test they were told they "must" apply. There is no likelihood that any reasonable juror would understand the instructions this way.

This case stands in stark contrast to cases like *United States v. Odum*, 65 F.4th 714 (4th Cir. 2023), on which Goldstein relies. (Mtn.9-10,17.) In *Odum*, the court instructed the jury that "it could convict" the defendant of robbery based on him aiding and abetting another, and then improperly explained the elements of such liability. *Id.* at 720, 721. That explicit invitation to convict based on § 2 is the opposite of the case here.

2. Goldstein's contrary claims are unpersuasive. His lead argument (Mtn.11,15) is to point to the government's change in position. But what matters are the instructions the jury received, not

[1] Each set of offense instructions followed the same pattern as Count One, except for failure to pay taxes, where the court referenced aiding and abetting but did *not* say that Goldstein was charged under § 2 or read that statute. (MA55-56 (26 U.S.C. § 7201); MA60-68 (26 U.S.C. § 7206(2); MA71-74 (26 U.S.C. § 7203); MA75-82 (18 U.S.C. § 1014)).

the government's thoughts on them, and reviewing those instructions demonstrate there was no basis for a § 2 conviction.

Goldstein also ignores *why* the government's position changed. As the government explained, it had mistakenly conflated § 2(a) and § 2(b), proposing a § 2(a) instruction despite never presenting a § 2(a) case. (MA13-15.) It had hoped to argue § 2(b) for Count 15 but was precluded from that. (MA12-13.) And the references to § 2 in the allegations remained in because the court did not want to do additional wordsmithing at that stage. (MA8-9.)

The government's "confusion" in mixing § 2(a) and § 2(b) is not uncommon. *Ruffin*, 613 F.2d at 416. It can even be seen in this Court's cases. *Rashwan*, for example, in upholding a conviction under § 2(b) liability, repeatedly described the defendant as having "aided and abetted," which is the language of § 2(a). *See* 328 F.3d at 165. The government's shift was due to an understandable confusion – one that took place outside the jury's presence.

Goldstein misleadingly claims (Mtn. 11-12) that the instructions "described Section 2 as 'pertinent,'" but his quotation is incomplete. The court said that Goldstein was charged with § 2, "which provides in

pertinent part as follows" (or similar phrasing), before quoting the statute. (MA56, MA64-65, MA78-79.) Thus, "pertinent" was used merely to describe what part of the statute was relevant to the allegations, which remained only allegations.

And Goldstein's claim (Mtn. 12) that § 2 "featured prominently" is hyperbole. The brief § 2 references occurred merely as background descriptions of allegations in instructions spanning over fifty transcript pages. (MA31-MA87.)

Goldstein claims (Mtn. 12-13) that the government's case often referred to third parties, but that is consistent with the charges, regardless of § 2 liability. This point is addressed more below in Section D, but, for example, Goldstein was charged with 26 U.S.C. § 7206(2), which covers those who "aid[] or assist[]" in a false tax return.

Nor does Goldstein's conviction on Count 15 change the analysis; Goldstein is incorrect (Mtn.13) that Count 15 depended on § 2. As Goldstein recognized in his closing, the government relied on IP address information to "show[] that Mr. Goldstein was in Maryland when the applications were submitted." (MA1184.) Goldstein takes the government's rhetorical comment (which he interrupted) about the

Virgin Islands out of context; as the government made clear, it was arguing that the application was "submitted from Maryland," not that Goldstein caused his wife to submit it. (MA1099.) The government reinforced the point in rebuttal, arguing that, as to Count 15, "the IP data is clear." (MA1213.) The jury's verdict merely shows that it decided to credit the IP data over the travel records that Goldstein emphasized.

Goldstein wrongly contends (Mtn.14) the court ignored the *Boyde v. California*, 494 U.S. 370 (1990), standard. The court clearly grasped Goldstein's *Boyde* argument that "there [was] a 'reasonable likelihood' that a reasonable juror would have understood the Jury Instructions in this case to permit a conviction under Section 2." (MA126.) The court simply disagreed that the standard was met. (MA127-29). That the court did not repeat that particular phrase later is immaterial.

Finally, Goldstein's claims (Mtn. 14-15) that referring to § 2 as "charges" meant that the jury would understand them as more than allegations misunderstands the instructions and the court's decision. Even if the jury understood the references to § 2 being charged as meaning it needed to consider § 2, the jury would not take this as an

invitation to invent its own legal tests. Rather, it would look to the elements instructions, which explicitly told the jury what to consider when deciding guilt on any count. The point is not, as Goldstein mistakenly says (Mtn.15), that the elements instructions "cure" any § 2 issue. Rather, it is that the elements instructions are the only instructions telling the jury what to consider in determining guilt.

### C) Goldstein was not prejudiced by the change in the instructions

Goldstein's second claim, that deleting the Accessory Instruction after closing prejudicially violated Federal Rule of Criminal Procedure 30(b), rises or falls with his first claim. Regardless, he was not prejudiced.

Although Goldstein presents this argument as distinct, it depends on his first claim. If the jury instructions did not allow for a § 2 conviction – and they did not – then no prejudice resulted from Goldstein's closing not addressing § 2. Only if Goldstein prevails on his first argument – that the jury *was* allowed to convict under § 2 – would his second argument matter. But then the second argument would be surplusage.

