No. 26-4392

# In the United States Court of Appeals for the Fourth Circuit

**UNITED STATES OF AMERICA,**

*Plaintiff-Appellee*,

v.

**THOMAS C. GOLDSTEIN,**

*Defendant-Appellant*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND, NO. 8:25-CR-00006-LKG-1
HON. LYDIA KAY GRIGGSBY

## BRIEF FOR DEFENDANT-APPELLANT THOMAS C. GOLDSTEIN


JONATHAN KRAVIS
LIU SHUR KRAVIS LLP
607 Fourteenth Street NW
Suite 625
Washington, DC 20005
(202) 302-0416

ELIZABETH B. PRELOGAR
*Counsel of Record*
ANDREW D. GOLDSTEIN
EPHRAIM A. MCDOWELL
ELIAS S. KIM
JADE FORD
SAHAR ATASSI
COOLEY LLP
1299 Pennsylvania Avenue NW
Suite 700
Washington, DC 20004
(202) 842-7800

*Counsel for Defendant-Appellant*

## TABLE OF CONTENTS

**Page**


INTRODUCTION ........................................................................ 1
JURISDICTIONAL STATEMENT ........................................................ 4
STATEMENT OF THE ISSUES .......................................................... 4
STATEMENT OF THE CASE ............................................................ 4
A. Factual Background ............................................................ 4
B. Procedural History ............................................................ 10
1. The government's second *Brady* violation and shifting tax theory ........................................ 10
2. The government's pursuit of convictions under 18 U.S.C. § 2 ........................................ 17
3. The verdict and post-trial proceedings .......................... 21
SUMMARY OF ARGUMENT ............................................................ 23
STANDARD OF REVIEW ................................................................ 27
ARGUMENT ................................................................................ 28
I. The Government's Second *Brady* Violation Requires A New Trial ........................................ 28
A. The Government Suppressed Evidence About The Deyhle Preparation Sessions ........................................ 29
B. The Evidence Was Favorable To Goldstein ........................... 35
C. The Evidence Was Material .................................................. 42
D. The Correct Remedy Is A New Trial Subject To Certain Conditions ........................................ 46
II. The Erroneous Exclusion Of Goldstein's Text Messages Requires A New Trial ........................................ 46
A. The District Court Incorrectly Excluded The Messages .......... 47
B. The District Court's Error Was Not Harmless ........................ 51
1. The text messages were relevant to the central issue of willfulness ........................................ 52
2. The district court did nothing to mitigate its error ........ 56
3. The case was close ....................................................... 61

**TABLE OF CONTENTS**
(continued)

**Page**

III. The District Court's Instructional Errors Require A New Trial ........65

A. Omitting The Elements Of Section 2 From The Instructions Violated Due Process ........65

1. The district court erroneously invited conviction under Section 2 without instructing on its elements......65

2. The instructional error was not harmless........75

B. The District Court Violated Rule 30(b) ........78

CONCLUSION ........80

REQUEST FOR ORAL ARGUMENT ........81

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Berger v. United States*,
295 U.S. 78 (1935)....4

*Boyde v. California*,
494 U.S. 370 (1990).... 27, 67-68, 70-72, 74-75

*Brady v. Maryland*,
373 U.S. 83 (1963)....2, 4, 12, 29

*Burgess v. Goldstein*,
997 F.3d 541 (4th Cir. 2021)....65

*Cheek v. United States*,
498 U.S. 192 (1991)....1

*Edwards v. Douglas*,
269 U.S. 204 (1925)....7, 49

*Gordon v. United States*,
344 U.S. 414 (1953)....58

*Juniper v. Davis*,
74 F.4th 196 (4th Cir. 2023)....32

*Kotteakos v. United States*,
328 U.S. 750 (1946)....62

*Kyles v. Whitley*,
514 U.S. 419 (1995).... 40-41

*Monroe v. Angelone*,
323 F.3d 286 (4th Cir. 2003)....46

*Moore v. Maryland*,
163 F.4th 828 (4th Cir. 2026)....29, 42

*Pittman v. Cnty. of Madison*,
863 F.3d 734 (7th Cir. 2017).... 59-60

*Samia v. United States*,
599 U.S. 635 (2023)....68, 70

*Spicer v. Roxbury Corr. Inst.*,
194 F.3d 547 (4th Cir. 1999).... 42, 44-45

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**


*Sprinkle v. Davis*,
111 F.2d 925 (4th Cir. 1940) ..........50

*State v. Garcia*,
245 N.J. 412 (2021) ..........57

*Taylor v. Kentucky*,
436 U.S. 478 (1978) ..........72

*United States v. Adams*,
139 F.4th 931 (D.C. Cir. 2025) ..........63

*United States v. Agurs*,
427 U.S. 97 (1976) ..........32

*United States v. Brizuela*,
962 F.3d 784 (4th Cir. 2020) .......... 26, 63-64

*United States v. Burfoot*,
899 F.3d 326 (4th Cir. 2018) ..........61

*United States v. Ealy*,
363 F.3d 292 (4th Cir. 2004) ..........68

*United States v. Gallagher*,
90 F.4th 182 (4th Cir. 2024) ..........25, 27, 47-55, 59, 62

*United States v. George*,
95 F.4th 200 (4th Cir. 2024) .......... 24, 27, 30-31, 36-37, 42-44

*United States v. Goodyear*,
649 F.2d 226 (4th Cir. 1981) ..........54

*United States v. Gumbs*,
283 F.3d 128 (3d Cir. 2002) ..........17, 67, 77

*United States v. Harris*,
346 F.2d 182 (4th Cir. 1965) ..........66, 73

*United States v. Hastings*,
134 F.3d 235 (4th Cir. 1998) .......... 66, 72, 75-78

*United States v. Horton*,
921 F.2d 540 (4th Cir. 1990) .......... 17, 66, 78-79

*United States v. Ibisevic*,
675 F.3d 342 (4th Cir. 2012) .......... 25-26, 47, 51-54, 56, 59-64

## TABLE OF AUTHORITIES
(continued)

**Page(s)**


*United States v. Jinwright*,
683 F.3d 471 (4th Cir. 2012) ....................................................................48

*United States v. Joyner*,
--F.4th--, 2026 WL 2329134 (4th Cir. Aug. 12, 2026) ....................................58

*United States v. Leake*,
642 F.2d 715 (4th Cir. 1981) ....................................................................47

*United States v. Lewis*,
53 F.3d 29 (4th Cir. 1995) ....................................................................70, 75

*United States v. Lighty*,
616 F.3d 321 (4th Cir. 2010) ....................................................................56

*United States v. Naum*,
134 F.4th 234 (4th Cir. 2025) ....................................................................75

*United States v. Odum*,
65 F.4th 714 (4th Cir. 2023) ....................................................... 3, 17, 26, 66-67

*United States v. Parker*,
790 F.3d 550 (4th Cir. 2015) .................................................................. 38-39

*United States v. Pasha*,
797 F.3d 1122 (D.C. Cir. 2015)....................................................................46

*United States v. Passaro*,
577 F.3d 207 (4th Cir. 2009) ....................................................................27

*United States v. Polowichak*,
783 F.2d 410 (4th Cir. 1986) ....................................................................66

*United States v. Rafiekian*,
991 F.3d 529 (4th Cir. 2021) ....................................................................51

*United States v. Rodriguez*,
496 F.3d 221 (2d Cir. 2007) ....................................................................32

*United States v. Rydland*,
461 Fed. Appx. 208 (4th Cir. 2012)..............................................................59

*United States v. Sanders*,
964 F.2d 295 (4th Cir. 1992) ....................................................................64

*United States v. Service Deli Inc.*,
151 F.3d 938 (9th Cir. 1998) .................................................................. 45-46

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*United States v. Toney*,
599 F.2d 787 (6th Cir. 1979) ....................57, 58

*United States v. Urbanik*,
801 F.2d 692 (4th Cir. 1986) ....................62

*United States v. Vargas*,
580 F.3d 274 (5th Cir. 2009) ....................57

*United States v. Winstead*,
708 F.2d 925 (4th Cir. 1983) ....................17, 66

*Wearry v. Cain*,
577 U.S. 385 (2016) ....................44

**Statutes**

18 U.S.C.
§ 2 ....................3, 4, 10, 17, 65
§ 2(a) ....................17
§ 2(b) ....................17
§ 1014 ....................10

26 U.S.C.
§ 7201 ....................10, 78
§ 7203 ....................10
§ 7206(2) ....................10, 78

28 U.S.C. § 1291 ....................4

Fed. R. Crim. P. 30(b) ....................78, 80

Fed. R. Evid. 803(3) ....................47

**Other Authorities**

2 McCormick on Evidence § 274 (8th ed.) ....................47, 51

2 Wharton's Criminal Evidence § 8:16 (15th ed.) ....................59

## INTRODUCTION

In this case, the government decided to secure a conviction no matter the facts or law. After a sprawling investigation, the government charged Tom Goldstein with various tax- and mortgage-related offenses. But once trial began, the government's case fell apart. To salvage the prosecution, the government took increasingly aggressive positions that violated Goldstein's rights and led to multiple legal errors—each of which warrants a new trial.

The central factual dispute was whether Goldstein willfully committed tax offenses. Given the "complexity of the tax laws," a person cannot be convicted of tax crimes simply because he failed to pay the right amount, file a return, or maintain adequate records; instead, prosecutors must prove he had the "specific intent to violate the law." *Cheek v. United States*, 498 U.S. 192, 200 (1991).

To comply with the tax obligations for his multiple income streams, Goldstein hired accountants and relied on office assistants to help prepare his returns. This prosecution arose from two false statements that Goldstein's tax preparer, Walter Deyhle, made to the IRS. In 2016, Goldstein's assistant informed Deyhle that Goldstein had opened a foreign bank account. But Deyhle failed to disclose the account on Goldstein's tax returns, prompting an IRS criminal investigation. When investigators interviewed Deyhle, he did not own up to the error. Instead, he doubled down with another false statement: that Goldstein never provided Deyhle with his

2016 gambling winnings from an individual named Alec Gores, which totaled about $26 million. That statement was false because Goldstein had emailed Deyhle the income amounts in October 2017.

When trial began, the government made Deyhle's story about Goldstein's 2016 gambling income its central theory. A week into trial, however, the government realized the story was false. While reviewing the defense's exhibits, the government discovered Goldstein's October 2017 email (which was produced years earlier) disclosing his gross gambling winnings, which included the $26 million Gores winnings. With that theory debunked, the government scrambled to save the case—causing three due process violations.

First, the government violated *Brady v. Maryland*, 373 U.S. 83 (1963). After discovering the October 2017 email, the government scheduled two emergency meetings with Deyhle to rework his testimony. Although the government claims it took no notes, one thing is clear: Deyhle admitted he received the email and used it to prepare Goldstein's 2016 returns. That admission contradicted his previous story and was classic impeachment evidence that had to be disclosed, along with the government's outlines from those meetings. But the government failed to disclose that evidence, materially undermining the defense's position that the tax errors stemmed from Deyhle's incompetence. It still has not produced the outlines.

The government then convinced the district court to erroneously exclude Goldstein's most important evidence. When the government's original theory fell apart, it pivoted to a new theory that Goldstein made $50 million gambling in 2016 and was motivated to evade taxes on that income in all ensuing years. The government misleadingly offered a subset of Goldstein's text messages to investors describing his gross winnings and suggested to jurors that Goldstein was describing his net income. To prove he did not believe his 2016 income was anything close to $50 million, Goldstein offered messages with another investor explaining how most of his winnings were offset by losses, owed to investors, or not paid until 2017. But the court wrongly excluded this state-of-mind evidence as hearsay.

Finally, the government aggressively pursued an accessory liability theory under 18 U.S.C. § 2, pointing to numerous third parties involved in Goldstein's alleged offenses. Indeed, after its theory of venue for Count 15 collapsed, the government put on a rebuttal case focused solely on Section 2. But after closing argument, the government persuaded the court to instruct jurors only on Section 2's statutory text and to delete further instructions on its elements. As this Court recognized in *United States v. Odum*, 65 F.4th 714 (4th Cir. 2023), instructing jurors using Section 2's text alone violates due process. And the district court further violated Federal Rule of Criminal Procedure 30(b), which prohibits amendments to jury instructions after closings.

Because each of these errors crippled Goldstein's defense, this Court should order a new trial—and remind the government that "while [it] may strike hard blows, [it] is not at liberty to strike foul ones." *Berger v. United States*, 295 U.S. 78 (1935).

## JURISDICTIONAL STATEMENT

Goldstein timely appealed from a final judgment of conviction entered on July 28, 2026, and amended on July 31, 2026. JA745-747. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether the government violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose impeachment evidence from meetings with its key witness.

2. Whether the district court erred by excluding Goldstein's primary state-of-mind evidence as hearsay.

3. Whether the jury instructions—which were amended after closing arguments—violated due process and Rule 30(b) by failing to specify the elements of 18 U.S.C. § 2.

## STATEMENT OF THE CASE

### A. Factual Background

For decades, Goldstein was a distinguished appellate litigator who owned a boutique law firm. He also founded SCOTUSblog and ran appellate advocacy clinics at law schools.

In 2016, Goldstein began playing high-stakes poker backed by Paul Phua, a businessman who invested in Goldstein's games. JA380-381. Goldstein asked his assistant to establish a bank account in Montenegro (Phua's residence) to exchange money more easily. JA406-407. After doing so, the assistant reported it to Goldstein's accountants, including Walter Deyhle. JA406-407.

