**No. 26-4392**

---

**IN THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

THOMAS C. GOLDSTEIN,

*Defendant-Appellant*.

---

On Appeal from the United States District Court for the District of Maryland at Greenbelt, No. 8:25-cr-00006-LKG-1, Hon. Lydia Kay Griggsby

---

# BRIEF FOR JOHN M. DOWD AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANT-APPELLANT AND REVERSAL

---

Andrew E. Goldsmith
Annamaria M. Morales-Kimball
Alyssa J. Picard
Eric X. Xu
KELLOGG, HANSEN, TODD,
FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
agoldsmith@kellogghansen.com
amorales-kimball@kellogghansen.com
apicard@kellogghansen.com
exu@kellogghansen.com

*Counsel for Amicus Curiae*

September 17, 2026

# TABLE OF CONTENTS

Page


TABLE OF AUTHORITIES ........ ii

IDENTITY AND INTEREST OF *AMICUS CURIAE* ........ 1

ARGUMENT ........ 3

I. THE GOVERNMENT'S IMPROPER CONDUCT WARRANTS A NEW TRIAL........ 4

A. The Government's Repeated *Brady* Violations ........ 4

B. The Government's Leveraging the District Court's Erroneous Exclusion of Evidence To Mischaracterize the Facts........ 7

C. The Government's Misleading Jury Instructions........ 10

II. THE GOVERNMENT'S MISCONDUCT PERVADED THE ENTIRE CASE, FROM INVESTIGATION TO SENTENCING........ 12

A. The Government's Shifting Positions To Find Any Viable Strategy Targeting Goldstein........ 13

B. The Government's Repeated Bouts of Dishonesty to Judge and Jury ........ 18

1. Pre-Trial, *Ex Parte* Misrepresentations to the Court ........ 18

2. Systematic Suppression of Favorable Evidence in Violation of *Brady* ........ 21

3. Continued Mischaracterizations at Sentencing........ 22

C. The Government's Improper Focus on Goldstein as an Individual, Rather Than the Purported Misconduct........ 24

CONCLUSION ........ 27

CERTIFICATE OF COMPLIANCE

## TABLE OF AUTHORITIES

Page(s)

**CASES**


*Berger v. United States*, 295 U.S. 78 (1935) ....................................................2, 12

*Brady v. Maryland*, 373 U.S. 83 (1963) .................................. 4, 5, 6, 12, 21, 22, 23

*Clark v. Abdallah*, 131 F.4th 432 (6th Cir. 2025)....................................................7

*Connick v. Thompson*, 563 U.S. 51 (2011)..........................................................12

*Giglio v. United States*, 405 U.S. 150 (1972) .........................................................6

*Sizemore v. Fletcher*, 921 F.2d 667 (6th Cir. 1990) ..............................................26

*United States v. Armstrong*, 517 U.S. 456 (1996) ....................................................2

*United States v. Blueford*, 312 F.3d 962 (9th Cir. 2002)..........................................9

*United Staes v. Clarke*, 842 F.3d 288 (4th Cir. 2016) ............................................11

*United States v. Craig*, 142 F.4th 192 (4th Cir. 2025)...........................................24

*United States v. Gallagher*, 90 F.4th 182 (4th Cir. 2024) ........................................8

*United States v. George*, 95 F.4th 200 (4th Cir. 2024)............................................5

*United States v. Ham*, 998 F.2d 1247 (4th Cir. 1993) ...........................................26

*United States v. Jeffers*, 570 F.3d 557 (4th Cir. 2009) ..........................................12

*United States v. Jenkins*, 633 F.3d 788 (9th Cir. 2011)..........................................20

*United States v. Michel*, 2019 WL 5797669 (D.D.C. Nov. 6, 2019).......................20

*United States v. Mosby*, 143 F.4th 264 (4th Cir. 2025) ..........................................10

*United States v. Odum*, 65 F.4th 714 (4th Cir. 2023) .............................................11

*United States v. Parker*, 790 F.3d 550 (4th Cir. 2015)............................................4

*United States v. Queen*, 132 F.3d 991 (4th Cir. 1997)..................................... 25-26

*United States v. Ratti*, 365 F. Supp. 2d 649 (D. Md. 2005)..............................20, 21

*United States v. Reyes*, 577 F.3d 1069 (9th Cir. 2009)............................................9

*United States v. Robinson*, 627 F.3d 941 (4th Cir. 2010)......................................22

*United States v. Rodriguez*, 496 F.3d 221 (2d Cir. 2007)........................................6

*United States v. Spurlock*, 2025 WL 1224720 (D. Nev. Apr. 25, 2025)...................6

*United States v. Stahl*, 616 F.2d 30 (2d Cir. 1980)................................................26

*United States v. Toney*, 599 F.2d 787 (6th Cir. 1979) ............................................9

*United States v. Trainor*, 376 F.3d 1325 (11th Cir. 2004) .....................................20

*United States v. Tucker*, 686 F.2d 230 (5th Cir. 1982)..........................................13

*United States v. Vargas*, 580 F.3d 274 (5th Cir. 2009) ...........................................9

*United States v. Wilson*, 135 F.3d 291 (4th Cir. 1998)............................................9

**CONSTITUTION, STATUTES, AND RULES**

U.S. Const. art. II, § 3 ...................................................................................2