Even if the second argument had independent merit, reversal on a Rule 30(b) violation requires prejudice. *See United States v. Horton*, 921 F.2d 540, 547 (4th Cir. 1990). Goldstein's closing never mentioned the Accessory Instruction. (MA1106-92.) The issue was simply not important. As the district court found, the "record makes clear" that the defense closing "would have been the same regardless." (MA130.)

**D) Any error was limited to the § 1014 charges**

Even if Goldstein's arguments had merit, his claim that all counts would be reversed is exaggerated. But it implicitly recognizes that without complete reversal he would still be serving a lengthy sentence and there would be no basis for release. At most, however, any § 2 error affects only the mortgage-fraud counts, not the tax charges that are the basis for Goldstein's sentence.

At trial, Goldstein recognized that his concerns pertained to § 1014. (MA24.) And while the government never urged the jury to convict under a causation theory, this could only have mattered with respect to Count 15, given Goldstein's objections to the government's closing. (MA1097; MA1214.)

But reversing the § 1014 counts would leave Goldstein's nine tax convictions intact. And those were the basis for his 72-month sentence.[2] The § 1014 charges had no effect on the Guidelines. (PSR ¶¶280,286-289.) Neither the parties nor the court even mentioned mortgage fraud when discussing the proper sentence. (MA258-272, MA294-302 (government); MA272-290 (defense); MA343-52 (court).)

Any effect of the § 2 question is limited to the § 1014 charges for two additional reasons. The failure-to-pay counts do not mention § 2 and have nothing to do with § 2. And the elements instructions on tax evasion and § 7206(2) discussed the involvement of third parties, so any juror who thought that the mention of § 2 required consideration of aiding and abetting would understand the elements instructions to already provide the necessary guidance.

Goldstein's four convictions under 26 U.S.C. § 7203 depended on his personal failure and inaction. While the court made a passing reference to aiding and abetting (MA71), it did not quote § 2 or say that

[2] Because of the statutory maximums, the only individual counts for which the court imposed 72 months were the § 1014 counts (MA350-51), but the court could impose the same sentence without those counts by running some tax counts consecutively.

Goldstein was charged with § 2, as it did for other counts (MA71-73). And the court's discussion of the elements made clear that § 7203 was concerned with Goldstein failing to pay his taxes. (MA72-74.) No juror would understand anything about abetting others to be relevant to these charges.

Goldstein was also convicted of four counts of 26 U.S.C. § 7206(2), which has been called the Tax Code's "aiding and abetting provision." *United States v. Williams*, 644 F.2d 696, 701 (8th Cir. 1981), *abrogated on other grounds as stated in United States v. Brooks,* 174 F.3d 950, 956 (8th Cir. 1999). It applies to those who "aided, assisted, or otherwise caused the preparation and presentation of a return." *United States v. Aramony*, 88 F.3d 1369, 1382 (4th Cir. 1996) (cleaned up). Accordingly, the jury was instructed the government must prove Goldstein "advised or assisted in the preparation of a tax return that was subsequently filed." (MA65.) If the jury thought § 2 was relevant, it would have understood the § 7206(2) instructions to contain what it needed to know.

Finally, the remaining tax charge, tax evasion under 26 U.S.C. § 7201, incorporates similar principles. "[A]ny conduct, the likely effect

of which would be to mislead or to conceal," is within the scope of § 7201. *Spies v. United States*, 317 U.S. 492, 499 (1943). Thus, for example, a defendant can violate § 7201 through a false return even if someone else signed the returns. *See*, *e.g.*, *United States v. McKee*, 506 F.3d 225, 233 (3d Cir. 2007).

Here, the court made clear that the jury had to unanimously agree that Goldstein committed an evasive act specified in the indictment and not any other act. (MA56, MA59.) Those acts, which the court listed, included "providing false and incomplete information" to an accounting firm and "causing the preparation" of two false tax returns. (MA58-59.) Once again, even if the jury thought that the reference to § 2 meant that they should consider it, the description of elements for Count One provided the test.

In short, even if Goldstein were right that there was a sufficiently close question about whether the court erred, the tax charges would stand and he would still spend years in prison. Accordingly, there is no basis for his release pending appeal.

## CONCLUSION

This Court should deny Goldstein's motion.

Respectfully submitted,

COLIN M. MCDONALD
*Assistant Attorney General*
*National Fraud Enforcement Division*

s/ Jason Poole
KATIE BAGLEY (202) 598-3298
JOSEPH B. SYVERSON (202) 598-5861
JASON POOLE (202) 532-3706
*Attorneys, Appellate Section*
*U.S. Department of Justice*
*950 Pennsylvania Ave., NW*
*Washington, D.C. 20530-0001*

*Of Counsel:*
KELLY O. HAYES
*United States Attorney*

DATED: August 25, 2026

## CERTIFICATE OF COMPLIANCE

This response complies with the length limitation of Federal Rule of Appellate Procedure 27(d)(2) because it is 5,151 words in length, excluding the parts excluded under Rule 32(f).

This response complies with the typeface and type-style requirements of Rule 27(d)(1)(E) because it has been prepared in a 14-point, proportionally spaced typeface (Century Schoolbook) using Word for Microsoft 365.

s/ Jason Poole
JASON POOLE
*Attorney for the United States*

DATED: August 25, 2026

## CERTIFICATE OF SERVICE

I hereby certify that on August 25, 2026, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system. Counsel for defendant are all registered ECF users and will be served by the ECF system.

s/ Jason Poole
JASON POOLE
*Attorney for the United States*

DATED: August 25, 2026