With Phua's help, Goldstein played numerous high-stakes games in 2016. Goldstein initially lost millions and thus sought coaching from two professional players—Keith Gipson and Andrew Robl—who helped him improve and began investing in his games. JA399-402.

Backed with those investments, Goldstein arranged a series of one-on-one games against three businessmen: "Chairman" and "Tango" (who he played at casinos in Asia where Phua controlled payouts between players), and Alec Gores. JA381. Goldstein won those games, with gross winnings of about $13 million from Chairman, JA403-404, $26 million from Gores, JA420-421, and $12 million from Tango, JA503-504. So, as Goldstein texted Gipson and Robl in December 2016, his gross winnings from those games was about $51 million. JA1134-1135.

But those gross numbers represented only part of the financial picture. Throughout 2016, Goldstein was in constant communication with "Kids"—Phua's assistant—about his poker results and debts to investors. JA501-502. In texts, Kids conveyed that Goldstein lost millions in earlier 2016 games; that Goldstein owed

most of his winnings from Gores, Chairman, and Tango to investors; and that Tango did not pay until 2017:

- In October, Kids texted a ledger documenting Goldstein's results. The ledger conveyed that Goldstein's share of the Chairman games —which took place in early September—was about $5.4 million and that Goldstein lost about $4.4 million in other games in Asia. JA5546-5547.

- The following months, Kids and Goldstein exchanged messages documenting investors' shares of Goldstein's wins against Gores. JA5548-5555. For one session involving gross winnings of about $18 million, they agreed Phua's share was 45%, Goldstein's share was 30%, and other investors' shares totaled 25%. JA5551-5552. For other sessions, the shares were different. After the Gores games, Kids stated Phua was entitled to over $10 million and directed Goldstein to use winnings to pay debts on Phua's behalf. JA5555; JA416.

- In mid-December, Kids confirmed Goldstein was entitled to $60.56 million HKD—roughly $8 million—from Tango. JA5558-5559.

- In February 2017, Kids told Goldstein Tango had still not paid for the 2016 games. JA5561.

In 2017, Goldstein and Phua agreed to "swap" their respective shares of the Gores and Tango games, as Gores had paid Phua's share to Goldstein and Tango eventually paid Goldstein's share to Phua. JA514-515.

In late 2016 and early 2017, Goldstein played games against an individual named Bob Safai and lost about $16 million. JA519. Goldstein had not secured investors in these games and ran out of money. JA519.

Throughout this period, Goldstein maintained a record of wires in and out of his poker bank account. JA430. This "wires document" reflects he paid more than $20 million in 2016. JA5477-5478. Because Goldstein and Phua swapped their shares of the Tango and Gores winnings, the document does not reflect exchanges with Phua (apart from a wire of $750,000 Phua sent after the Chairman games). JA5477.

Because taxes are owed on net income "actually received during the tax year," *Edwards v. Douglas*, 269 U.S. 204, 211 (1925), Goldstein knew the combination of losses, offsets, and unpaid winnings would complicate his 2016 taxes. In January 2017, he told Walter Deyhle he had significant gambling winnings in 2016 but a large portion was owed to investors or offset by losses. JA441-442.

In March, Deyhle wrote that Goldstein could ask for an extension until October 15 without filing or paying taxes and stated the only consequence was penalties and interest. JA5843. Deyhle said Goldstein could provide his 2016 "net winnings," JA5469, "[at] his convenience," JA5464.

Just before the October deadline, Deyhle followed up. JA5462. Goldstein used the wires document to quickly calculate that he had won $27,185,050 (which included the $26 million Gores winnings), lost $13,498,000, and distributed $10,938,700 to investors, resulting in net gambling income of $2,748,500. JA5462. He emailed these figures to Deyhle, who subsequently filed a 2016 tax return derived

from those amounts. JA5462. Because Goldstein could not pay by the deadline, he took on a tax debt.

From 2017 to 2021, Goldstein stopped playing high-stakes poker and focused on his law practice. JA521. During these years, Goldstein relied heavily on his office assistants and Deyhle to manage his taxes and bookkeeping. Because Goldstein was the firm's sole owner, he asked assistants to pay his personal expenses out of the firm's accounts, rather than first transferring the money to a personal account. JA3930-3931. The assistants were the point of contact when the accountants had questions about how to classify transactions. JA372-373. Although several transactions were misclassified during this period, there is no evidence that Goldstein ever directed someone to misclassify a transaction.

In 2021, Goldstein and his wife purchased a home in Washington, D.C. Because Goldstein did not disclose his poker debts to his wife, their mortgage applications omitted the debts. JA3975. Goldstein was traveling when they submitted at least one of the applications, so his wife signed it on his behalf. JA4083-4084.

Meanwhile, the government began investigating Goldstein for tax violations. In October 2020, they interviewed Walter Deyhle, who made several false statements. Initially, the government was focused on Goldstein's Montenegro bank account, which Deyhle had not reported. JA3919-3920. Because the government

eventually obtained the emails disclosing the account, it never pursued charges related to that omission. But at the meeting, Deyhle said Goldstein had not told him about the account. JA5488.

Deyhle also made additional false statements that took the investigation in a different direction: He stated that Goldstein never provided information about his 2016 gambling income in writing, never responded to requests for information, and never disclosed his gross winnings from the Gores games. JA5485-5486. This was false because, as noted, Goldstein had informed Deyhle of his gross winnings, losses, and investor distributions over email. JA5462.

Believing Deyhle's story, the government investigated Goldstein for five years. The government interviewed Deyhle three more times before calling him as a grand jury witness. JA5491; JA5498; JA5533; JA5540. Throughout, Deyhle repeated his false statements about Goldstein's 2016 gambling income. JA5492-5493; JA5534-5535; JA5513-5514.

The government eventually sought an indictment based on Deyhle's story—but took no steps to confirm it. The government did not, for instance, subpoena Deyhle's communications with Goldstein or read the October 2017 email to Deyhle, which Goldstein had produced. If the government had taken these basic steps, it would have realized it was proceeding on a fundamentally false story.

## B. Procedural History

In January 2025, Goldstein was charged with multiple tax and mortgage-related offenses. For each count, the indictment charged Goldstein with the substantive offense and with accessory liability under 18 U.S.C. § 2. JA787-JA801.

When trial began in January 2026, the operative indictment included sixteen counts: (1) one count of tax evasion related to Goldstein's 2016 income, in violation of 26 U.S.C. § 7201; (2) eight counts of assisting the preparation of a false tax return in tax years 2017 through 2021, in violation of 26 U.S.C. § 7206(2); (3) four counts of willful failure to pay taxes in tax years 2017, 2019, 2020, and 2021, in violation of 26 U.S.C. § 7203; and (4) three counts of making false statements on a loan application, in violation of 18 U.S.C. § 1014. JA748.

### 1. The government's second *Brady* violation and shifting tax theory

A central aspect of the trial was the government's theory of willfulness, which shifted dramatically. The government pursued an overarching theory for all tax offenses that focused on Goldstein's 2016 poker activities, arguing that if Goldstein willfully hid millions from the IRS in 2016, subsequent inaccurate tax returns and missing payments were likely not mistakes. This theory was critical to the government's case because there was no independent evidence that many of the minor inaccuracies it charged as felonies—*e.g.*, the omission of $263 in interest income in 2017, JA595—were willful.

The government's key witness was Walter Deyhle. Based on Deyhle's repeated assertions, the government focused on the $26 million Goldstein received from Gores and claimed that Goldstein hid these winnings from Deyhle.

On December 28, 2025, the government prepared Deyhle to testify. JA3277-3278. Contrary to its practice for other witness meetings, the government did not prepare a memorandum describing the Deyhle meeting and did not disclose it to the defense. But according to the government, Deyhle's statements at the meeting were consistent with his earlier story that Goldstein hid his 2016 gambling income, including the Gores winnings. JA3278. The defense later learned that the government prepared an outline to walk Deyhle through his planned testimony. JA3110. The government added checkmarks to the outline, seemingly indicating that Deyhle's planned testimony met their expectations. JA3110.

When trial began in January 2026, the government made clear that Deyhle's story was the core of its case. In its opening argument, the government stressed that Goldstein "in 2016, won $26 million from Mr. Alec Gores," and highlighted bank records showing a $26 million wire from Gores. JA1045. Relying on Deyhle's statements, the government stated Goldstein "hid" those "winnings from his tax preparer." JA1043. The government repeatedly stated jurors should credit Goldstein's "accountants" and "tax preparers" and deem Goldstein a liar. JA1045-1050.

But midway through trial, the government realized that narrative was wrong. On January 23, the government finally reviewed the defense's exhibits and discovered Goldstein's October 2017 email—which contradicted Deyhle's statements. JA3279.

The government quickly scheduled additional meetings with Deyhle to try to salvage its case. On January 28, it met with Deyhle, informed him of the October 2017 email, and confirmed he had used that email to prepare Goldstein's 2016 tax return. JA3280-3282. Deyhle's confirmation contradicted multiple prior representations, including that Goldstein never provided information about his 2016 gambling income in writing, failed to respond to Deyhle's requests for information, and never provided his gross winnings or investor payouts. JA5512-5514.

Notwithstanding those obvious inconsistencies, and despite the requirements of *Brady v. Maryland*, 373 U.S. 83 (1963), the precise details of the meeting are unknown. Although Deyhle's admissions about the October 2017 email contradicted the story he told just one month earlier, the government conspicuously took no notes. The government later admitted it decided to assume Deyhle's prior representations were mistakes and therefore did not press him on the inconsistencies. JA3281. Instead, the government once again prepared an outline to walk Deyhle through his expected new testimony given the email. JA3282. The government

added checkmarks to the outline, seemingly indicating that Deyhle had agreed to the contradictory version of events.

Two days later, the government and Deyhle had a final preparation session. JA3282. Again, the government took no notes and did not press Deyhle on his inconsistent statements—in fact, it did not even discuss the email proving Deyhle's prior story false. Instead, it appears the government used the session to confirm Deyhle's new testimony, presumably using another outline given the prosecutors' practice.

The government's discovery that its key witness had given false information to a grand jury would have materially aided Goldstein's defense. But neither that discovery nor the preparation sessions were revealed until Deyhle's cross-examination. On direct, the government asked Deyhle to review the October 2017 email and explain how he used it to prepare Goldstein's 2016 taxes. JA2897. On cross-examination, the defense questioned Deyhle about his changed story and Deyhle mentioned only that he reviewed the email in a single trial-preparation session with the government. JA3040.

Based on that information that Deyhle made undisclosed inconsistent statements in a preparation session, the defense sought relief under *Brady*. JA3069. The district court had already found that the government violated *Brady* by

suppressing exculpatory emails between the lead case agent and a partner at Deyhle's accounting firm. JA2071-2072.

When the defense sought *Brady* relief again, the government finally disclosed the other preparation sessions. JA3110-3113. But it insisted it took no notes and therefore had nothing to produce. It said "no one from [the] prosecution team asked or challenged Deyhle about his prior statements to the IRS or the grand jury" because it simply presumed his prior false testimony reflected his "best (if inaccurate) recollection." JA3281. The district court concluded there could be no *Brady* violation because the government took no notes. JA12-15. It therefore did not address the defense's impeachment-related arguments.

With Deyhle's original story debunked, the government developed a new willfulness theory: that Goldstein had $50 million in 2016 income from the games against Gores, Chairman, and Tango and designed his life to evade taxes on that income. JA4548-4549. To prove that income, the government relied on text messages Goldstein sent Gipson and Robl describing $50 million in gross winnings. JA1134-1135; JA4555. After introducing those messages, the government asked Deyhle and an IRS agent whether Goldstein ever disclosed that figure. JA2904; JA3254.

But Goldstein did not believe his *net* 2016 gambling income was anything close to $50 million. Although his gross winnings from the games against Gores,

Chairman, and Tango were substantial, Goldstein always believed that he owed significant shares of those winnings to investors, that he lost tens of millions of dollars in other games, and that the Tango winnings were not paid until 2017 and thus did not count as 2016 income.

Because the defense had focused on Deyhle's story about the Gores winnings and planned to principally argue the tax errors resulted from Deyhle's incompetence, it had to scramble to respond to the government's new theory. The defense determined the best way to establish Goldstein's beliefs about his 2016 income was to introduce his contemporaneous messages with Kids. JA3847. Because Goldstein had relied on those messages and the embedded ledger to track his wins, losses, and investor shares, the messages were powerful evidence of what he believed regarding his 2016 gambling income. In fact, because Phua, Kids, Chairman, and Tango were unavailable to testify, the messages were the *only* corroborating proof of Goldstein's beliefs.

The defense argued the messages "speak directly to Mr. Goldstein's state of mind" by demonstrating his "*belie[f]*" that Phua "had significant shares" in his games, JA3854, and his "state of mind" "as to his wins and losses," JA343-344. Although the government had used similar messages to prove willfulness, the district court excluded the messages as hearsay. JA349. When Goldstein testified, he used

the excluded messages to refresh his recollection and referenced the ledger, but he was unable to present any corroborating evidence. JA399-415.

The government's closing crystallized its new willfulness theory. Its first words were: "In 2016, Tom Goldstein won almost $50 million playing poker." JA4548. The government then stressed that "the main question in [jurors'] deliberations on the tax charges is whether [Goldstein] acted willfully." JA4551. And it repeatedly emphasized that Goldstein's desire to avoid paying taxes on gambling income he "secretly won" in Asia "motivated everything that Mr. Goldstein did from March 2016 through December 2022." JA4549; *see* JA4565. Indeed, the government said it would spend "the bulk of [its] time" in closing "talking about Count One," JA4552, and would address the other charges only briefly "[f]or expediency" because "all of this is motivated by his tax evasion in 2016," JA4576.