18 U.S.C. § 2.........................................................................................11, 14, 17

18 U.S.C. § 2(a) ...................................................................................10, 11, 17

18 U.S.C. § 2(b) ...................................................................................10, 11, 17

18 U.S.C. § 3292...................................................................................18, 20, 21

26 U.S.C. § 7203.......................................................................................12

28 U.S.C. § 516.........................................................................................2

28 U.S.C. § 547 .......... 2

Fed. R. Crim. P. 30(a) .......... 11

Fed. R. Crim. P. 30(b) .......... 11

Fed. R. Evid. 404(b) .......... 25

**OTHER AUTHORITIES**

DOJ Manual, https://www.justice.gov/jm/jm-9-1000-department-justice-policy-and-responsibilities .......... 1, 2, 3, 5, 6, 14, 26

Robert H. Jackson, *The Federal Prosecutor*, 24 J. Am. Jud. Soc'y 18 (1940) .......... 2, 13, 21, 27

U.S.S.G. § 2T1.1 app. n.2 .......... 23

## IDENTITY AND INTEREST OF *AMICUS CURIAE*[1]

*Amicus curiae* is a former federal prosecutor with a deep and continuing interest in the administration of justice in criminal cases. Specifically, he has decades of experience investigating and taking criminal cases to trial, including for tax offenses. Mr. Dowd was a trial attorney in the Tax Division of the U.S. Department of Justice and chief of an Organized Crime Strike Force in the Criminal Division. *See* John M. Dowd Biographical Sketch, *available at* https://dcchs.org/sb_pdf/john-m-dowd-biographical-sketch/. He has an interest in ensuring the prosecutors who currently represent the United States hold themselves to the highest standards of professional and ethical conduct, particularly in light of the tremendous discretion they wield.

The conduct of the prosecutors in Goldstein's case is troubling. *Amicus* files this brief to express his disappointment in the way government counsel handled this case and his concern that justice has not been done. *See*, *e.g.*, DOJ Manual 9-5.001, https://www.justice.gov/jm/jm-9-1000-department-justice-policy-and-responsibilities ("[T]he government's disclosure [obligations] will exceed its

---

[1] All parties have consented to the filing of this brief. Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amicus* states that no counsel for a party authored this brief in whole or in part, and no party or party's counsel made a monetary contribution intended to fund its preparation or submission. No person other than *amicus* and his counsel made a contribution intended to fund the preparation or submission of this brief.

constitutional obligations," and exculpatory and impeachment material shall be disclosed "in sufficient time to permit the defendant to make effective use of that information at trial."); *id.* 9-27.300 ("Prosecutors have an ongoing obligation to evaluate a case and the provable evidence, even after offenses have been charged.").

Prosecutors have wide latitude to enforce the criminal laws because they have been delegated the "constitutional responsibility to 'take care the Laws be faithfully executed.'" *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (quoting U.S. Const. art. II, § 3, and citing 28 U.S.C. §§ 516, 547). "In the ordinary case," they therefore earn the presumption that "they have properly discharged their official duties." *Id.* Their "interest . . . in a criminal prosecution is not that [they] shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935).

This was no ordinary case. Rather than focus on enforcing the law, the prosecutors here apparently "pick[ed] the man," and then worked tirelessly "to pin some offense on him." Robert H. Jackson, *The Federal Prosecutor*, 24 J. Am. Jud. Soc'y 18, 19 (1940) (address at Conference of United States Attorneys, Washington, D.C., Apr. 1, 1940). Then-Attorney General Jackson warned against these abuses of prosecutorial power nearly a century ago. Yet in this case, from the beginning of the investigation through sentencing, the government improperly

withheld evidence, mischaracterized the facts, and unpredictably shifted positions to find any workable way to target Goldstein. And it improperly focused on lurid details about Goldstein's personal life—not the purported misconduct—prejudicing the jury and singling him out under an unprecedented legal theory. Such conduct falls far short of the high expectations for attorneys representing the United States to act fairly and justly. *See* DOJ Manual 9-27.001 (The success of the federal prosecutorial system "must rely ultimately on the character, integrity, sensitivity, and competence of those men and women who are selected to represent the public interest in the federal criminal justice process."); *see also id.* 9-27.110 (describing the "basic responsibilities of federal attorneys: making certain that the general purposes of the criminal law . . . are adequately met, while making certain also that the rights of individuals are scrupulously protected").

*Amicus* urges this Court to vacate Goldstein's convictions and remand for a new trial.

## ARGUMENT

As set forth in Goldstein's brief, there are three independent reasons for vacatur. But the conduct underlying those fatal flaws in Goldstein's prosecution was only part of a far broader pattern of impropriety.

# I. THE GOVERNMENT'S IMPROPER CONDUCT WARRANTS A NEW TRIAL

## A. The Government's Repeated *Brady* Violations

The government suppressed material evidence that would have been favorable to Goldstein, in violation of its *Brady* obligations, when it withheld evidence about its star witness: Goldstein's accountant Walter Deyhle. *See United States v. Parker*, 790 F.3d 550, 558 (4th Cir. 2015) (prosecution violates *Brady* where: (1) "undisclosed information was favorable, either because it was exculpatory or because it was impeaching"; (2) "the information was material"; and (3) "the prosecution knew about the evidence and failed to disclose it").