Throughout closing, the government also emphasized that jurors could not trust Goldstein's testimony because of his asserted lies. JA4552; JA4690. Its primary example was Goldstein's supposed "lie[s] to his accountants about the $50,000,000 2016 poker income." JA4690. The government even suggested Goldstein was lying about the existence of the ledger. JA4561. Recognizing that argument was improper, the court instructed jurors not to speculate about "why" the ledger was not admitted. JA614.

### 2. The government's pursuit of convictions under 18 U.S.C. § 2

Another central aspect of the trial is the government's aggressive pursuit of conviction on an accessory liability theory under 18 U.S.C. § 2 across all counts. Section 2 covers two forms of accessory liability. The text of section 2(a)—aiding-and-abetting liability—provides that "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." *Id*. § 2(a). But Section 2(a) also has non-textual elements: it requires finding another guilty principal, that the defendant shared the principal's intent, and that the defendant committed an affirmative act. *See United States v. Horton*, 921 F.2d 540, 543-44 (4th Cir. 1990); *United States v. Winstead*, 708 F.2d 925, 927 (4th Cir. 1983); *Odum*, 65 F.4th at 721-22. In turn, the text of Section 2(b)—cause liability—provides that "[w]hoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States," is likewise "punishable as a principal." 18 U.S.C. § 2(b). To convict, the jury must find "the defendant had the *mens rea* required by the underlying statute." *United States v. Gumbs*, 283 F.3d 128, 135 (3d Cir. 2002).

Before trial, the government proposed preliminary jury instructions, which included instructions on Section 2 liability. JA804. For each category of offense, the preliminary instructions specified Goldstein was charged with both the substantive offense and accessory liability under Section 2. JA1022-1023; JA1027;

JA1029-1030; JA1033. The instructions referenced or quoted Section 2 seven times total.

In keeping with those instructions, the government repeatedly stressed the role that third parties played in Goldstein's alleged crimes. In its opening statement, the government highlighted the involvement of Goldstein's accountants, office assistants, and wife in the charged conduct. JA1047-1054. Over the next six weeks of trial, the government built out its Section 2 case. On the tax charges, the government highlighted Phua's general role, questioned Deyhle about his role in preparing Goldstein's tax returns, and elicited testimony from the firm's office assistants about their role classifying transactions as personal or business expenses. JA1737-1740; JA2879-2880; JA2902-2903; JA2929-2930; JA3240. And on Count 15, the government abandoned its attempt to convict Goldstein directly of mortgage fraud after he demonstrated that he did not transmit the false statements from Maryland because travel records prepared and introduced by the government established he was in the Virgin Islands when the relevant application was submitted. JA5849; JA4083-4084. Instead, the government put on a rebuttal case advancing what the Court later recognized was a "new theory": that Goldstein was guilty under Section 2 of causing his wife to submit the false applications from Maryland. JA545-546.

At the charge conference, the government vigorously argued that it should be permitted to pursue conviction under Section 2 for every charge. The government stressed evidence that Goldstein reported gambling income "through his accountant," JA4454-4455, and that "other people, including firm managers, helped him with these crimes." JA4455. As to the mortgage charges, the government emphasized that Goldstein was "submitting these applications with someone else; namely, his wife." JA4483.

The district court agreed the government had presented sufficient evidence to pursue a Section 2(a) theory of aiding-and-abetting liability, JA4455-4456, but agreed with the defense that a standalone instruction specifying its elements was "needed," JA4492-4493. Critically, that instruction limited the jury to Section 2(a) and excluded Section 2(b) cause liability as a path to conviction by making clear the jury had to find the elements of Section 2(a) to convict under Section 2. *See* JA4591-4592; JA4707-4708.

During closing arguments, however, the government realized it needed Section 2(b) to be available under the instructions to secure a conviction on Count 15. In both its initial and rebuttal closing, the government argued a Section 2(b) theory that although Goldstein was concededly in the Virgin Islands when the application was submitted, he caused his wife to submit that application from Maryland. JA4590; JA4706-4707. The defense objected, arguing the jury

instructions precluded the government from pursuing a cause theory. JA4591-4592. The district court stopped the government from arguing that theory further to jurors. JA4592-4593.

So the night after closing arguments, the prosecution sought to get Section 2(b) back into the case. The government sent an email to defense counsel asserting that "this is a § 2(b) case (in addition to (a))," and proposing an amendment including instructions on the elements of both Section 2(a) *and* 2(b). JA4743. When defense counsel did not consent, the government filed a motion asking the court to delete the instructions on Section 2(a)'s elements while retaining all other Section 2 language. JA4740.

The government explained that the purpose of this post-closing request was to eliminate the instruction limiting the jury to applying only Section 2(a) so that the instructions would also be "[]*appropriate* for cases involving violations of subsection (b)." JA4740; *see* JA552 (government stating "the reality is that both sections are charged. That's already in part of the jury instructions"). The government insisted that simply reading Section 2's statutory text would suffice to instruct the jury on both Section 2 theories, stating "there is language specifically quoting Section 2(a) and (b)," "[s]o that is already in the instructions" and "sufficiently clear." JA539; JA550. When the defense objected that the government wants to "tell the jury they can convict Mr. Goldstein of aiding and abetting and then

remove the instruction explaining to them what they would have to find to do that," JA537, the government did not disavow seeking a conviction under Section 2. Instead, the government argued the language describing Section 2(a)'s elements "should come out, and the other aiding and abetting language should stay in," JA537, reiterating that "[i]t's already cited in the instructions, and so there is no reason to have a separate standalone" describing the elements. JA539.

After initially rejecting the government's request, the district court agreed and deleted the instruction on Section 2(a)'s elements, while leaving in place the remaining language inviting conviction under Section 2. The court explained that "[t]he other language [on aiding-and-abetting liability] is in there," JA555, echoing the government's view that the language needed to convict under Section 2 was "already in the instructions," JA539. As a result, the instructions permitted jurors to convict under Section 2(a) and 2(b) without specifying the elements of accessory liability. The court denied the defense's request to remove the Section 2 language entirely. JA536-537.

#### 3. The verdict and post-trial proceedings

After more than two days of deliberations, the jury returned a mixed verdict, acquitting Goldstein on four counts of assisting the preparation of a false and fraudulent tax return—Counts 2, 4, 5, and 6—and convicting him on the remaining twelve counts. JA4774-4777.

Goldstein subsequently moved for a new trial. Among other things, he argued the erroneous accessory liability instruction violated due process and Rule 30(b), which prohibits amending jury instructions after closing arguments. JA4869. He also argued the erroneous exclusion of the messages with Kids required a new trial. JA4902.

In its opposition, the government reversed its position on the accessory liability instructions. Rather than defend its prior assertions that Section 2's statutory text was "sufficiently clear" to instruct on accessory liability, the government claimed the instructions "*did not* permit the jury to convict under *any* § 2 theory" at all. JA4947. Worse yet, the government misrepresented its prior position, claiming it never sought "to convict Goldstein under [a Section 2(a)] theory," JA4947—even though it argued the opposite at the charge conference, contended "this is a § 2(b) case (in addition to (a))" after closing arguments, and fought to keep language in the instructions on both Section 2(a) and 2(b) for the purpose of presenting both theories to the jury, JA4743. As for the excluded messages, the government maintained they were inadmissible hearsay. JA4983.

The district court denied Goldstein's new-trial motion. On Section 2, it acknowledged the government's position had "shifted," but endorsed the government's post-hoc theory that the seven references to Section 2 in the instructions did not permit the jury to convict on accessory liability. JA5167-5168.

On Rule 30(b), the court acknowledged the post-closing deletion of Section 2's elements "violat[ed]" Rule 30(b), JA5169, but the court deemed the error harmless. Finally, on the exclusion of the messages, the court found any error harmless. JA5172.

The district court sentenced Goldstein to 72 months' imprisonment, JA681, and this appeal followed.

## SUMMARY OF ARGUMENT

The district court committed multiple errors that crippled Goldstein's defense. Each independently requires a new trial.

I. The government violated *Brady* a second time by failing to disclose the occurrence of or details about trial-preparation sessions where its lead witness, Walter Deyhle, made inconsistent statements. At the first session, Deyhle's statements tracked his previous story that Goldstein never provided his 2016 gambling income in writing. But at the second and third sessions, Deyhle admitted he received and relied on an email where Goldstein provided his 2016 gambling income. The government subsequently acknowledged it used outlines to walk Deyhle through the testimony it expected him to give and made checkmarks that presumably indicated his agreement. The government's suppression of that evidence violated *Brady*.

A. That evidence was "suppressed" because it did not come to light until Deyhle testified—and even then, it was only partially disclosed. *United States v. George*, 95 F.4th 200, 209 (4th Cir. 2024). The government's failure to take notes does not absolve it of its *Brady* obligations. And in any event, the government's outlines used to walk Deyhle through fundamentally inconsistent stories—his original story on December 28 and a contradicting version on January 28 and 30—needed to be disclosed.

B. The suppressed evidence was favorable to Goldstein. It was exculpatory because it confirmed that Goldstein was innocent under the government's lead theory. And the evidence was impeaching because the defense could have used it to discredit Deyhle's testimony—and the rest of the government's evidence—in three ways. First, the defense would have argued that Deyhle's inconsistencies undermined his credibility. Second, the defense would have used the evidence to argue that Deyhle wanted to avoid prosecution and so would testify to anything the government wanted. Third, the defense would have used the evidence to show the government's investigation was inadequate.

C. The suppressed evidence was material. It confirmed Goldstein's innocence under the government's lead theory. Moreover, the evidence would have seriously undermined Deyhle's credibility. Deyhle's testimony was the most important part of the government's case. He not only supplied the government's

central theory, but also testified that Goldstein understood his tax obligations. Any evidence that would have led the jury to doubt Deyhle could have affected the trial's outcome.

II. The district court wrongly excluded Goldstein's messages with Kids, which contained state-of-mind evidence critical to rebut the government's overarching willfulness theory.

A. The messages were not hearsay because they were offered to prove Goldstein's "state of mind" regarding his 2016 income. *United States v. Gallagher*, 90 F.4th 182, 195 (4th Cir. 2024) (citation omitted). The government asserted that Goldstein's desire to evade taxes on $50 million in income motivated all the alleged tax crimes. The excluded messages were essential to establish Goldstein's contemporaneous belief that his 2016 income was nowhere close to $50 million.

B. The government cannot show the error was harmless under this Court's three-factor test that considers "(1) the centrality of the issue affected by the error; (2) the steps taken to mitigate the effects of the error; and (3) the closeness of the case." *United States v. Ibisevic*, 675 F.3d 342, 350 (4th Cir. 2012) (citation omitted).

The first factor favors Goldstein because the excluded evidence went to "the central issue in the case, *i.e.*, [Goldstein's] intent." *Id.* at 350. Indeed, the messages directly rebutted the government's overarching willfulness argument about Goldstein's 2016 income.

The second factor favors Goldstein because the court did not "acknowledge any existence of an error" and therefore "took no steps to mitigate [its] effects." *Id.* at 351. Additionally, the government exacerbated the error by making improper remarks about Goldstein's lack of corroborating evidence.

The third factor favors Goldstein because the government offered no "direct evidence" on the central issue of intent. *Id.* at 353-54. Moreover, the "split verdict indicates the case was close." *United States v. Brizuela*, 962 F.3d 784, 799 (4th Cir. 2020).

III. The district court committed two related instructional errors that deprived Goldstein of due process.

A. First, the district court erroneously authorized conviction under Section 2 without instructing on its elements. In *United States v. Odum*, 65 F.4th 714 (4th Cir. 2023), this Court held the district court erred by "'read[ing] directly from' 18 U.S.C. § 2" without instructing on its elements. *Id.* at 720. That is precisely what happened here.

After the verdict, the government reversed its prior position and argued the instructions did not permit conviction under Section 2. But basic interpretive principles refute that position. The instructions told the jurors their role was to "find Mr. Goldstein guilty or not guilty" as to the "offenses charged"; stated Goldstein was "charged" with Section 2 liability for every offense; repeatedly quoted Section

2's text in full; and repeatedly described Section 2's text as "pertinent." The jury received those instructions after the government stressed the involvement of third parties in the alleged offenses and put on a rebuttal case directed at Section 2. And the conviction on Count 15 must have rested on Section 2, which provided the only basis to find venue for that charge. A "reasonable likelihood" exists that a "reasonable juror" would have understood the instructions to permit conviction under Section 2, *Boyde v. California*, 494 U.S. 370, 380 (1990)—indeed, the government itself understood the instructions that way until its post-trial about-face.

B. The district court violated Rule 30(b) by changing the instructions after closing arguments to omit Section 2(a)'s elements. That error caused prejudice: Defense counsel would have changed his closing by arguing that to convict under Section 2, jurors must find each of the elements the court deleted from the instructions.

## **STANDARD OF REVIEW**

A district court's failure to recognize a *Brady* violation is a "legal error" that this Court reviews "de novo." *George*, 95 F.4th at 208 (citation omitted). In turn, evidentiary and instructional rulings are reviewed for "abuse of discretion," which occurs when the district court "commits an error of law." *Gallagher*, 90 F.4th at 195 (citation omitted); *see United States v. Passaro*, 577 F.3d 207, 221 (4th Cir. 2009).