At the start of trial, the government's theory—based on Deyhle's testimony—was that Goldstein hid the full amount of his 2016 gambling winnings from his tax preparer. *See* JA0758, JA0763 (Second Superseding Indictment); *see also* JA1043 (government's opening statement asserted Goldstein "hid" his winnings from Deyhle); JA1045 ("Goldstein didn't share the records of [his] account with his tax preparer or accountants."). But two October 2017 emails from Goldstein to Deyhle, in which Goldstein provided records of his gambling earnings, unequivocally undermined this narrative. *Compare* JA3277 (describing Deyhle's grand jury testimony in which he asserted Goldstein had not provided his

2016 net income in writing), *and* JA5459 (similar), *with* JA5462 (Goldstein providing his 2016 net income to Deyhle via email).

During Deyhle's cross-examination, the defense learned *for the first time* that Deyhle and the government reviewed the October 2017 emails during a mid-trial meeting. JA3285. Yet, despite its *Brady* obligations, the government failed to alert the defense to any discussion of the October 2017 emails that was inconsistent with Deyhle's prior testimony—even though any such discussion would necessarily have been inconsistent, because the emails directly contradicted Deyhle's longstanding story. *See generally* JA3276-93. There can be "no dispute" that Deyhle's "inconsistent statements" qualify as favorable impeachment evidence of which the government was aware. *See United States v. George*, 95 F.4th 200, 208-09 (4th Cir. 2024). This impeachment evidence was material because Deyhle's credibility was central to the government's case. *See generally* JA1047-50 (urging jurors to credit Goldstein's "tax preparers" rather than Goldstein). And it was exculpatory and material because whether Goldstein willfully concealed his income was at issue.

The government's conduct also deviates from prosecutorial norms. It is highly unusual and contrary to government policy to fail to memorialize witness interviews, particularly as to material variances in a witness's testimony. DOJ Manual 9-5.002, Step 1(B)(8)(a) (witness interviews "should be memorialized,"

including "[m]aterial variances in a witness's statements," which should be provided to the defense). As the government's own practice in this case demonstrates, memorializing witness interviews is the standard. *See*, *e.g.*, JA3277 (describing government's transmission of "a sixteen-page letter outlining the various statements made by numerous witnesses" and prior interview memos). And "prosecutors should be particularly attuned to new or inconsistent information disclosed by [a] witness during a pre-trial witness preparation session," as "[n]ew information that is exculpatory or impeachment information should be disclosed . . . even if the information is first disclosed in a witness preparation session." DOJ Manual 9-5.002, Step 1(B)(8)(b) (including deviations from the witness's prior statements).

Regardless of form, when new information is first disclosed in a witness preparation session, the general practice is to disclose that information to the defense, consistent with *Brady* and *Giglio*. *See* DOJ Manual 9-5.002. This makes sense; it cannot be that the government lawfully shirks its *Brady* obligations simply by failing (or refusing) to write down evidence that harms its case. *See United States v. Rodriguez*, 496 F.3d 221, 226 (2d Cir. 2007) ("The obligation to disclose information covered by the *Brady* and *Giglio* rules exists without regard to whether than information has been recorded in tangible form."); *United States v. Spurlock*, 2025 WL 1224720, at *1 (D. Nev. Apr. 25, 2025) ("The government cannot avoid

its disclosure obligation by intentionally not reducing inculpatory statements to writing or by selectively recording certain statements while omitting others . . ."); *see also Clark v. Abdallah*, 131 F.4th 432, 459 (6th Cir. 2025) ("[M]aterial need not appear in tangible form" to require disclosure under *Brady*.).

### B. The Government's Leveraging the District Court's Erroneous Exclusion of Evidence To Mischaracterize the Facts

In its closing argument, the government incorrectly *and repeatedly* mischaracterized the facts. This misrepresentation stemmed from the government's position that, even though the jury's "main question" was whether Goldstein "acted willfully," JA4551, his state-of-mind evidence could be excluded. Specifically, the government argued that Goldstein had no evidence to corroborate his testimony regarding his 2016 gambling income. This was false, and the government knew it. *See generally* JA4750-55.

Indeed, Goldstein testified about a ledger that would corroborate his testimony (the "Phua ledger"). The Phua ledger, contained within a series of text messages, tracked Goldstein's international wins and losses, just as he had testified, and Goldstein testified that he relied on it in good faith. JA0397-98, JA0481-82. The defense attempted to introduce the text messages containing the

Phua ledger into evidence, but the Court erroneously[2] sustained the government's hearsay objection. JA4750; JA0483-85.

Yet the government still told the jury that "there are no records, at least *no records the IRS can get its hands on*," of Goldstein's winnings in Asia. JA4557 (emphasis added). The government knew such evidence existed in the form of the Phua ledger and that it was readily available to the IRS. *See* JA4751. Similarly, the government's argument that "[t]he only evidence of Mr. Goldstein having offsetting losses in Asia is [his] own testimony," JA4574, was inappropriately misleading. The Phua ledger itself and defense witness David Williams would have corroborated Goldstein's testimony—had the Phua ledger been admitted. *See* JA4751-52 (explaining that Williams was not called to testify once the Phua ledger was deemed inadmissible). But *excluded* evidence is not the same as *nonexistent*

[2] The messages and the Phua ledger were not inadmissible hearsay; they were not offered to prove the truth of the transactions reflected but, instead, to show that Goldstein relied on the records in good faith. *See*, *e.g.*, *United States v. Gallagher*, 90 F.4th 182, 195 (4th Cir. 2024) ("Not everything a person says or writes is hearsay. . . . A classic example are statements offered for their effect on the [recipient]. . . . Such statements are not hearsay because their relevance does not depend on whether the [out of court statement reflected] the truth. Instead, they are admissible because they are offered to 'establish the state of mind thereby induced' in the recipient or 'to show the information which the recipient had as bearing on the reasonableness or good faith of subsequent conduct.' ") (cleaned up).

evidence, and the government should know the difference, especially when it obtained its exclusion.