## ARGUMENT

### I. THE GOVERNMENT'S SECOND *BRADY* VIOLATION REQUIRES A NEW TRIAL

This case involves a blatant *Brady* violation. The government suppressed evidence that its lead witness, Walter Deyhle, reversed his story midway through trial—including between trial preparation sessions held just weeks apart. The government had an obligation to record and disclose the details of those sessions, as well as to produce the outlines used in those sessions, with checkmarks seemingly indicating Deyhle's agreement with inconsistent narratives.

This second *Brady* violation was willful. Indeed, the government's own filings suggest it intentionally sought to avoid soliciting exculpatory or impeaching statements from Deyhle. The government's discovery that its core theory was based on a false statement by its lead witness should have prompted the government to confront that witness, explore the falsity of his prior statements, and document his explanation. Indeed, one of the government's case agents acknowledged it is "important" to create records in such situations. JA3318-3319. But the government here did the opposite—it "presum[ed]" Deyhle made a mistake, decided not to "challenge[] Deyhle about his prior statements," and directed the case agent to take notes only if Deyhle said something "substantially different from prior statements." JA3281-3282. Instead, prosecutors simply prepared an outline of the changed testimony it expected Deyhle to give. JA3282.

Despite these efforts to avoid creating a record, the government violated *Brady v. Maryland*, 373 U.S. 83 (1963). Under *Brady*, prosecutors must "disclose exculpatory evidence" and "evidence that would be useful to impeach government witnesses." *Moore v. Maryland*, 163 F.4th 828, 840 (4th Cir. 2026). To prevail on a *Brady* claim, a defendant must prove that (1) prosecutors suppressed evidence; (2) the evidence was favorable; and (3) "the evidence was material, such that it may have impacted the outcome of the case." *Id.*

Goldstein's *Brady* claim satisfies each element. The government suppressed evidence from trial-preparation sessions in which Deyhle made inconsistent statements about the core narrative that led to Goldstein's prosecution. That evidence was favorable because it would have confirmed that the government's lead theory was false and allowed the defense to impeach Deyhle. And the evidence was material because Deyhle was the government's central witness on willfulness. The appropriate remedy for this blatant violation is a new trial with certain conditions.

### A. The Government Suppressed Evidence About The Deyhle Preparation Sessions

"Evidence disclosed after a trial commences is 'suppressed' for *Brady* purposes if the prosecution's delay prevented the defendant from 'using the disclosed material effectively in preparing and presenting [his] case.'" *Moore*, 163 F.4th at 840 (citation omitted). Accordingly, this Court has held that evidence disclosed for the first time during a witness's examination is "suppressed" for

purposes of *Brady*. In *George*, the government's key witness stated in a pre-trial interview that two other people had been in the back seat of the car. 95 F.4th at 202-03. But "two weeks before trial," the government re-interviewed the witness, who identified different passengers. *Id.* at 203. The government did not disclose the new story, so the defense did not learn it until the witness testified. *See id.* at 208-09. This Court held that the "inconsistent statement" was suppressed under *Brady*. *Id.*

By the same logic, the government here suppressed evidence related to the trial-preparation sessions where Deyhle told a new story about the October 2017 email. Until trial, Deyhle maintained that Goldstein avoided providing information in writing, never disclosed his gross winnings from the Gores games, and never provided information about investor payouts. *Supra* at 8-9. Deyhle repeated that story in the December 28 preparation session—indeed, the government walked Deyhle through an outline of his expected testimony that reflected that story and added checkmarks, presumably indicating Deyhle's agreement with particular points. JA3110; JA3278.

But after reviewing the October 2017 email mid-trial, the government realized Deyhle's story was false. It immediately scheduled a preparation session on January 28 where it showed Deyhle the email and confirmed he used it to calculate Goldstein's 2016 taxes. JA3280-3281. The government again relied on an outline to walk Deyhle through the testimony it expected from him, which necessarily had

to change given the email. JA3282. And the outline again included "checkmarks," seemingly indicating Deyhle agreed with points as the government prepared him. JA3282. Two days later, the government held a third session, again confirming Deyhle's agreement with the new narrative. JA3282. Prior to these sessions, the government had disclosed transcripts of Deyhle's pre-indictment interviews and grand jury testimony—but it changed course and did not disclose the occurrence of these sessions or the outlines used to walk Deyhle through the two conflicting narratives.

Thus, as in *George*, the government did not timely "disclose [Deyhle's] inconsistent statement," the meetings, or the outlines—"[i]nstead, [Goldstein] was ambushed" at trial. 95 F.4th at 209. Goldstein did not learn about Deyhle's new story until direct examination and did not learn about the first and second preparation sessions until "cross examination." *Id.* at 204, 209. He did not learn about the third session or the outlines until after Deyhle's testimony. JA3282. All this evidence was therefore "suppressed" under *Brady*. To this day, the government still has not disclosed specific details about the Deyhle preparation sessions—including the outlines or what Deyhle said upon learning the government had discovered the October 2017 email, beyond his acknowledgment that he used it.

The district court rejected the *Brady* claim on the theory that there was no evidence to suppress. The government claimed it took no notes because Deyhle

made no "exculpatory statements," and that it did not "challenge[]" him because it presumed his prior testimony reflected his "best (if inaccurate) recollection." JA3281-3284. Relying on that representation, the court denied relief. JA12-15.

That ruling violates settled law: the government's failure to take notes does not excuse noncompliance with *Brady*. Its "obligation to disclose" "material information that impeaches its witness or exculpates the defendant" exists "without regard to whether that information has been recorded in tangible form." *United States v. Rodriguez*, 496 F.3d 221, 226 (2d Cir. 2007). When it possesses such information, "it does not avoid the obligation under *Brady*/*Giglio* to disclose the information by not writing it down." *Id.* at 222. Moreover, this Court has stressed that "the prosecution should err on the side of disclosure." *Juniper v. Davis*, 74 F.4th 196, 254 (4th Cir. 2023) (citation omitted). That is "because the significance of an item of evidence can seldom be predicted accurately until the entire record is complete." *United States v. Agurs*, 427 U.S. 97, 108 (1976).

Here, the government should have disclosed several pieces of evidence regardless of whether it took notes. First, it should have disclosed that the preparation sessions occurred and their purpose—to ask Deyhle about the October 2017 email that contradicted his prior statements. Second, it should have disclosed Deyhle's admission that he received and used the email. Even if Deyhle said nothing further, he necessarily confirmed receipt and use when the government "informed

him that [it] had identified [the] emails" and "walked Deyhle through" a "math demonstration" of how he calculated Goldstein's taxes using the email. JA3281.

As explained below, the occurrence of the meetings and Deyhle's admissions were exculpatory and impeaching. *Infra* at 35-41. Deyhle's statements would have been the death knell for the government's theory that Goldstein hid his winnings from the Gores games from Deyhle. More broadly, Deyhle's statements would have been critical impeachment evidence because they contradicted nine prior statements that he made to the government and the grand jury (including in the December 28 preparation session just weeks before). Specifically, Deyhle's admission that he received the email contradicted the following prior representations:

- Goldstein only provided information about his winnings "verbally," JA5513-5514;
- Goldstein wanted to avoid providing information in writing, JA5512;
- Goldstein did not provide any information about his gambling winnings to Deyhle after January 2017, JA5514; and
- Goldstein never responded to requests for documentation from Deyhle. JA5534-5535.

In turn, Deyhle's admission that he used the email to prepare Goldstein's tax returns contradicted the following prior representations:

- Goldstein provided the incorrect gambling winnings figure used on the 2016 tax return, JA5496;

- Goldstein provided the incorrect gambling loss figure used on the 2016 tax return, JA5496;

- Goldstein never provided his gross gambling winnings, JA5534-5535;

- Goldstein acknowledged only $1.6 million in net gambling winnings in 2016, JA5511-5512; and

- Goldstein never specified whether the Gores winnings included shares owed to investors. JA5534-5535.

Accordingly, Deyhle's admissions had to be disclosed regardless of whether the government took notes.

The district court's contrary holding would gut *Brady* with respect to pretrial witness statements. If the government can avoid its disclosure obligations by not taking notes on anything that does not directly aid its narrative, then it would never need to disclose pretrial witness statements. And if the government can limit its disclosure obligations by taking notes only on statements it deems directly exculpatory, then it would never need to disclose many kinds of impeachment evidence.

In any event, the government's representation that it withheld no written evidence was incorrect. There was a written record of the preparation sessions: the prosecutors' outlines of Deyhle's anticipated testimony. JA3110; JA3282. Those outlines were (partial) written records of the sessions because they included checkmarks that the prosecutors presumably added to indicate that Deyhle agreed

with the content they prepared. Because the outlines documented that Deyhle made inconsistent statements just weeks apart, those outlines were critical impeachment evidence and had to be disclosed. *Infra* at 37-39. Just as the government cannot evade *Brady* by writing nothing down, it cannot accomplish the same result by preparing a document that outlines its preferred version of the witness's testimony and asking him to agree. The fact that the government did not write down "Deyhle agreed" does not negate its *Brady* obligations.

Beyond the evidence Goldstein has identified, the government likely suppressed other statements Deyhle made because it adopted a rigid approach to evaluating whether his statements were impeaching. Specifically, it directed the case agent to record only statements "that were substantially different from prior statements." JA3282. This was a significant departure from the approach the government took with other witnesses, whose preparation sessions in December 2025 resulted in detailed memoranda that were disclosed. The government's contrary approach to the Deyhle preparation sessions suggests it knew Deyhle's statements could damage its case irreparably.

### B. The Evidence Was Favorable To Goldstein

Even accepting the government's representations, it suppressed at least four pieces of favorable evidence: (1) the occurrence of the Deyhle preparations sessions and their purpose; (2) outlines from the sessions; (3) Deyhle's admission that he

received the October 2017 email; and (4) Deyhle's admission that he used the October 2017 email to calculate Goldstein's 2016 taxes. This evidence was exculpatory because it confirmed that Goldstein was innocent under the government's lead theory—that Goldstein hid the Gores winnings from Deyhle.

More broadly, the defense would have used the suppressed evidence to impeach Deyhle. Throughout trial, the defense argued that Deyhle could not be trusted because he had an incentive to protect himself and was incompetent. For instance, the defense highlighted Deyhle's false statement that Goldstein never informed him about the Montenegro bank account. JA3129-3130. And an expert testified at length that Deyhle's performance was plainly inadequate. JA3446. The defense would have used the evidence to further discredit Deyhle's testimony and the government's case in at least three ways.

1. To start, the defense would have emphasized that Deyhle's original story—which led to the indictment and formed the basis for the government's core theory—changed significantly. This Court has held that if a witness changes his story in any way in a "trial preparation interview," the new story is an "inconsistent statement" that impeaches credibility. *George*, 95 F.4th at 208-09. The same logic applies to Deyhle's statements. Deyhle repeatedly stated before trial that Goldstein never shared his gross winnings from Gores in writing—including at the December 28 preparation session—and made numerous other claims about Goldstein's conduct

with respect to his 2016 gambling income. *Supra* at 8-11. But Deyhle's admissions at the January 28 and 30 preparation sessions contradicted *nine* of those claims. *Supra* at 33. Those "inconsistent statement[s]" undoubtedly were "impeaching." *George*, 95 F.4th at 208-09 (citation omitted). If the jury was aware of Deyhle's admissions, it would have recognized that Deyhle's prior false statements—*e.g.*, that he repeatedly sought information from Goldstein and Goldstein did not respond—were intended to create a false impression that Deyhle was a competent accountant.

Moreover, the suppressed evidence of multiple preparation sessions would have allowed the defense to demonstrate that Deyhle testified falsely at trial. Deyhle represented that he attended only one trial preparation session and immediately recognized there that he prepared the 2016 tax return using the October 2017 email. JA3065-3066. But just weeks prior, Deyhle told a different story in the December 28 preparation session. JA3278. Had jurors known of this close-in-time inconsistency and Deyhle's efforts to elide it, they would have been skeptical of all his testimony.

The government insisted that Deyhle's admissions in the January preparation sessions were not inconsistent because the October 2017 emails "*substantiated* the numbers Deyhle ultimately reported on Goldstein's 2016 tax return." JA3281. That argument willfully misses the point. Deyhle's admissions were inconsistent with his prior statements not because they contradicted the numbers in the returns, but

because they contradicted Deyhle's prior statements that Goldstein never reported those numbers.

2. The defense would have further used the suppressed evidence to establish Deyhle's bias toward the government. It is well-established that "an effective showing of bias held by a witness" diminishes his credibility. *United States v. Parker*, 790 F.3d 550, 559 (4th Cir. 2015). And one way to "demonstrate" an individual's "potential bias in testifying as a government witness" is to show he faced potential liability under federal law. *Id.* at 558.

If the defense had known about Deyhle's changed story at the January 28 preparation session, it would have bolstered the argument that Deyhle was biased because he wanted to avoid prosecution and save his accounting firm from serious professional consequences. The government's investigation originally targeted Deyhle and he faced significant liability after the government discovered he urged Goldstein to create a secret bank account to avoid IRS collection activities (which Goldstein declined to do). JA3057; JA5497. Deyhle's accounting firm had also performed well below accepted professional standards—for example, failing to disclose the Montenegro account, JA3131, and faced liability if the government determined it committed wrongdoing. JA3454. The defense argued that Deyhle's testimony was not credible given his interest in avoiding these consequences. JA4601-4602. Evidence of the January 28 session would have reinforced that

argument by showing Deyhle knew the government had unequivocal proof he had given false sworn testimony to the grand jury. The defense could have argued that Deyhle "was influenced by a desire to receive favorable treatment from the government." *Parker*, 790 F.3d at 561.