Indeed, the government "may not argue the absence of evidence [it] well knew existed." *United States v. Vargas*, 580 F.3d 274, 278 (5th Cir. 2009) (the government "may not argue the absence of evidence [it] well knew existed"); *United States v. Toney*, 599 F.2d 787, 791 (6th Cir. 1979) ("[T]he closing argument forecloses any possible claim that the exclusion of the [evidence] could have been harmless error" when "[t]he prosecutor told the jury that it should convict because of the absence of evidence which he knew existed.").

And while the government may argue based on reasonable inference (*see infra*), it is *unreasonable* to argue based on information it knows to be untrue. Whether excluding the Phua ledger was correct or not, by asserting the ledger *did not exist*, the government violated Goldstein's due process rights. *Cf. United States v. Wilson*, 135 F.3d 291, 298 (4th Cir. 1998) (reversing conviction and remanding for a new trial because prosecutor's closing argument referred to excluded evidence and "there was no basis from . . . reasonable inference for [this] argument"); *see also United States v. Blueford*, 312 F.3d 962, 963-64, 968 (9th Cir. 2002) (the government "violated defendant's right to a fair trial" where the prosecution asked the jury to make inferences contrary to the evidence); *United States v. Reyes*, 577 F.3d 1069, 1077 (9th Cir. 2009) (the government may not

"present to the jury statements or inferences it knows to be false or has very strong reason to doubt.").

### C. The Government's Misleading Jury Instructions

After closing arguments, the government changed its theory of accessory liability. Until that point, the government had proposed instructing the jury on aiding-and-abetting liability under 18 U.S.C. § 2(a) for every charge. *See* JA4177. Accordingly, the instructions adopted at the charge conference before closing arguments specified the elements for a conviction under § 2(a). *See* JA4259-61, JA4493-94.

As trial progressed, however, the government had apparently realized that aiding-and-abetting liability would not be enough for its case. It also needed to rely on a different form of accessory liability altogether, namely, that Goldstein "willfully caused" another to commit the underlying offenses, which would be a crime under § 2(b). *See* JA546 (court recognizing that this was a "new theory"). By then, the government's mortgage fraud theory had fallen apart, because the evidence showed that Goldstein did not transmit the alleged false statement from the District of Maryland, so venue was lacking. *See United States v. Mosby*, 143 F.4th 264, 281-82 (4th Cir. 2025). The government therefore argued in closing that Goldstein had willfully caused his wife to submit the alleged false statements, while his *wife* was in Maryland. *See* JA4591-92, JA4707-08.

But that is not aiding and abetting another's offense under § 2(a). Even if the government were correct about the facts, they would support only willfully causing another's offense. To retroactively enable the pivot it had made in its closing argument, the government made the extraordinary request *after* closing to simply *delete* the instructions on the elements of § 2(a). JA4740; *cf.* Fed. R. Crim. P. 30(a)-(b) (the court must finalize jury instructions before closing arguments). Without those instructions, the jury could convict Goldstein under § 2 under any theory of accessory liability—possibly including the government's belatedly raised "willfully causing" theory for mortgage fraud under § 2(b)—and without full instruction on the elements of either. This change, adopted by the district court, was clearly erroneous and violated important tenants of criminal procedure. *See United States v. Odum*, 65 F.4th 714, 720 (4th Cir. 2023) (jury instructions on 18 U.S.C. § 2 that only repeated the statue and did not describe the non-textual elements were pain error); *see also* Fed. R. Crim. P. 30(a)-(b); *cf. United Staes v. Clarke*, 842 F.3d 288, 295 (4th Cir. 2016) (failure to provide final instructions to the parties prior to closing "placed Defendant's counsel in the difficult position of having to argue to the jury without knowing how the court would ultimately instruct the jury").

## II. THE GOVERNMENT'S MISCONDUCT PERVADED THE ENTIRE CASE, FROM INVESTIGATION TO SENTENCING

Viewed in context, the above violations of Goldstein's rights were part and parcel of the government's litigation strategy—not mistakes. Indeed, prosecutorial misconduct pervaded every stage of the proceedings below: shifting its theory of liability to pin on Goldstein whatever it could, misleading the Court in *ex parte* filings, flouting the government's *Brady* obligations, making false representations at sentencing, and inflaming the jury rather than focusing on the conduct charged.

Such tactics are an affront to the serious responsibility vested in prosecutors, and they deprived Goldstein of the fair trial guaranteed by the Due Process Clause. *See*, *e.g.*, *United States v. Jeffers*, 570 F.3d 557, 572 n.11 (4th Cir. 2009) (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935) (a prosecutor "may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones.")); *see also Connick v. Thompson*, 563 U.S. 51, 71 (2011) ("It is as much a prosecutor's duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.") (cleaned up).