Disclosure of the government's outlines would have further strengthened the defense's argument by showing that Deyhle simply repeated testimony the government prepared for him. At trial, the government used the October 2017 email to walk Deyhle through how he prepared Goldstein's 2016 returns—a routine that came straight from the January 28 session. JA2897. Specifically, the government admitted it "walked Deyhle through a similar math demonstration as the one used on direct examination," relying on an "outline" with "checkmarks" to ensure he hit the right points. JA3281. Presumably, that outline even contained the same math error that Deyhle was forced to acknowledge on cross-examination. JA3089-3091. Had the defense received the January 28 outline, it would have used it to argue that Deyhle would have testified to anything the government asked. And had the defense received the December 28 outline, which the government used to walk Deyhle through a *conflicting* version of his testimony, the defense's argument would have been even stronger.

3. The suppressed evidence also casts doubt on the legitimacy of the government's investigation. As the Supreme Court's *Brady* cases teach, evidence

that undermines "the thoroughness" of "the [government's] investigation" can be used to impeach the government's case. *Kyles v. Whitley*, 514 U.S. 419, 445 (1995). In *Kyles*, the Court concluded that disclosure of a witness's inconsistent statements to the police "would have revealed a remarkably uncritical attitude on the part of the police." *Id.* at 445-46. And if the defendant possessed those statements, he could have "attacked the reliability of the investigation" and undermined the government's case. *Id.*

Here, the defense could have used the January 2026 preparation sessions to reinforce its argument that the government's investigation was incompetent. By pursuing a theory of guilt that was easily falsified by the October 2017 email, the government had already demonstrated that its investigative process had broken down. The government evidently failed to take basic steps that would have confirmed that theory was false, such as subpoenaing the accountants' emails with Goldstein or reviewing the communications Goldstein produced. Disclosure of the preparation sessions would have cast further doubt on "the thoroughness and even the good faith of the [government's] investigation" by showing the government failed to review the defense's exhibits before trial. *Kyles*, 514 U.S. at 445-46. Had the defense been aware of that fact, it would have "attacked the reliability of the investigation." *Id.*

Moreover, evidence about the government's approach to the Deyhle sessions would have confirmed its witnesses were unreliable. The government admitted that "no one from prosecution team asked or challenged Deyhle about his prior statements." JA3281. Disclosing that fact "would have revealed a remarkably uncritical attitude on the part of the" government, and the defense would have argued the government's case was likely "replete with inconsistencies" it "never even bothered to check." *Kyles*, 514 U.S. at 445, 450.

Finally, the defense would have emphasized that this was the government's second *Brady* violation. Earlier in the trial, the district court found that the government violated *Brady* by failing to disclose emails in which the lead case agent asked an accountant at Deyhle's firm whether he had evidence Goldstein was responsible for mischaracterizing personal expenditures as business expenditures (he did not). JA2071-2072. Because the exchange took place through personal emails instead of formal subpoenas, the first *Brady* violation demonstrated that the government and the accountants were collaborating closely and that the government was taking a casual approach to scrutinizing the accountants. JA2058-2059. Thus, the defense would have argued that the government's multiple *Brady* violations meant that it could not be trusted to give an honest account of the evidence. In other words, the government's suppression of *additional* evidence "could have been used to cap an attack on the integrity of the investigation." *Kyles*, 514 U.S. at 449.

### C. The Evidence Was Material

"Suppressed evidence 'is "material" under *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceedings would have been different." *Moore*, 163 F.4th at 842. And "where 'the question of guilt or innocence essentially involved a credibility determination between' the defendant and a witness, 'evidence that seriously undermined [the witness's] credibility must be considered material." *George*, 95 F.4th at 209. Thus, a witness's "prior inconsistent statement relating to the central issue that the jury was required to decide" is "material." *Spicer v. Roxbury Corr. Inst.*, 194 F.3d 547, 561 (4th Cir. 1999).

The suppressed evidence was material because it confirmed Goldstein's innocence under the government's lead theory. It was also material because Deyhle's credibility was key to the government's case. Indeed, Deyhle's importance cannot be overstated. The government interviewed him four times before his grand-jury testimony and conducted three trial-preparation sessions. *Supra* at 8-12. And Deyhle supplied the government's most important evidence across every tax charge. *Supra* at 11. The government used his story about the Gores winnings to press an overarching theory of willfulness, and although the October 2017 email undermined that theory, at least one juror may have relied on it. Additionally, every tax charge relied on Deyhle's testimony that he had informed Goldstein of his tax obligations.

Thus, a central question for the jury was whether to believe Goldstein or instead Deyhle, and any evidence that would have "seriously undermined [Deyhle's] credibility must be considered material.'" *George*, 95 F.4th at 209 (citation omitted). Throughout trial, the government presented Deyhle and his accounting firm as neutral victims of Goldstein's supposed scheming. In turn, the core of Goldstein's defense was that the mistakes Goldstein made in reporting his taxes resulted from Deyhle's bad advice—not from any willful scheme. For instance, Deyhle had told Goldstein he would not be breaking the law if he paid his taxes late with penalties and interest. JA5843; JA3156-3157. Similarly, Deyhle had told Goldstein that he would not be breaking the law if he only reported his net gambling income. JA5469; JA3074. Accordingly, as in every tax prosecution that turns on the defendant's willfulness, the tax preparer's credibility was a central issue. And as discussed, Deyhle's inconsistent statements—along with the outlines and other details about the preparation sessions—were devastating impeachment evidence. *Supra* at 36-41.

Indeed, the government's suppression of evidence from the preparation sessions—in particular, the outline from the December 28 preparation session—materially impeded Goldstein's ability to cross-examine Deyhle. Going into the cross-examination, the defense expected that Deyhle would be caught off guard by questions about the October 2017 email. Instead, when the defense asked Deyhle whether the October 2017 email was inconsistent with his prior statements, he

professed not to remember those prior statements, stating they had occurred years ago. *See, e.g.*, JA3040 ("don't recall" inconsistencies); JA3044 ("don't recall" saying Goldstein never provided the "gross [gambling] number"); JA3045 ("don't recall" saying Goldstein did not provide investors' shares); JA3061 ("don't recall" making untrue statements to the grand jury). The defense had no ready means to rebut Deyhle's claim that his memory had faded. But if the government had disclosed the trial preparation sessions, the defense could have argued that Deyhle's purported ignorance of his past statements was false. In particular, if the defense had the outline from the December 28 session where Deyhle apparently *reaffirmed* his prior statements, it would have pointed out that Deyhle's feigned ignorance was implausible. Because that evidence was disclosed so late and the outline was never disclosed at all, the defense could not make "effective" use of it during the cross-examination. *George*, 95 F.4th at 210. The government's suppression of those "prior inconsistent statement[s] relating to the central issue" therefore had a "material" impact. *Spicer*, 194 F.3d at 561.

The fact that the defense had other limited opportunities to impeach Deyhle does not require a different conclusion. Even if a witness's "credibility" is "already impugned," evidence "further diminish[ing]" his credibility is material. *Wearry v. Cain*, 577 U.S. 385, 393 (2016). Indeed, courts have held that specific evidence of a witness's "prior inconsistent statement" is material even where a witness has

already been impeached. *Spicer*, 194 F.3d at 561; *see United States v. Service Deli Inc.*, 151 F.3d 938, 943-44 (9th Cir. 1998). In *Spicer*, this Court concluded that such a statement would be "a far more serious blow to the prosecution's case" than other impeachment evidence the defense had presented, *e.g.*, evidence the witness's "testimony resulted from a plea bargain." 194 F.3d at 561. Similarly, in *Service Deli*, the Ninth Circuit rejected the government's argument that a suppressed witness interview—which would have allowed the defense to question the key witness about "conflicting" statements and his "motivation to testify"—was not material because "each of these areas of impeachment was in fact brought out by [the defense] at trial." 151 F.3d at 943-44. Because the "most damning impeachment evidence" was "withheld," prior impeachment attempts did not render that evidence immaterial. *Id.*

That logic applies here. Although the defense impeached Deyhle in several ways, it did not have one piece of evidence that tied the various threads together. But if the defense had known about Deyhle's inconsistent statements at the preparation sessions before he testified, it could have used that evidence to simultaneously lay bare Deyhle's inconsistent statements, his incentive to curry favor, and the government's flawed investigation. Accordingly, that evidence was material because it would have dealt a "far more serious blow to the prosecution's case" than any evidence the defense used to attack particular aspects of Deyhle's story. *Spicer*, 194 F.3d at 561. It was the "most damning impeachment evidence"

possible and its exclusion affected the outcome of the trial. *Service Deli*, 151 F.3d at 943-44.

### D. The Correct Remedy Is A New Trial Subject To Certain Conditions

A new trial is the minimum remedy for the government's second *Brady* violation. *See Monroe v. Angelone*, 323 F.3d 286, 316-17 (4th Cir. 2003) (collecting cases). "But when a new trial alone does not cure the prejudice, more is required": the "new trial may require striking evidence, a special jury instruction, or other additional curative measures tailored to address persistent prejudice." *United States v. Pasha*, 797 F.3d 1122, 1138-39 (D.C. Cir. 2015).

Here, the government's *Brady* violation will cause persistent prejudice unless this Court orders several conditions at a new trial. First, the government must provide a detailed summary of each preparatory meeting with Deyhle. Second, the defense must have additional latitude to cross-examine Deyhle and the case agents who participated in the preparatory meetings. Third, the district court must instruct the jury that the government violated its *Brady* obligations twice.

## II. THE ERRONEOUS EXCLUSION OF GOLDSTEIN'S TEXT MESSAGES REQUIRES A NEW TRIAL

After the government's original theory about the Gores winnings was proven false, the government pivoted to a different core theory that Goldstein made $50 million in 2016 and willfully underreported that income. *Supra* at 14-16. The government advanced an overarching willfulness claim: Goldstein's desire to avoid

paying taxes on his 2016 income "motivated everything [he] did from March 2016 through December 2022." JA4549.

In response, Goldstein offered contemporaneous text messages showing he did not believe he made anything close to $50 million, which he believed represented his gross winnings from three sets of games—not his 2016 net income. Because Goldstein offered the messages to prove his state of mind, they were not impermissible hearsay. And excluding the messages was not harmless.

### A. The District Court Incorrectly Excluded The Messages

The rule excluding hearsay does not apply to a statement that "tend[s] to prove state of mind." 2 McCormick on Evidence § 274 (8th ed.). Because the hearsay rule applies only to a "statement offered '*to prove the truth of the matter asserted in the statement*,'" a statement "is not hearsay and may not be excluded on that basis" if it is offered to establish the defendant's "state of mind" or beliefs. *Gallagher*, 90 F.4th at 195 (citation omitted). Indeed, Rule 803(3) expressly provides that "[a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan)" is "not excluded" by the hearsay rule. Fed. R. Evid. 803(3).

Accordingly, this Court has repeatedly reversed district courts for excluding state-of-mind evidence as hearsay. *E.g.*, *Gallagher*, 90 F.4th at 195-96; *Ibisevic*, 675 F.3d at 349-50; *United States v. Leake*, 642 F.2d 715, 720-21 (4th Cir. 1981). For instance, *Gallagher* held the district court erroneously excluded "seemingly

loving" messages between defendants who allegedly "conspire[ed] to fraudulently obtain U.S. citizenship" for a noncitizen husband after their "marriage was over." 90 F.4th at 187, 195. This Court held the messages could not be excluded as hearsay because they were not offered to prove the "[wife] truly loved [the husband]," but instead to show "what [he] could have believed about the state of the marriage." *Id.* at 195-96.

Under those principles, Goldstein's texts with Kids could not be excluded as hearsay because Goldstein offered them to rebut the government's theory of willfulness. The government presented no direct count-by-count proof of willfulness, instead arguing an overarching theory that the jury could infer willfulness for every tax charge based on Goldstein's desire to hide his 2016 income. *See* JA4565 ("[E]verything that happens is motivated by Mr. Goldstein's decision to cheat on his taxes in 2016."). To establish both Goldstein's tax debt and his willfulness, the government introduced texts in which Goldstein conveyed he won $50 million in the games against Chairman, Gores, and Tango. JA1134-1135. Following its playbook in criminal tax cases, the government argued those messages established both that Goldstein's 2016 gambling income was $50 million *and* that Goldstein willfully underreported that income. *See United States v. Jinwright*, 683 F.3d 471, 476 (4th Cir. 2012) ("To establish that defendants knowingly understated their taxable income, the government introduced evidence of unreported income.").

To rebut that willfulness theory, the defense offered Goldstein's messages with Kids showing the Goldstein did not believe he had net income of $50 million—or anything close to that. As discussed, Kids conveyed that: (1) Goldstein lost significant sums gambling in 2016; (2) Phua and other investors were entitled to significant shares of Goldstein's wins against Chairman, Gores, and Tango; and (3) Tango did not pay until 2017. *Supra* at 6, 15. Goldstein's responsive text messages conveyed he believed Kids' calculations were correct. Thus, whether the facts asserted in the messages were true, the messages showed Goldstein *believed* them to be true and therefore did not think his 2016 taxable income was anything close to $50 million. That is because taxes are owed only on net income "actually received during the tax year," *Edwards*, 269 U.S. at 211, and the messages tended to establish Goldstein's belief that much of the money he won in 2016 was offset by losses, owed to investors, or not paid until 2017.