Indeed, the trial outcome underscores the government's convict-by-any-means-necessary approach. Goldstein was convicted on four counts of willful failure to pay taxes under 26 U.S.C. § 7203. JA0688. But Goldstein filed timely tax returns for each of the tax years at issue, and he ultimately paid every cent of

his tax liability, with penalties and interest. D. Ct. Dkt. 126, at 1. To the defense's knowledge, and to *amicus*'s as well, "the government has never before charged a taxpayer with a crime under these circumstances." *Id.* That charge is typically reserved for taxpayers who fail altogether to file tax returns; the many taxpayers who fail to make full payments on time are typically left to civil proceedings with the IRS. That the government brought a "rare" prosecution under § 7203 for failure to pay taxes, *United States v. Tucker*, 686 F.2d 230, 233 (5th Cir. 1982), underscores the misguided nature of the government's pursuit of Goldstein.

### A. The Government's Shifting Positions To Find Any Viable Strategy Targeting Goldstein

A prosecutor wields great discretion to "choose his cases," but in that discretion lies "the most dangerous power of the prosecutor: that he will pick people that he thinks he should get, rather than pick cases that need to be prosecuted." Jackson, 24 J. Am. Jud. Soc'y at 19. Goldstein's case showcases that dangerous power. Throughout the investigation and prosecution, the government remained focused on Goldstein, but not on any particular crime. It changed its fundamental theory of the case as its factual and legal positions fell apart—even as late as after conviction—so that it could maintain a case against Goldstein under any viable strategy. In *amicus*'s experience, it is highly unusual for the government to change positions with the frequency or to the extent that occurred in this case. Indeed, the government's case was weak, which manifested in its

continuing need to change course. Against this backdrop, the government's last-minute pivot on the § 2 jury instructions (*supra* Part I.C) is especially egregious and demonstrates that the government was motivated to prosecute the man, not the crimes.

*Investigation and charging.* The government started its investigation into Goldstein in 2020. It only sought an indictment years later, finally charging Goldstein in 2025. D. Ct. Dkt. 1. The government would go on to file two superseding indictments. *See* D. Ct. Dkt. 159; JA0748-803. Of course, prosecutors have a continuing duty to evaluate their case and to dismiss charges that are "no longer readily provable or appropriate" because of a change in evidence. DOJ Manual 9-27.300. But the superseding indictments in this case are unusual in that they embodied starkly different theories of the case each time. *Cf. id.* 9-27.320(1) (prosecutors should add charges only when "necessary to ensure that the information or indictment adequately reflects the nature and extent of the criminal conduct involved").

At its core, the government's tax evasion theory arose from its investigation of Goldstein's communications with his accountant, and accordingly focused on Goldstein's alleged failure to disclose his poker winnings to that accountant. D. Ct. Dkt. 1, at 8-16, 37. But the government then padded its case with subsidiary theories of liability and charges that in *amicus*'s experience would have been

highly unlikely to be charged in isolation. For example, the government's initial indictment introduced an additional tax evasion theory of underemployment: the government accused Goldstein of hiring employees for his law firm who performed "little or no work," thereby evading taxes by treating their salaries and health insurance premiums as business expenses. *Id.* at 5. Such a theory raised obvious constitutional vagueness concerns: under the government's interpretation of the tax statutes, employers would have no notice as to when an employee's underperformance might convert employment into a federal crime.

Perhaps as a result, the government pivoted in the second superseding indictment to a theory of sham employment: it now accused Goldstein of intentionally hiring romantic partners for "no-show jobs." JA0752. Ultimately, the district court dismissed *all* the allegations concerning Goldstein's employees, and that theory had no role at trial whatsoever. D. Ct. Dkt. 297.

*Pre-trial release.* Leading up to trial, the government filed (and was granted) an *ex parte* arrest warrant based on misrepresentations. *See generally* D. Ct. Dkt. 45. The government told the district court that Goldstein had violated the terms of his release, because he had transferred funds using two undisclosed cryptocurrency accounts. *See generally* D. Ct. Dkt. 40. But that was patently false: the accounts did not belong to Goldstein, nor did he transfer funds using

them. D. Ct. Dkt. 45, at 4-8. Belatedly recognizing that Goldstein should not have been detained on this basis, the district court ordered his release. D. Ct. Dkt. 62.

*Eve of trial.* Days before jury selection, the government's case changed yet again, this time when it moved to dismiss nearly all the tax evasion counts. *See* D. Ct. Dkt. 337; *see also* D. Ct. Dkt. 343 (granting motion). The government asserted it was doing so to "tailor the issues for trial," but did not explain how or why drastically restructuring the charged conduct on the eve of trial would do that. D. Ct. Dkt. 337, at 1. Indeed, in conversations with the defense shortly before filing the motion to dismiss, the government represented that it would be introducing "all the same evidence" regardless, but would now argue its relevance to the charges of aiding in filing false tax returns. *See* D. Ct. Dkt. 339, at 2. It therefore appeared that the government was *not* motivated by any changes in the facts it would prove. Instead, the government's motion allowed it to sidestep the need for special unanimity instructions requiring the jury to agree on the particular instance of conduct that gave rise to the alleged tax evasion. *Id.*

*Trial.* The government's theory of its case next shifted dramatically between its opening statement and closing argument at trial. At the start of the trial, for example, the government argued that the false statements at issue concerned Goldstein's purportedly undisclosed winnings from a series of poker games against Alec Gores. JA1043-45 (asserting in its opening that Goldstein