Accordingly, Goldstein was entitled to use the messages to prove his beliefs regarding his 2016 income. Indeed, the government itself relied on texts to establish its primary theory of what Goldstein believed about his 2016 income—that the $50 million he won was net income. But when Goldstein attempted to complete the story by offering similar "messages" that would "rebut[] the government's central contention" about his "intent" and "state of mind," *Gallagher*, 90 F.4th at 196-97,

the district court inexplicably ruled that evidence was inadmissible hearsay. That was an "error of law." *Id.* at 195 (citation omitted).

In resolving Goldstein's new-trial motion, the district court barely defended its decision to exclude the messages, beyond suggesting that Goldstein could have "intended to use this evidence" for the truth of the matter "to show [he] suffered poker losses in 2016." JA664. The government had asserted Goldstein's purpose was "pretext" and that his use of the messages to refresh his recollection when testifying about the amount of his 2016 income proved he wanted to use them for their truth. JA4984-4985.

That pretext claim lacks merit. When Goldstein testified, the district court had *already excluded* the messages—so it was impossible for him to use the messages for any purpose besides refreshing his recollection. Before that, the defense had offered the messages as evidence of Goldstein's state of mind at every stage. *Supra* at 15.

Even if a risk existed that Goldstein could use the messages for an improper hearsay purpose, their relevance to his intent meant they could not be excluded as hearsay. When a "fact" is "admissible for one purpose but inadmissible for another," "the established rule is that the evidence should be accepted" with an "instruction" to prevent "misuse." *Sprinkle v. Davis*, 111 F.2d 925, 931 (4th Cir. 1940). This principle applies to out-of-court statements offered to prove the defendant's state of

mind: the court should "admit the statement and direct the jury to consider it only as proof of the state of mind and disregard it as evidence of other issues." 2 McCormick on Evidence § 274 (8th ed.). So even if the district court believed there was a "danger" the jury would use the messages for an "improper [hearsay] purpose," it was error to exclude them. *United States v. Rafiekian*, 991 F.3d 529, 550 (4th Cir. 2021).

**B. The District Court's Error Was Not Harmless**

When the district court commits an evidentiary error, the burden shifts to the government to demonstrate it "did not have a 'substantial and injurious effect or influence in determining the jury's verdict." *Ibisevic*, 675 F.3d at 349-50 (citation omitted). In assessing whether the government has met its burden, three factors are relevant: "(1) the centrality of the issue affected by the error; (2) the steps taken to mitigate the effects of the error; and (3) the closeness of the case." *Id.* (citation omitted).

*Ibisevic* and *Gallagher* are the key precedents. In *Ibisevic*, this Court vacated the conviction because the district court excluded an out-of-court statement tending to show the defendant lacked the intent to lie to customs agents. 675 F.3d at 355. The court explained that (1) the statement went "to the central issue in the case, *i.e.*, [the defendant's] intent"; (2) the defendant's testimony did not mitigate the error because the absence of corroborating evidence may have caused jurors to think the

defendant was lying; and (3) the case was close because the Government "presented no direct evidence of [the defendant's] intent." *Id.* at 350-53.

Similarly, in *Gallagher*, this Court found that each factor favored the defendants: (1) "intent was a 'central issue"; (2) the defendants' "in-court testimony" could not "mitigate the effects of the error"; and (3) the case was close because the "excluded messages" could have "countered the government's somewhat weak evidence." 90 F.4th at 197-98. Moreover, because "the messages were relevant to rebutting the government's central contention," this Court reversed on *all* counts. *Id.* at 196. The same result is warranted here.

**1. The text messages were relevant to the central issue of willfulness**

The first factor weighs heavily in Goldstein's favor because "the excluded [evidence] clearly did go to the central issue in the case, *i.e.*, [Goldstein's] intent." *Ibisevic,* 675 F.3d at 350. When intent is the core disputed element, it qualifies as "a 'central issue.'" *Gallagher*, 90 F.4th at 197 (citing *Ibisevic,* 675 F.3d at 350). And here, the government had to prove willfulness for all tax charges. *Supra* at 10. Because Goldstein offered the excluded evidence to prove lack of willfulness, this "factor points toward vacatur." *Gallagher*, 90 F.4th at 197.

Here, the government emphasized to jurors that willfulness was "the main question in [their] deliberations." JA4551. And critically, the government itself told jurors that Goldstein's beliefs regarding his 2016 income were central to *every* tax

charge—not just Count 1. The government stated that Goldstein's desire to avoid paying taxes on his 2016 income "motivated everything that Mr. Goldstein did from March 2016 through December 2022," JA4549, and told jurors that it would not present specific evidence of willfulness for the other tax counts because "all of this is motivated by his tax evasion in 2016," JA4576.

The excluded messages were essential because they directly rebutted the government's core argument that Goldstein made $50 million in 2016 and designed his life around evading taxes on that income. The government urged jurors to "reject Mr. Goldstein's claim" that he believed those winnings were "offset" by "unreported losses in Asia and set asides" for investors, JA4573, asserting that the "only evidence" that he believed he had "offsetting losses" was "Goldstein's own testimony." JA4574. It follows that "the messages"—showing Goldstein's belief that most of his 2016 winnings were offset by losses, owed to investors, or not paid until 2017—"were relevant to rebutting the government's central contention" about Goldstein's "intent." *Gallagher*, 90 F.4th at 196-97.

The excluded messages were also "central to the defense" because they were the "*only* evidence" corroborating "[Goldstein's] claim that he believed" his 2016 net income was nowhere close to $50 million. *Ibisevic*, 675 F.3d at 350-51. When trial began, the defense planned to focus on disproving Deyhle's story about the Gores winnings. *Supra* at 14-15. But after that theory collapsed and the government

pivoted to the $50 million claim, Goldstein needed to introduce the messages as the only documentary evidence that could "rebut[] the government's central contention." *Gallagher*, 90 F.4th at 196.

Finally, the erroneous exclusion of the messages affected every charge because the messages would have broadly bolstered Goldstein's credibility. The government made Goldstein's credibility a central issue, asserting that his lies about his 2016 gambling income undermined his credibility. JA4690 (highlighting Goldstein's purported "lie[] to his accountants about the $50,000,000 2016 poker income"). Thus, excluding the "only evidence that would have corroborated [Goldstein's] testimony of assertedly innocent conduct" affected the jury's assessment of Goldstein's credibility. *Ibisevic*, 675 F.3d at 351.

The district court's contrary conclusion was fundamentally flawed. The court asserted that "the issue of whether Mr. Goldstein had poker gambling winnings or losses in 2016" was "relevant only to" Count 1. JA665. Even as to Count 1, the court concluded Goldstein's 2016 gambling income was not "central" because the government introduced evidence of improper business deductions to show a tax deficiency and "other evidence to show affirmative acts of tax evasion." JA665.

That analysis misses the point. Tax evasion requires proving: (1) "a substantial tax deficiency"; (2) "an affirmative act" constituting attempted evasion; and (3) "willfulness." *United States v. Goodyear*, 649 F.2d 226, 227-28 (4th Cir.

1981). Even if the government had "other evidence" of a tax deficiency and an affirmative act, the messages provided powerful evidence about the *third* element: willfulness.

Moreover, in concluding the error could have affected only Count 1, the district court "fail[ed] to grapple with how [the excluded messages] cast doubt on the government's overarching theory of the case." *Gallagher*, 90 F.4th at 197. In *Gallagher*, the defendants were charged with multiple counts of fraud arising from alleged misstatements over several years. But instead of presenting count-by-count evidence of fraudulent intent, the government presented a central "theory" of intent, as articulated in its "closing argument." *Id.* at 195. This Court held that the excluded messages were relevant to every charge because they directly "rebutt[ed] [that] central contention." *Id.* at 196. The same logic applies here. Because the excluded text messages "cast doubt on the government's overarching theory of the case," they were relevant to every tax charge. *Id.* at 197.

The district court also ignored that its erroneous exclusion affected Goldstein's credibility because the government repeatedly argued he was lying about his 2016 income. *Supra* at 53-54. If Goldstein had been able to rebut that argument with the messages, the jury would have concluded he was telling the truth about the other charges as well.

### 2. The district court did nothing to mitigate its error

The second harmlessness factor strongly favors Goldstein because "the district court failed to acknowledge any existence of an error" and therefore "took no steps to mitigate [its] effects." *Ibisevic*, 675 F.3d at 351. Indeed, there is nothing the court could have done. All cases "rel[ying] on mitigation efforts to find an error harmless" have involved the erroneous *admission* of evidence. *See id.* at 351-52. In such cases, the court can direct jurors to "disregard" what they have seen. *United States v. Lighty*, 616 F.3d 321, 361 (4th Cir. 2010). But the court cannot direct jurors to *consider* evidence they have not seen.

Far from any mitigation, the government *exacerbated* the error by making repeated improper remarks. After the court excluded the messages, Goldstein testified about the ledger to explain how he kept track of his wins and losses. JA397-398. In response, the government argued that Goldstein's testimony could not be trusted because he had failed to produce the ledger itself. Throughout closing, the government referred to the "supposed" ledger, JA4561, and stated that "Goldstein's own testimony" was his "only evidence," JA4574. The government further misled the jury by asserting Goldstein never asked his expert to review the ledger. JA4574. As the government knew, however, Goldstein had hired *another* expert to analyze the ledger; but because the court excluded the ledger, that expert never testified. *See* JA4594-4595.

The government's assertion that Goldstein had no corroborating evidence was grossly misleading. Indeed, numerous courts have held that it is improper for the government to object to the introduction of evidence and then emphasize its absence. *E.g.*, *United States v. Vargas*, 580 F.3d 274, 278 (5th Cir. 2009) ("[A] prosecutor may not argue the absence of evidence she well knew existed."); *United States v. Toney*, 599 F.2d 787, 791 (6th Cir. 1979) (similar); *State v. Garcia*, 245 N.J. 412, 436 (2021) (similar).

Here, because the government knew the ledger existed and objected to the messages containing the ledger, the government's remarks exacerbated the harm from the erroneous exclusion. *Toney* provides useful guidance. There, the defendant claimed he won stolen money gambling with Jimmie King and sought to introduce King's out-of-court corroborating statements. *Toney*, 599 F.2d at 788-89. After the prosecutor successfully objected "on hearsay grounds," the prosecutor emphasized in closing there was no evidence King "did any gambling on the [relevant] night." *Id.* at 789-90. The court held that this was "foul play" because "the prosecutor well knew" that corroborating evidence existed. *Id.* at 790-91. "[T]he nature of the closing argument" meant the exclusion of the statement was not "harmless error." *Id.* at 791. The government's remarks in this case were similarly "foul play." The government successfully objected to the ledger, then suggested in closing it did not

exist and Goldstein's "testimony" was the "only evidence" he had offsetting poker losses. JA4574.

Although the district court instructed the jury "not to speculate about why the Phua Ledger was not admitted into evidence," JA614, that instruction did not mitigate the harm. In cases where the defendant has sought a new trial based on improper remarks, this Court has explained that "whether the court gave a curative instruction" is just one of several relevant factors. *United States v. Joyner*, --F.4th--, 2026 WL 2329134, at *9 (4th Cir. Aug. 12, 2026). If improper remarks can justify a new trial *even with* a curative instruction, then they can surely amplify the harm from the exclusion of evidence that the district court did not recognize as error. The mitigation factor favors Goldstein even absent the prosecutor's improper remarks—but those remarks further "foreclose[] any possible claim that the exclusion of the [messages] could have been harmless." *Toney*, 599 F.2d at 791.

In concluding otherwise, the district court gave short shrift to this Court's precedent. The court believed any error was mitigated because Goldstein "testified extensively about the excluded evidence." JA665. But the "document is a more reliable, complete and accurate source of information as to its contents and meaning than anyone's description." *Gordon v. United States*, 344 U.S. 414, 421 (1953). Accordingly, this Court has repeatedly held that a defendant's "in-court testimony about" the substance of excluded documentary evidence "d[oes] not mitigate the

effects of the error"—"[q]uite the contrary." *Gallagher*, 90 F.4th at 197; *see Ibisevic*, 675 F.3d at 351-52. When a defendant testifies "about what [he] 'believed,'" the court's "exclu[sion] [of] 'the sole evidence that directly corroborated [his] testimony" is "particularly problematic given the risk that jurors may disregard self-serving testimony by criminal defendants." *Gallagher*, 90 F.4th at 197.

Goldstein's use of the messages to refresh his recollection does not change the analysis. When a witness uses a document to refresh his recollection, "the evidence is the witness's present recollection, not the [document]." 2 Wharton's Criminal Evidence § 8:16 (15th ed.); *see United States v. Rydland*, 461 Fed. Appx. 208, 210 (4th Cir. 2012). Indeed, "a party may not attempt to introduce otherwise inadmissible evidence under the guise of refreshing recollection." *Rydland*, 461 Fed. Appx. at 210.

Courts have therefore held that a witness's use of excluded evidence to refresh his recollection does not mitigate the harm from its exclusion. In *Pittman v. County of Madison*, 863 F.3d 734 (7th Cir. 2017), the court erroneously excluded a witness's interview recorded immediately after the relevant event. *Id.* at 736-37. Although the witness used a transcript to refresh his recollection, the Seventh Circuit held the exclusion was not harmless, explaining "[i]t was senseless to think that testimony by

[the witness] seven *years* after [the event] was as or more reliable than his recorded testimony made three *hours* after the [event]." *Id.* at 737.