"won $26 million from Mr. Alec Gores" in domestic games but "hid" the "winnings from his tax preparer"). But that theory fell apart halfway through the trial, when the government realized the defense had documentary evidence that Goldstein *had* disclosed his winnings in an email to his accountant. JA3279. That email had been produced years earlier, but the government had apparently overlooked it (or willfully ignored it) and only "discovered" it mid-trial as it reviewed the defense exhibits. *Id.*

But, rather than dismiss the false statement counts, the government pivoted to an entirely new theory of the returns' falsity. This new theory centered on different winnings in different games against different individuals. *See* JA4548-49 (arguing in its closing that Goldstein "won almost $50 million playing poker," most of which he won "in Asia from Chairman and Tango" and kept "secret[]" "off the books and offshore").

*Post-trial*. Even after trial, the government continued to equivocate about the accessory liability theories underlying its case. For example, in its opposition to Goldstein's motion for release pending appeal, the government suggested that it had never meant to rely on a § 2(a) theory at all and had sought to amend the jury instructions (*see supra*) because it meant to remove § 2 from the case entirely, not to allow for a conviction under § 2(b). *See* Dkt. 23, at 14-15, 18-19.

In *amicus*'s experience, it is highly improper for the government to make so many changes to fundamental aspects of its case, let alone for it to do so mid-trial and beyond. The government's constantly evolving strategy prejudiced Goldstein's ability to mount his defense. And it ran counter to the Justice Department's consistent guidance and policy that prosecutors focus on particular misconduct, not engage in a freewheeling attempt to find any workable offense for a specific suspect.

### B. The Government's Repeated Bouts of Dishonesty to Judge and Jury

From its pre-indictment investigation through sentencing, the government supported its case with mischaracterizations and the intentional concealment of evidence. None of this is proper.

#### 1. Pre-Trial, *Ex Parte* Misrepresentations to the Court

The government's misconduct began from the jump. In October 2023 and May 2024, the government applied *ex parte* to suspend the statute of limitations[3] under 18 U.S.C. § 3292, on the ground that it sought a foreign government's assistance obtaining evidence located abroad. *See* D. Ct. Dkt. 116-1 ¶ 5. The applications and accompanying declarations—and, in turn, the court's order

[3] The relevant statutes of limitation were to otherwise expire in October 2023. D. Ct. Dkt. 116, at 5.

granting both—were based on material misrepresentations. D. Ct. Dkt. 116, at 9-26.

For example, the declarations averred that Goldstein "may have used [his Montenegro-based bank] accounts to further hide his income from the IRS and further evade U.S. taxes." D. Ct. Dkt. 116-4, at 10-11 (Accardi Decl.); D. Ct. Dkt. 116-5, at 14 (Accardi Decl.). As evidence of this, the declarations asserted that, when questioned, Goldstein falsely stated that the Montenegrin transfers reflected loans rather than income. *See* D. Ct. Dkt. 116-5 ¶ 13. But that was untrue. As the government later admitted, "Goldstein did not claim that the 2016 [Montenegrin] transfers were loans." D. Ct. Dkt. 116-3 at 2 n.1.

The government was also forced to admit that its applications incorrectly claimed that Goldstein did not report approximately $1 million deposited in his Montenegrin account in 2016. *See id.* ("of the approximately $1,000,000 . . . , he reported as income the $885,000").[4]

These *ex parte* misrepresentations improperly tolled the statute of limitations, when it otherwise would have expired before indictment as to the 2016 tax year. Indeed, these misrepresentations got at the heart of what the government

---

[4] The applications also incorporated other falsehoods unrelated to the Montenegrin accounts. These side-issues atmospherically corroborated the government's theory that Goldstein willfully hid his income but, again, were based on false factual allegations. *See* D. Ct. Dkt. 116, at 13-26.

was required to show to properly toll the statute of limitations: whether, "by a preponderance of the evidence," it reasonably appeared that the evidence sought was located abroad. 18 U.S.C. § 3292. A declaration riddled with affirmative misstatements about where and why evidence might be abroad—especially when contravened by then-available evidence—cannot meet this standard. *See United States v. Trainor*, 376 F.3d 1325, 1331-33 (11th Cir. 2004) ("[T]he nature of § 3292 proceedings suggests the Government must provide evidence bearing some indicia of reliability" and sworn declarations must "contain[] the necessary factual information" to satisfy the government's burden); *United States v. Ratti*, 365 F. Supp. 2d 649, 658 (D. Md. 2005) ("Since the Fourth Circuit has yet to address this issue, the Court will take *Trainor* as the standard."); *United States v. Jenkins*, 633 F.3d 788, 797-98 (9th Cir. 2011) (§ 3292 requires a factual finding, by a preponderance of the evidence, that relevant evidence is located abroad); *United States v. Michel*, 2019 WL 5797669, at *9 (D.D.C. Nov. 6, 2019) (§ 3292 requires that the requested evidence be "reasonably specific" to the crimes under investigation).