So too here. Goldstein's testimony occurred ten years after the events; the messages were, in most cases, sent just days afterwards. The messages were a far "more reliable" indicator of what Goldstein believed than his testimony. *Id.*

Indeed, because Goldstein's credibility was a central issue, his use of the messages to refresh his recollection may have damaged his defense. Throughout trial, the government introduced numerous messages that Goldstein sent and received and put on witnesses to testify about those messages. *Supra* at 14. Goldstein's testimony was the only part of trial where a witness referenced documents but did not introduce them as evidence. As a result, Goldstein's use of the messages—in which he looked at the messages, put them away, and then responded to defense counsel's questions—likely appeared unnatural. JA399-415. The jury could have interpreted this routine as dishonest, especially because the government repeatedly intimated that Goldstein was lying about the ledger's existence. *Supra* at 56.

The district court also cited its curative instruction that jurors not speculate about "why the ledger was not admitted into evidence." JA665. But an instruction cannot mitigate the improper *exclusion* of evidence. *Supra* at 56. Indeed, the cases

the court cited involve improperly *admitted* evidence. *United States v. Burfoot*, 899 F.3d 326, 341 (4th Cir. 2018); *see Ibisevic*, 675 F.3d at 351-52.

In any event, the curative instruction only addressed the government's misconduct. As discussed, the court issued that instruction in a (failed) attempt to mitigate the *additional* prejudice from the government's improper remarks about the ledger's absence. *Supra* at 58. An instruction that directs the jury not to speculate about "*why*" evidence was not admitted—*i.e.*, the reason it was not admitted—cannot mitigate the underlying harm from the erroneous exclusion.

**3. The case was close**

The closeness of the case confirms a new trial is required. Where the defendant's "intent" was the central issue, "the Government presented no direct evidence" of intent, and the defendant's credibility was on the line, this Court has held the third factor favors the defendant—especially if the excluded evidence would have "directly corroborat[ed]" his testimony. *Ibisevic*, 675 F.3d at 353-54.

This is such a case. The government sought to prove willfulness based on circumstantial evidence about Goldstein's 2016 gambling income—most notably, Goldstein's messages to Gipson and Robl. *Supra* at 14. Against that evidence, the excluded messages would have established that the government's theory that Goldstein believed he had $50 million in 2016 income was incomplete and misleading. The messages would have "directly corroborat[ed]" Goldstein's

testimony about his beliefs, *Ibisevic*, 675 F.3d at 353-54, and "countered the government's somewhat weak evidence," *Gallagher*, 90 F.4th at 197.

The government has argued that jurors could infer Goldstein's intent to underreport his 2016 income because he improperly included several deductions on his returns. JA4560. But unlike the purported evidence of Goldstein's $50 million poker winnings, those discrete deductions did not remotely suggest a broader motive. Thus, the government downplayed that evidence during closing, mentioning it only when discussing Count 1. JA4560.

In any event, a court may not find an evidentiary error harmless simply because "there was sufficient untainted evidence to convict" on an alternative theory. *United States v. Urbanik*, 801 F.2d 692, 698-99 (4th Cir. 1986). Instead, the court must be "sure that the error did not influence the jury, or had but very slight effect." *Kotteakos v. United States*, 328 U.S. 750, 764 (1946). Accordingly, the "closeness inquiry 'involves assessing whether'" the "evidence is not only sufficient to convict, but whether it is sufficiently powerful in relation' to the excluded [evidence] to ensure the error did not affect the outcome." *Ibisevic*, 675 F.3d at 354 (citation omitted). Any inference of willfulness from isolated deductions is not so powerful that this Court can conclude the exclusion was harmless. That is especially true because the excluded messages "would have been the only corroborating evidence going to the central" issue—"[Goldstein's] intent." *Id.*

The split verdict confirms the point. A "split verdict indicates the case was close, perhaps so much so that the erroneously admitted evidence was the deciding factor." *Brizuela*, 962 F.3d at 799. That is particularly true where "all counts largely relied on the same evidence" and the "matter 'not in evidence'" was "relevant to all counts." *United States v. Adams*, 139 F.4th 931, 942 (D.C. Cir. 2025) (citation omitted). Here, the jury acquitted on four tax counts. And given the government's theory of willfulness, "all counts largely relied on the same evidence" about Goldstein's 2016 gambling income and the messages were "relevant to all counts." *Id.*

Indeed, the split verdict demonstrates the excluded messages could have made all the difference because the jury acquitted on every substantive tax charge where Goldstein was allowed to present documentary evidence. For instance, Counts 2 and 6 charged Goldstein with false returns because he did not report gross gambling income. JA595-596. But documents showed Deyhle told Goldstein he only needed to report his net income, corroborating the lack of willfulness. JA5469. The acquittal on those counts shows that the "'clearly relevant' excluded [messages] 'could have been of decisive importance in tipping the balance.'" *Ibisevic*, 675 F.3d at 354 (citation omitted).

The district court incorrectly reasoned that the case was not close because jurors "never indicated during [their] two-day deliberations that [they were]

struggling to reach a verdict." JA665-666. But the court cited cases in which this Court found the error *not* harmless because jurors deliberated for several hours on a handful of counts. *Ibisevic*, 675 F.3d at 352; *United States v. Sanders*, 964 F.2d 295, 299 (4th Cir. 1992). Here, deliberations lasted more than two days.

Moreover, the district court's conclusion warrants no deference because its analysis contradicts this Court's precedent. The court ignored the rule that a "split verdict indicates the case was close." *Brizuela*, 962 F.3d at 799. Instead, the court stated—without further explanation—that "the Government presented the testimony of 39 witnesses, extensive documentary evidence and six factual stipulations." JA665. That conflates the quantity of evidence with its strength. In any event, "the strength of the Government's case does not, in itself, resolve the 'closeness' question." *Ibisevic*, 675 F.3d at 354. Even in cases where "the Government presented strong direct evidence of guilt," this Court has "weigh[ed] that evidence in relation to the excluded evidence" and "held that the improper exclusion was not harmless." *Id.* Here, no witness besides Deyhle testified directly to Goldstein's willfulness. And the court never considered how the excluded messages would have directly corroborated Goldstein's lack of willfulness and so could have led jurors to acquit.

## III. THE DISTRICT COURT'S INSTRUCTIONAL ERRORS REQUIRE A NEW TRIAL

Two instructional errors independently require a new trial. First, the instructions violated due process by permitting jurors to convict Goldstein of accessory liability without specifying the non-statutory elements required by 18 U.S.C. § 2. Second, the district court violated Federal Rule of Criminal Procedure 30(b) by changing the relevant instructions after closing argument—stripping the defense of an opportunity to argue Goldstein's innocence under the instructions actually given.

### A. Omitting The Elements Of Section 2 From The Instructions Violated Due Process

Due process required the district court to instruct the jury on the elements of Section 2 before permitting conviction on an accessory liability theory. The court failed to do so. At the government's urging, the court deleted the only instruction containing several elements not set forth in the statutory text—while retaining instructions inviting conviction under Section 2 for every count. The result was a constitutionally deficient charge that enabled Goldstein's wrongful conviction.

#### 1. The district court erroneously invited conviction under Section 2 without instructing on its elements

A district court abuses its discretion in instructing jurors if it fails to "fairly state the controlling law." *Burgess v. Goldstein*, 997 F.3d 541, 557 (4th Cir. 2021) (citation omitted). "The key question is whether, when viewed holistically and in

context, the instructions 'adequately informed the jury of the controlling legal principles without misleading or confusing the jury to the prejudice of the objecting party.'" *Odum*, 65 F.4th at 721. Where, as here, "a defendant timely objects" to "an erroneous instruction," a conviction must be reversed unless the prosecution proves "beyond a reasonable doubt[] that the error was harmless." *United States v. Hastings*, 134 F.3d 235, 241 (4th Cir. 1998).

Importantly, the court must instruct on "the elements of [each] offense charged." *United States v. Polowichak*, 783 F.2d 410, 415 (4th Cir. 1986) (citation omitted). Simply "reading" the "statute to the jury" does not suffice; instructing on the elements "is mandatory and indispensable." *United States v. Harris*, 346 F.2d 182, 184 (4th Cir. 1965). Section 2 liability is no exception: In *Odum*, this Court held the district court plainly erred by "'read[ing] directly from' 18 U.S.C. § 2" without instructing on its elements. 65 F.4th at 720.

That is precisely what occurred here. Because the government asserted the statute was "sufficiently clear," JA539, the district court merely quoted Section 2's text, JA585; JA593-594; JA607-608. That error crippled Goldstein's defense. Jurors did not know that Section 2(a) aiding-and-abetting liability requires finding another guilty principal, that the defendant shared the principal's intent, and that the defendant committed an affirmative act. *See United States v. Horton*, 921 F.2d 540, 543-45 (4th Cir. 1990); *United States v. Winstead*, 708 F.2d 925, 927 (4th Cir. 1983);

*Odum*, 65 F.4th at 721. And jurors did not know that Section 2(b) cause liability requires finding "the defendant had the *mens rea* required by the underlying statute." *United States v. Gumbs*, 283 F.3d 128, 135 (3d Cir. 2002). None of these elements appears in Section 2's text—violating due process. *Odum*, 65 F.4th at 720-21.

When Goldstein identified this error in his new-trial motion, the government reversed course. Rather than defend its prior theory that reading the statute was "sufficiently clear," JA539, the government claimed the instructions "*did not* permit the jury to convict under *any* § 2 theory." JA4947. The government went so far as to misrepresent its prior position, asserting it proposed amending the instructions to remove Section 2 from the case, Dkt. 23 at 21, rather than to allow for conviction under "2(b) . . . in addition to (a))," JA4743.

Despite recognizing the government's position on accessory liability had "shifted," the district court denied relief. *See* JA5167-5168. The court did not dispute that, if the instructions permitted conviction under Section 2, then the instructions were inadequate, prejudicial, and not harmless error—requiring a new trial on all counts. But the court agreed with the government's post-hoc theory that the instructions did not permit conviction under Section 2 in the first place. JA658-659.

That conclusion cannot be squared with the instructions and basic interpretive principles. To determine if the instructions permitted conviction under Section 2,

the Court must ask whether a "reasonable likelihood" exists that a "reasonable juror" would have understood them that way. *Boyde*, 494 U.S. at 380; *see United States v. Ealy*, 363 F.3d 292, 298 (4th Cir. 2004) (applying "reasonable likelihood" standard to Section 2). The district court did not even purport to apply that standard here. The Court must also presume "jurors will 'attend closely the particular language of [the] instructions" and "strive to understand, make sense of, and follow' them." *Samia v. United States*, 599 U.S. 635, 646 (2023) (citation omitted). Put differently, it is wrong to assume jurors will ignore segments of the charge or deem passages inoperative.

Here, there is a "reasonable likelihood"—indeed, a virtual certainty—that jurors read the instructions to permit conviction under Section 2. *Boyde*, 494 U.S. at 380. After all, the government itself insisted the instructions would submit Section 2 liability to the jury, until the moment the government realized the error in briefing the post-trial motions. *Compare* JA552, *with* JA4947. At trial, in explaining its request to delete the instructions on Section 2's elements, the government stressed that "this is a § 2(b) case (in addition to (a))," JA4743, and argued that the remaining language in the instructions "quoting Section 2(a) and (b)" would suffice to submit those charges to the jury, JA550. When the defense objected that the government wanted to "tell the jury they can convict Mr. Goldstein of aiding and abetting and then remove the instruction explaining to them what they would

have to find to do that," JA537, the government did not disavow seeking a conviction under Section 2—or suggest the instructions precluded conviction under Section 2. Instead, the government argued the language describing Section 2(a)'s elements "should come out, and *the other aiding and abetting language should stay in*," JA537 (emphasis added), because "the statute is sufficiently clear" to submit Section 2 liability to the jury, JA539. The district court sided with the government, denying the defense's request to remove the remaining Section 2 language when it deleted discussion of its elements. JA555. Given that the government fought to keep Section 2 language in the instructions on the theory that reading the statute sufficed to permit conviction under Section 2—and the district court agreed—it is implausible to suggest there is not even a reasonable likelihood that lay jurors would have read the instructions that way.

Moreover, the government's initial position was correct. Four points in the instructions, read together, plainly invited conviction under Section 2. First, the court instructed the jury that its role was to "find Mr. Goldstein guilty or not guilty" as to the "offenses charged." JA570-571. Second, the instructions on all counts specified that Goldstein was "charged" with the substantive offense *and* Section 2 liability—"aiding and abetting, counseling, commanding, inducing or procuring such an offense." JA584; JA589-590; JA600; JA604-605. Third, the instructions regarding tax evasion, false returns, and mortgage fraud each quoted Section 2's text

in full. JA585; JA593-594; JA607-608. And fourth, each time, the instructions described Section 2's text as "pertinent." JA585; JA593-594; JA607-608. In total, the instructions invoked Section 2 seven times—more than any other basis for liability or charge.

Reading those instructions as a whole, any reasonable jury would have understood that its role was to determine "guilt or innocence" on the "offenses charged"; that Section 2 liability was one such "charge" for every count; and that Section 2's text set forth the "pertinent" information to determine such liability. At minimum, there is a "reasonable likelihood" jurors would have understood the instructions that way. *Boyde*, 494 U.S. at 380. To suggest otherwise would require assuming that jurors *ignored* the court's repeated invocation of Section 2. But "our legal system presumes that jurors will 'attend closely [to the instructions]'" and "strive" to "follow them." *Samia*, 599 U.S. at 646 (citation omitted). And "the purpose of jury instructions is to instruct the jury clearly regarding the law to be applied in the case," *United States v. Lewis*, 53 F.3d 29, 34 (4th Cir. 1995)—not to provide irrelevant language about extraneous charges in the indictment to be disregarded.