The government's applications, resting on affirmative misstatements, run afoul of both § 3292's requirements and prosecutorial norms. This is especially so when the marred *ex parte* applications (to which Goldstein could not respond in real time) had dispositive consequences: improperly tolling the statute of

limitations just in the nick of time. *See* Jackson, 24 J. Am. Jud. Soc'y at 18 (A prosecutor's "discretion is tremendous . . . on the basis of his one-sided presentation of the facts; [he] can cause the citizen to be indicted and held for trial."). Because it involves the *ex parte* presentation of evidence, tolling under § 3292 should be "carefully made." *Ratti*, 365 F. Supp. 2d at 658. But the government was anything but careful here.

#### 2. Systematic Suppression of Favorable Evidence in Violation of *Brady*

The government's suppression of the Deyhle material was not its first *Brady* violation. Indeed, when the Deyhle suppression came to light, the district court had already cautioned the government against violating *Brady*. Yet the government did exactly that.

The government's first *Brady* violation involved emails between the government's lead agent (Accardi) and a key witness (accountant Shuman). *See generally* D. Ct. Dkt. 367. The emails, which the government sat on for years, were exculpatory and material because they rebutted the government's core theory that Goldstein willfully caused his personal payments to be mischaracterized as business expenses. *Id.* at 2-7. Specifically, before Goldstein's indictment, Shuman stated that *no records existed* that would support the government's theory that Goldstein reviewed and approved of the accounting records Shuman's firm maintained. *Id.* at 3. Indeed, Shuman said that his firm—not Goldstein—

"controlled [the] process" of coding and classifying transactions and that any related communications would be with "[Goldstein's] assistant rather than with [Goldstein] directly." *Id.* (citing suppressed emails); *see also* JA2067.

The emails were undeniably suppressed because the government's lead investigator was a participant on them. *See United States v. Robinson*, 627 F.3d 941, 951 (4th Cir. 2010) ("[T]he knowledge of some of those who are part of the investigative team is imputed to prosecutors regardless of the prosecutors' actual awareness."). The emails only came to light via a non-party subpoena—not because the government disclosed them. JA2058. Accordingly, the suppressed Accardi-Shuman emails satisfy all prongs of *Brady*, as the district court correctly held. JA2069-73; *see also* Dkt. 381. Because this *Brady* violation was discovered mid-trial, the Court only granted Goldstein "latitude" when cross examining Shuman and did not issue further remedies. JA2072-73. This slap-on-the-wrist approach likely informed the government's disregard of its *Brady* obligations with respect to the Deyhle material.

**3. Continued Mischaracterizations at Sentencing**

The government's pattern of skewing the truth did not end with the verdict. In pursuing an extraordinary 97-month sentence, the government pointed to Goldstein's *alleged* failure to *timely* file and pay taxes in 2022 and 2023 to drive up the sentencing guidelines. D. Ct. Dkt. 520, at 41-43. The government argued

that these belated but partially paid taxes—which were factually and temporally distinct, D. Ct. Dkt. 541, at 12, from the crimes of conviction—were "relevant conduct" under the sentencing guidelines. D. Ct. Dkt. 520, at 41-43. But the guidelines instruct that additional conduct violating the tax laws should not be considered in determining the total tax loss attributable to the offense when "the evidence demonstrates that the [additional] conduct is clearly unrelated." U.S.S.G. § 2T1.1 app. n.2. And as the district court noted prior to and at trial, that was the case here. *See* D. Ct. Dkt. 541, at 12 (describing pre-trial and mid-trial evidentiary rulings). By characterizing Goldstein's late, but paid taxes as "related" to willful tax evasion (when it was not), the government's calculation of tax loss increased more than $7.6 million. *See id.* at 11-14.

The government similarly shoehorned $4.5 million of tax "loss" associated with the misdemeanor offenses (Counts 10-13) into the total tax loss for Goldstein's felony offenses. *Id.* at 14. But Goldstein had already paid those taxes (including penalties and interest) before indictment, so there was no actual loss. *Id.* The government's reference to uncharged and misdemeanor conduct skyrocketed Goldstein's sentence far beyond what was otherwise appropriate. JA5392 (the court considering both).

The government also made false statements at sentencing and, without prior notice to the defense, convinced the Court to revoke Goldstein's bond. *See*

*generally* JA5402-24. It argued that Goldstein's 2025 tax returns, in which he reported gambling, revealed a violation of his pre-trial release conditions. D. Ct. Dkt. 541, at 32. Not so: the gambling reflected in Goldstein's 2025 tax returns occurred *before* his indictment and, therefore, could not possibly violate the terms of his release. *Id.*; *see also* D. Ct. Dkt. 501, at 1-2 (Goldstein disclosed this pre-indictment gambling to his probation officer). The government also falsely asserted that Goldstein's 2025 tax returns improperly claimed a credit from prior years. *See* D. Ct. Dkt. 541, at 31. But Goldstein was exercising an option provided by the IRS. *Id.*; JA5325-26.

"[T]he government, like any party, has a duty of candor to the court," including at sentencing. *United States v. Craig*, 142 F.4th 192, 198 (4th Cir. 2025) (discussing government's duty of candor when seeking an enhancement). The government's misrepresentations at the sentencing phase were not flukes; they were persistent features of the government's litigation strategy that infected every stage of the proceedings.

### C. The Government's Improper Focus on Goldstein as an Individual, Rather Than the Purported Misconduct

Before trial, the government repeatedly sought authorization to introduce irrelevant and prejudicial evidence about Goldstein's personal life. The government's Rule 404(b) notice focused on Goldstein's "personal expenses," his lawful poker activities, and his purported relationships with employees. D. Ct.