Additional "context [from] the proceedings" reinforces that jurors understood Section 2 liability as an available basis for conviction. *Boyde*, 494 U.S. at 383. The jury received the final instructions against the backdrop of the preliminary

instructions, which likewise repeatedly quoted Section 2's text and explained that Goldstein was separately "charged" with aiding and abetting for every offense. JA1022-1023; JA1027; JA1029-1030; JA1033. And the jury received the final instructions only after hearing the government's case—which included a rebuttal case directed at Section 2—and closing arguments, which stressed the involvement of Paul Phua, Goldstein's accountant, office assistants, and wife. *Supra* at 17-18. That evidence provided fertile ground to wrongfully convict based on an erroneous understanding of Section 2's elements.

If there were any remaining doubt, the verdict on Count 15 confirms that jurors understood the instructions to permit conviction under Section 2. The government acknowledged that Goldstein "was in the Virgin Islands," not Maryland, when the mortgage application for Count 15 was submitted. JA4590. That concession was necessary given Goldstein's flight records, which the jury requested to review during deliberations. JA4759-4760. Thus, the only way to find venue for Count 15 was based on Section 2 cause liability. And, critically, the Section 2 instructional language for Count 15 was identical for the tax evasion, false returns, and remaining mortgage fraud counts. JA585; JA593-594; JA607-608. If the jury understood it could convict under Section 2 for Count 15—as it must have given the verdict—then it is "reasonabl[y] like[ly]" it understood the same for those other counts. *Boyde*, 494 U.S. at 380.

The district court's contrary reasoning lacks merit. To begin, the court failed to apply *Boyde*'s "reasonable likelihood" standard, instead offering its own interpretation without asking whether a "reasonable likelihood" exists that a "reasonable juror" would have read the instructions to permit conviction under Section 2. 494 U.S. at 380, 386. The court then compounded that error by suggesting a retrial is warranted only if the court is convinced the defendant is "innocent." JA655. Instead, retrial to correct a preserved instruction error is required unless the prosecution proves "beyond a reasonable doubt" that the jury convicted on a valid basis. *Hastings*, 134 F.3d at 241. These legal errors alone justify reversal.

In any event, the court's reading of the instructions is wrong. Start with the court's contention: that the repeated "references to Section 2" "simply summarized the charges alleged" and were "not evidence for the Jury to consider." JA659. In support, the court cited its instruction that "an indictment is merely a statement of charges and not itself evidence." JA658-659. But telling the jury the indictment is not "evidence" says nothing about the legal theories available to convict. Instead, that clarification addresses a separate issue: that "one accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial." *Taylor v. Kentucky*, 436 U.S. 478, 485 (1978). And instructing that the indictment set forth the "charges" only reinforces the problem. The court

instructed jurors to "find Mr. Goldstein guilty or not guilty" as to the "offenses charged." JA570-571. So if those "charges" included Section 2 liability—as the court told jurors—then the jury would have understood its role as determining guilt or innocence on Section 2 liability.

Moreover, the Section 2 instructions did not simply "summarize the charges" in the indictment. The court told jurors to determine "guilt or innocence" on the "offenses charged"; stated Goldstein was "charged" with Section 2 liability for every count; repeatedly read Section 2's statutory text; and described that text as "pertinent." *Supra* at 69-70. That goes far beyond summarizing the indictment—which merely included a bare reference to "18 U.S.C. § 2" for each count without quoting it. JA787; JA796-801

The court likewise erred in finding no Section 2 problem because jurors were "properly instructed" on "the essential elements" for each "tax and mortgage fraud offense[]." JA659. Proper instructions on the elements of the substantive offenses cannot cure the lack of adequate instructions on Section 2. *See Harris*, 346 F.2d at 184. Nor does it matter that the instructions on the substantive offense elements did not "refer to Section 2." JA659. The charges contained two separate paths for conviction: (1) the substantive offenses, and (2) accessory liability for those substantive offenses, defined only by Section 2's statutory text. Instructions on the

substantive-offense elements would not have changed the jury's understanding that Section 2 remained an independent basis for conviction.

The court's error is confirmed by its reasoning that the "evidence presented at trial was not sufficient to sustain a conviction under Section 2(a)." JA657. Only a jury properly instructed on Section 2(a)'s elements would have realized that. That is the constitutional problem—not the solution. The jury was never told that Section 2(a) requires, for example, another guilty principal—creating the opportunity for wrongful conviction.

Finally, the court never grappled with the government's complete reversal in position. Recall that the government included Section 2 in the preliminary instructions it drafted, JA804; fought to keep Section 2 instructions in during the charge conference, JA4454-4455; and insisted after closing argument that the language on Section 2 should "stay in," and only the further description of Section 2's elements should come out, JA537. A court assessing the "reasonable likelihood" that jurors would have read the instructions to permit conviction under Section 2 cannot simply ignore that the government itself read the instructions that way—and vigorously argued to keep Section 2 language in the instructions for that very purpose. *Boyde*, 494 U.S. at 380.

The court's decision to preserve Section 2 language in the final instructions also cannot be reconciled with its own practice when charges were eliminated from

the case. When the court dismissed certain charges before trial, it omitted language about those charges from the instructions in full, *see* JA548-612; it did not "summarize[]" them as part of the initial "charges alleged," JA659. Rightly so: instructions set forth the "law to be applied in the case"—not irrelevant language to be disregarded. *Lewis*, 53 F.3d at 34. If Section 2 truly was not part of the case, as the government now contends, then the court should have excised the Section 2 references in full, just as it excised the parallel language for every other dismissed charge. Instead, the government fought to keep Section 2 in and the court agreed. That is powerful evidence that both the government and the court understood Section 2 to remain a live basis for conviction, as any "reasonable juror[]" would have. *Boyde*, 494 U.S. at 383.

**2. The instructional error was not harmless**

The district court did not dispute that, if the instructions permitted conviction under Section 2, a new trial is required. With good reason: The government could not—and did not—even attempt to meet the demanding standard to show harmless error.

Because the instruction was erroneous, "the government bears the burden of establishing that the error was harmless." *United States v. Naum*, 134 F.4th 234, 241 (4th Cir. 2025). To do so, it must prove "beyond a reasonable doubt[] that a correctly instructed jury would have reached the same conclusion." *Hastings*, 134 F.3d at

241. Where, as here, the instructions permit conviction "on two or more alternate theories, one of which is the subject of an erroneous instruction," the government must show the "jury must have convicted the defendant on the legally adequate ground." *Id.* at 242. Here, that means the government must establish beyond a reasonable doubt that—for every count—the jury *must have* convicted under the primary liability theory.

The government cannot meet that demanding burden. Indeed, it did not even try below. *See* JA4946-4972. That makes sense because the government repeatedly insisted during trial that there was sufficient evidence to submit Section 2 liability to the jury for every count—even with proper instructions on its elements. In its proposed jury instructions, for instance, the government argued it had "introduced more than sufficient evidence to support an aiding and abetting instruction" for every count. JA4177. During the charge conference, it again asserted there "[a]bsolutely" was sufficient evidence to support an "aiding and abetting instruction"—highlighting the "evidence of Mr. Goldstein working with accountants" and "evidence that other people, including firm managers, helped him with these crimes." JA4454-4455. And post-closing, the government continued to insist "this is a § 2(b) case (in addition to (a))." JA4743. The government cannot now claim with a straight face "that the jury *must have* convicted" Goldstein on a primary

liability theory, rather than accessory liability, for each count. *Hastings*, 134 F.3d at 242 (emphasis added).

That is especially so given that jurors did not know the actual elements for accessory liability. Thus, to convict under Section 2(a), jurors did not know they had to find another guilty principal, that Goldstein had the *mens rea* of the underlying offense, and that he took an affirmative act to further the offense. *Supra* at 66. Nor did jurors know that to convict under Section 2(b) they had to find Goldstein "willfully cause[d] an act" constituting the underlying offense with the intent required to commit that offense. *Gumbs*, 283 F.3d at 132, 136 (citation omitted).

It therefore does not matter that Goldstein has always contended there was insufficient evidence to convict under Section 2. JA4176-4177. That position was based on Section 2's elements—and the entire problem is that jurors did not know those elements and so could have wrongfully convicted. For instance, the evidence showed Goldstein relied on third parties to prepare his returns and the government stressed the involvement of third parties—including Goldstein's accountants, office assistants, and wife—throughout its case. *Supra* at 18-19. Willfulness was a central issue for all tax offenses, but the jury could have easily viewed Section 2 liability as a way to bypass that issue and convict Goldstein merely for aiding or inducing those third parties in a colloquial sense.

Nor is this just speculation. The jury convicted on Count 15 and, as discussed, Section 2(b) cause liability provided the only permissible basis to find venue for that count. *Supra* at 71. Because the jury *actually* convicted based on accessory liability, the government cannot show that jurors "must have convicted" based on primary liability for that count—or any others. *Hastings*, 134 F.3d at 242.

Unable to satisfy the applicable standard, the government argues that accessory and cause liability are "built into" the false-returns statute, 26 U.S.C. § 7206(2), and the tax evasion statute, 26 U.S.C. § 7201—meaning that Goldstein's convictions for those offenses did not "necessarily rel[y] on § 2." JA4967. That inverts the relevant standard: The *government* bears the burden to show beyond a reasonable doubt that Goldstein's convictions necessarily relied on primary liability (the theory with the legally adequate instructions). *See Hastings*, 134 F.3d at 242. In any event, regardless of whether some substantive offenses build in accessory concepts, the jury could have viewed Section 2 as a wholly alternative pathway to convict.

### B. The District Court Violated Rule 30(b)

The district court's post-closing amendment to the instructions independently requires a retrial. Rule 30(b) prohibits courts from substantively amending jury instructions after closing arguments. *See* Fed. R. Crim. P. 30(b); *United States v. Horton*, 921 F.2d 540, 547 (4th Cir. 1990). The court conceded it violated Rule

30(b) by eliminating instructions on Section 2's elements after closings. *See* JA5169 (acknowledging the "defense is correct" that the amendment "violat[ed]" Rule 30(b)). Yet the court found no prejudice.

Prejudice under Rule 30(b) turns on whether the violation affected the defense's closing—for instance, by impacting counsel's ability to address a "new line of argument." *Horton*, 921 F.2d at 547-48. The Rule ensures the defendant has "an adequate opportunity to argue his innocence under the district court's instructions in order to be assured a fair trial." *Id*. at 546-47. Actual prejudice exists here because if defense counsel had known the court would omit Section 2's elements, he would have approached closing differently—arguing that conviction under an aiding-and-abetting theory requires a guilty principal, shared willful intent, and an affirmative act. It was "essential" that jurors know those elements to avert an erroneous accessory liability conviction. *Id.*

The district court found harmless error for three reasons—each of which lacks merit. First, the court observed that "Section 2(a) liability was not an issue that the Defense addressed during the trial." JA660. That is incorrect. Goldstein argued strenuously against instructing on Section 2—starting with the preliminary instructions, at the charge conference, and again in the post-closing colloquy regarding the government's proposed amendments. *Supra* at 17-21. The court's observation that "the Defense maintained throughout the trial that the evidence

introduced by the Government was not sufficient to support a conviction under Section 2(a)," JA660, only reinforces the point: Goldstein argued the evidence was insufficient based on a *correct* understanding on Section 2's elements—the very elements the jury never received.

Second, the court noted that "Defense Counsel did not address Section 2(a) liability during his closing argument" and concluded his closing "would have been the same." JA660. That reasoning ignores the amendment's effect on the defense's strategy. Defense counsel expected the instructions would properly specify Section 2(a)'s elements—making clear Goldstein was not guilty under those elements. There was no reason to devote closing time to an issue the instructions resolved. Had counsel known the court would delete those instructions, he would have addressed the elements himself.

Finally, the court observed the defense "did not seek to make an additional closing argument" after the amendment. JA660. But this Court has never held a defendant must request additional closing time to preserve a Rule 30(b) claim. The violation independently requires a new trial on every count.

## **CONCLUSION**

The Court should vacate Goldstein's convictions and remand for a new trial.

## REQUEST FOR ORAL ARGUMENT

Mr. Goldstein respectfully requests oral argument. Given the importance of the constitutional questions in the case, oral argument would assist the Court's consideration.

Dated: September 10, 2026

Respectfully submitted,

*/s/ Elizabeth B. Prelogar*
ELIZABETH B. PRELOGAR
ANDREW D. GOLDSTEIN
EPHRAIM A. MCDOWELL
ELIAS S. KIM
JADE FORD
SAHAR ATASSI
COOLEY LLP
1299 Pennsylvania Ave., NW, Suite 700
Washington, DC 20004
(202) 842-7800
eprelogar@cooley.com

JONATHAN KRAVIS
LIU SHUR KRAVIS LLP
607 Fourteenth Street, NW
Suite 625
Washington, DC 20005
(202) 240-7100
jonathan.kravis@lskllp.com

*Counsel for Defendant-Appellant*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 10, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/ Elizabeth B. Prelogar*
Elizabeth B. Prelogar

## CERTIFICATE OF COMPLIANCE

I certify that:

1. This brief complies with the expanded 18,000-word limit that Defendant-Appellant sought in the pending motion filed on August 25, 2026, consistent with Federal Rule of Appellate Procedure 32 and Local Rule 32(b). *See* Dkt. No. 27. The brief consists of 17,990 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced, serif typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ Elizabeth B. Prelogar*
Elizabeth B. Prelogar