Dkt. 210, at 5. In a trial ostensibly about taxes, the government sought to introduce "graphic" evidence of "emails, text messages, videos, . . . photographs . . . and . . . online dating profiles" that bore little connection to the charged conduct. *Id.* at 23. None of it related to tax return accuracy. Next, the government sought to present at trial cumulative evidence about Goldstein's spending habits. D. Ct. Dkt. 375, at 2 n.1 (listing hundreds of pages of proposed personal spending evidence the government intended to introduce at trial).

The government's trial presentation confirmed its improper focus on Goldstein's person, not his alleged misconduct. The government's opening statement referenced Goldstein's spending on his car, restaurant bill, and rental property. *Id.* at 1. The government further obtained leave to introduce evidence of dozens of personal transactions, on the tenuous ground that they revealed Goldstein's willfulness on misdemeanor charges. JA0039-40, JA0045-46. And in cross-examining Goldstein, the government walked through a lengthy, itemized list of personal expenses in a manner that risked unfairly prejudicing the jury against Goldstein. JA4036-42. At every turn, the government introduced personal spending evidence of questionable relevance to cast a shadow over all the charges, creating a substantial risk of improper character-based inferences.

The government's strategy raised serious concerns about its potential to "unduly excite the emotions of the jury." *United States v. Queen*, 132 F.3d 991,

994 (4th Cir. 1997). By introducing such evidence before a jury charged with evaluating complex tax charges, the government risked encouraging the jury to focus on Goldstein's wealth and lifestyle, rather than the charged conduct. Where the government presents evidence of the defendant's involvement in inflammatory activities, it runs a risk that "jurors will convict a defendant based on the jurors' disdain." *United States v. Ham*, 998 F.2d 1247, 1252-53 (4th Cir. 1993). Thus, courts prohibit prosecutorial "appeals to wealth and class biases" to obtain a conviction. *See Sizemore v. Fletcher*, 921 F.2d 667, 670 (6th Cir. 1990). "Such appeals to class prejudice must not be tolerated in the courtroom," for fear that a defendant's station in life (and not his alleged conduct) will become the focus of the trial. *See id.* at 672. And where prosecutors "intend to arouse prejudice against the defendant because of his wealth," such appeals to class prejudice require reversal. *United States v. Stahl*, 616 F.2d 30, 32-33 (2d Cir. 1980).

The government's approach in this case is fundamentally at odds with the standards that guide federal prosecutors. *See* DOJ Manual 9-27.260 (the decision to prosecute an individual "may not be influenced by" specific characteristics of the defendant, including "political association, activities, or beliefs," the prosecutor's "own personal feelings concerning the [defendant]," or the "possible effect of the decision on the [prosecutor]'s own professional or personal circumstances"). As a former prosecutor, *amicus* takes seriously the law's

admonition that the courtroom is no place for appeals to class resentment or personal animus. *Cf.* Jackson, 24 J. Am. Jud. Soc'y at 19 (warning that the "greatest danger of abuse of prosecuting power" is where "the prosecutor picks some person whom he dislikes or desires to embarrass"). A jury's duty is to decide a case on the facts and apply the law, not on whether a defendant's lifestyle offends the jurors' sensibilities.[5] The government's approach here fell short of that ideal.

## CONCLUSION

For the foregoing reasons, *amicus* requests that the Court vacate Goldstein's convictions and remand for a new trial.

[5] The government employed a similar tactic in seeking an exorbitant sentence. *See*, *e.g.*, D. Ct. Dkt. 520, at 5 (referring to Goldstein's "exorbitant lifestyle, replete with Bentleys, globe-trotting vacations, and a $200,000, watch"); JA5305 (arguing at sentencing that Goldstein "spent an incredible amount of money on himself, on personal expenditures, romantic partners . . . to prioritize himself and his luxury over paying his taxes").

Respectfully submitted,

/s/ *Andrew E. Goldsmith*
Andrew E. Goldsmith
Annamaria M. Morales-Kimball
Alyssa J. Picard
Eric X. Xu
KELLOGG, HANSEN, TODD,
FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
agoldsmith@kellogghansen.com
amorales-kimball@kellogghansen.com
apicard@kellogghansen.com
exu@kellogghansen.com

*Counsel for Amicus Curiae*

September 17, 2026

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

**No.** 26-4392 **Caption:** United States v. Goldstein

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

**Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2) & 40(d)(3).

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6). Sans-serif type, such as Arial, may not be used except in captions and headings.

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

☑ this brief or other document contains 6,071 [*state number of*] words

☐ this brief uses monospaced type and contains ____________ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

☑ this brief or other document has been prepared in a proportionally spaced typeface using
Microsoft Word [*identify word processing program*] in
Times New Roman, 14 point [*identify font, size, and type style*];

**or**

☐ this brief or other document has been prepared in a monospaced typeface using
____________ [*identify word processing program*] in
____________ [*identify font, size, and type style*].

**NOTE: The Court's preferred typefaces are Times New Roman, Century Schoolbook, and Georgia. The Court discourages the use of Garamond.**

(s) Andrew E. Goldsmith

Party Name John M. Dowd Date: 09/17/2026

**CERTIFICATE OF SERVICE**

I hereby certify that, on September 17, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

/s/ *Andrew E. Goldsmith*
Andrew E. Goldsmith

*Counsel for Amicus Curiae*