# No. 26-4392

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FOURTH CIRCUIT**

---

**UNITED STATES OF AMERICA,**

**Plaintiff/Appellee**

**v.**

**THOMAS C. GOLDSTEIN,**

**Defendant/Appellant**

---

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NO. 25-CR-6**

---

## ANSWERING BRIEF FOR THE UNITED STATES

---


**COLIN M. MCDONALD**
*Assistant Attorney General*
*National Fraud Enforcement Division*

| | |
|---|---|
| **KATIE BAGLEY** | **(202) 598-3298** |
| **JOSEPH B. SYVERSON** | **(202) 598-5861** |
| **SEAN BEATY** | **(202) 598-7004** |
| **EMERSON GORDON-MARVIN** | **(202) 598-7011** |
| **HAYTER WHITMAN** | **(202) 227-0683** |
| **JASON POOLE** | **(202) 532-3706** |

*Attorneys*
*U.S. Department of Justice*
*950 Pennsylvania Ave., NW*
*Washington, D.C. 20530-0001*

*Of Counsel:*
**KELLY O. HAYES**
*United States Attorney*

## TABLE OF CONTENTS

**Page**

Table of contents .................................................................................ii

Table of authorities ...............................................................................iv

Introduction............................................................................................ 1

Statement of the issues .......................................................................... 3

Statement of the case ............................................................................. 3

A. Procedural history ........................................................................ 3

B. Offense conduct ............................................................................ 4

Summary of argument .......................................................................... 14

Argument............................................................................................... 17

I. There was no *Brady* violation .................................................. 17

A. Standard of review ................................................................ 17

B. Background............................................................................ 17

C. There was no *Brady* violation .............................................. 24

D. Any error is limited to Count One ........................................ 40

II. The district court correctly excluded text messages as inadmissible hearsay ........................................................................ 44

A. Standard of review ................................................................ 44

B. Background............................................................................ 44

C. The text messages were inadmissible hearsay............. 49

D. Any error was limited to Count One .............................. 59

III. There was no instructional error .......................................... 60

A. Standard of review ...................................................... 60

B. Background................................................................. 60

C. The jury instructions did not allow Goldstein to be convicted of 18 U.S.C. §2 liability .................................. 64

Conclusion ............................................................................... 73

Statement regarding oral argument ........................................ 73

Certificate of compliance

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Boyde v. California*,
494 U.S. 370 (1990) .......... 71

*Bowman v. Stirling*,
45 F.4th 740 (4th Cir. 2022) .......... 40

*Spicer v. Roxbury Correctional Institute*,
194 F.3d 547 (4th Cir. 1999) .......... 32, 33

*United States v. Agurs*,
427 U.S. 97 (1976) .......... 29

*United States v. Aramony*,
88 F.3d 1369 (4th Cir. 1996) .......... 67

*United States v. Bishop*,
264 F.3d 535 (5th Cir. 2001) .......... 38

*United States v. Buculei*,
262 F.3d 322 (4th Cir. 2001) .......... 37

*United States v. Covington*,
180 F.4th 576 (4th Cir. 2026) .......... 65

*United States v. Dugan*,
136 F.4th 162 (4th Cir. 2025) .......... 29

*United States v. Gallagher*,
90 F.4th 182 (4th Cir. 2024) .......... 56

*United States v. Gentner*,
177 F.4th 519 (4th Cir. 2026) .......... 42, 65

*United States v. George*,
95 F.4th 200 (4th Cir. 2024) ............................................ 25, 28, 30, 32

*United States v. Horton*,
921 F.2d 540 (4th Cir. 1990)............................................................... 72

*United States v. Hoyte*,
51 F.3d 1239 (4th Cir. 1995)............................................................... 30

*United States v. Ibisevic*,
675 F.3d 342 (4th Cir. 2012)........................................................ 52, 56

*United States v. Ince*,
21 F.3d 576 (4th Cir. 1994)................................................................. 52

*United States v. Jinwright*,
683 F.3d 471 (4th Cir. 2012)............................................................... 50

*United States v. Jordan*,
2021 WL 24778 (W.D. Va. 2021) ........................................................ 40

*United States v. Joyner*,
187 F.4th 84 (4th Cir. 2026) .................................................. 52, 59, 60

*United States v. Kaixiang Zhu*,
854 F.3d 247 (4th Cir. 2017)............................................................... 44

*United States v. Kuehner*,
126 F.4th 319 (4th Cir. 2025) ..................................................... 17, 25

*United States v. Odum*,
65 F.4th 714 (4th Cir. 2023) ............................................................... 66

*United States v. Rashwan*,
328 F.3d 160 (4th Cir. 2003)........................................................ 60, 69

*United States v. Richeson*,
825 F.2d 17 (4th Cir. 1987) .......... 61

*United States v. Ruffin*,
613 F.2d 408 (2d Cir. 1979) .......... 61, 69

*United States v. Rydland*,
461 F. App'x 208 (4th Cir. 2012) .......... 57

*United States v. Service Deli Inc.*,
151 F.3d 938 (9th Cir. 1998) .......... 32, 33

*United States v. Smith Grading & Paving, Inc.*,
760 F.2d 527 (4th Cir. 1985) .......... 27

*United States v. Taylor*,
942 F.3d 205 (4th Cir. 2019) .......... 33, 34

*United States v. Wayne*,
903 F.2d 1188 (8th Cir. 1990) .......... 40

*United States v. Williams*,
644 F.2d 696 (8th Cir. 1981) .......... 67

*United States v. Zorio*,
34 Fed. App'x 296 (9th Cir. 2002) .......... 36

*Wearry v. Cain*,
577 U.S. 385 (2016) .......... 32, 33

**Statutes**

18 U.S.C. § 2 .......... Passim

18 U.S.C. § 1014 .......... 3, 64, 68

26 U.S.C. § 7201 .......... 3, 64, 67

**Rules**

Fed. R. Evid. 801(c)(2) ........ 49

Fed. R. of Crim. Proc. 30(b) ........ 72

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FOURTH CIRCUIT**

---

**No. 26-4392**

**UNITED STATES OF AMERICA,**

**Plaintiff/Appellee**

**v.**

**THOMAS C. GOLDSTEIN,**

**Defendant/Appellant**

---

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NO. 25-CR-6**

---

**ANSWERING BRIEF FOR THE UNITED STATES**

---

## INTRODUCTION

Thomas Goldstein was convicted of tax and mortgage-fraud crimes. On appeal, he misunderstands the government's case and describes inconsequential events as significant errors. But his sharp rhetoric does not alter what the record shows: he received a fair trial, and his conviction should stand.

Goldstein makes a *Brady* claim about his accountant's statements, but because he already had the most powerful impeachment evidence —

an email contradicting past statements — his argument depends on minutiae. What he claims was withheld was that the accountant implicitly acknowledged that email's accuracy in a mid-trial prep session. Regardless, Goldstein learned this in time to prepare a thorough cross-examination, which repeatedly prompted the accountant to admit his inconsistent statements.

Goldstein claims the district court wrongly excluded as hearsay text messages supporting his supposed then-existing beliefs about his 2016 gambling winnings, but according to his testimony, the messages contradicted his good-faith belief back then. Only a decade later, preparing for trial, did he supposedly discover that he lost money in 2016. And the exclusion was merely nominal: Goldstein repeatedly refreshed his recollection using the messages, repeated the messages to the jury, and told the jury in closing that the messages corroborated his testimony.

Finally, Goldstein claims that because the jury instructions mentioned aiding-and-abetting, the court should have instructed on the elements of aiding-and-abetting, but the court identified those references as mere allegations. The jury could not have convicted on an

aiding-and-abetting theory because the instructions required it to find the substantive elements of each offense. And there was no need to instruct on a liability theory not actually presented to the jury.

## STATEMENT OF THE ISSUES

I. Whether the district court correctly held that the government did not violate *Brady*.

II. Whether the district court properly exercised its discretion to exclude text messages as hearsay.

III. Whether the district court properly exercised its discretion not to instruct the jury on aiding-and-abetting liability.

## STATEMENT OF THE CASE

### A. Procedural history

A jury found Goldstein guilty on nine tax counts for five years: tax evasion (26 U.S.C. § 7201) (2016); four counts of aiding the preparation of false returns (§7206(2)) (2017, 2019-21); and four counts of willfully failing to pay taxes (§7203) (2017, 2019-21). He was also convicted on three counts of false statements on mortgage applications (18 U.S.C. § 1014). He was acquitted on four counts of §7206(2). Goldstein was sentenced to 72 months' imprisonment. (JA681.) This appeal followed.

## B. Offense conduct

Goldstein was a prominent Supreme Court litigator turned high-stakes poker player. (JA1092, JA2825.) In 2012, the IRS audited Goldstein and told him to keep better gambling records. (JA1859-1861, JA1867-1868, JA1903.) Afterward, Goldstein fired his return preparer, ostensibly because of the preparer's failings. (JA1906-1907.) Goldstein hired accountant Walter Deyhle, but for several years never told Deyhle about his poker playing. (JA2867, JA2876-2877.)

### 1. Tax year 2016 (evasion of tax assessment)

In 2016, Goldstein won about $50 million playing poker against three wealthy individuals: "Chairman," "Tango," and Alec Gores. (JA1133-1135.) In these matches, Goldstein had "investors" who shared in his winnings (or losses). (JA381, JA1108, JA5441-5442.) According to Goldstein, he "personally cleared about $12 million" after investors' shares. (JA5456.)

In January 2017, Goldstein told Deyhle that he had won over $20 million gambling in 2016 but had paid out a substantial amount to investors. (JA2888-2889.) On December 22, 2016, Goldstein created a ledger of his poker activity, recording the receipt of $27,235,000 and

payouts of $21,366,700, for nearly $6 million net. (JA2368, JA2906, JA3677-3678, JA3680, JA5458). In March 2017, Deyhle told Goldstein that he would owe $600,000 in taxes before accounting for any gambling winnings. (JA2891.)

On October 8, 2017, Deyhle asked Goldstein for the 2016 gambling figures; Goldstein replied on October 12 that he won $27,185,050, with losses and distributions of $24,436,700, so "the net was [$]2,748,350." (JA5761.) On October 13, Goldstein emailed himself a new version of the ledger, which kept the receipts the same but added over $3 million in payouts — which Goldstein summed on a line labeled "REV" — to match the losses and distributions figure he emailed Deyhle. (JA2909-2912, JA3686.)

These additions comprised three improper items. Goldstein added a $770,000 gambling-related payment he made in January 2017 (not 2016) to Bob Safai, another businessman he played poker with. (JA472, JA1258-1263, JA2910-2911, JA3681-3682). This was despite Goldstein's knowledge that there was "no carry forward for gambling losses." (JA5674, JA2371-2372.)

Goldstein also double-counted a $1.3 million payment to the Resnicks (JA3685), business owners who had loaned him money for gambling. (JA2823, JA2826). And he included a $1 million payment even though the wire was returned. (JA3682.) In December 2016, Goldstein had instructed his assistant to resend "the wire to Montenegro by Friday so that can be distributed this year for tax purposes." (JA3683.) The assistant responded that this was impossible; the wire was not sent in 2016. (JA3683-3684.)

The "Ins" on Goldstein's ledger — $27,235,000 — closely matched what he reported to Deyhle as his gross winnings. (JA2906-2907.) The ledger did not include Goldstein's winnings from games in Asia against Chairman and Tango[1] or the $250,000 he won playing Andrew Robl and actor Kevin Hart. (JA2907-2908, JA5441.) Goldstein did not share either version of the ledger with Deyhle. (JA2895.)

Deyhle prepared Goldstein's 2016 return using the $2,748,350 net gambling income figure that Goldstein provided. (JA3688.) Goldstein's return thus did not include his full gambling winnings or the $3.3

[1] Goldstein's ledger recorded $750,000 of his Chairman winnings that he transferred from Montenegro but listed the name as "??" (JA3674-3675, JA409.)

million difference in net winnings between the original and the falsely revised ledger. (JA3676, JA3680, JA3688-3689.)

In 2016, Goldstein also falsely categorized as business expenses six poker-related payments from his law firm's account, causing Deyhle to deduct them on the firm's tax return. (JA3699-3700, JA5823.) This reduced the firm's income and thus the income that Goldstein reported as shareholder. (JA3703.) These payments, which totaled around $1.1 million, included payments to the Resnicks and to Robl, Alfred Decarolis, and Safai to cover poker losses and loan repayments. (JA1964-1970, JA1265-66, JA2272, JA2826.) Goldstein knew how to classify payments as personal distributions rather than business expenses (JA4013), and he knew that to ensure correct classification of personal expenditures he should first wire the funds to his personal account (JA4016).

The day before Goldstein first created his 2016 poker ledger, he asked his assistant for financial information, including wires of $40,000 or more sent to "individuals like Dan Bilzerian," another poker associate. (JA1442, JA3701, JA1967.) The assistant emailed Goldstein

a spreadsheet listing wires from the firm account, including wires for poker-related payments categorized as legal fees. (JA3701-3702.)

Goldstein's actual 2016 tax due was, conservatively, $1.4 million more than what he reported. (JA3709.) This calculation used only $6 million in 2016 net gambling income; it did not account for Goldstein's admission that he "cleared about $12 million" (JA5456) or his Chairman and Tango winnings (JA3676-3677).

**2. Tax year 2016 (evasion of payment)**

Goldstein's 2016 return reported nearly $1.7 million in tax owing, which he did not timely pay. (JA2935.) In late 2016, Goldstein wrote that he had "$800,000 in Asia," but he would use this money to fund upcoming poker matches rather than pay his taxes; he said he would pay the tax "penalties instead. That's fine and it's my problem." (JA5674, JA2371-2372.)

By early 2018, Goldstein owed over $1.8 million; the IRS began collections. (JA2001-2003.) In March, an IRS revenue officer visited Goldstein's home. (JA2007-2009.) Goldstein asked if she was from "criminal investigation," something no taxpayer had asked her before. (JA2021.) Goldstein told the officer that his outstanding 2016 balance

resulted from "a large payment from a case." (JA2010-2011 (cleaned up).) He never mentioned his gambling. (JA2012.)

During the meeting, Goldstein wrote a $100,000 check and said he would try to pay the rest by year's end. (JA2010, JA2013.) Meanwhile, the IRS placed a notice of federal tax lien on Goldstein's then-residence in Maryland. (JA2022.) Because Goldstein did not fully pay, the IRS issued several levies, seizing nearly $1 million from a personal account. (JA2022-2028.)

In May 2019, Goldstein and the IRS entered a monthly installment-payment agreement for his outstanding 2016 and 2017 taxes, which were then about $1.2 million. (JA2142-2144.) The agreement required Goldstein to timely pay future taxes and warned that a breach could result in cancellation and collection by levy of the entire balance. (JA2144-2145.)

In October 2020, IRS-CI special agents interviewed Goldstein, notifying him he was under criminal investigation. (JA3235-3237.) Goldstein told the agents that most of his 2016 gambling winnings were from Gores, which was the only match for which he had investors; Goldstein did not mention playing Chairman or Tango. (JA3253-3258,

JA3263-3264.) Shortly afterward, Goldstein started offering his assistant various things — such as Bitcoin, a $10,000 payment, student loan repayments — leading her to text a friend: "The tax stuff must be getting to him because he keeps offering me money." (JA2521-2524.)

In 2021, Goldstein wanted to buy a house in Washington, D.C. (JA3181-3182.) In February, Goldstein asked his assistant for information on his IRS installment plan; Deyhle's firm told the assistant that Goldstein was in default because he had not timely paid his 2019 taxes. (JA2680-2683.). Goldstein closed the sale the next month by transferring funds through a circuitous route that included his firm's IOLTA. (JA70-71.) Goldstein knew his IOLTA was meant for client funds. (JA4011.)

**3. Tax years 2017, 2019-2021 (false returns)**

Goldstein's law firm's 2017 tax return omitted legal fees that he diverted to his personal account despite knowing that he needed to report firm income that was not deposited into the firm's account. (JA1602-1611, JA1815, JA3711.) He also used firm funds to pay a poker debt: after persuading a plaintiff's firm he worked with to invest $500,000 in his poker matches, he instead used the money to pay down

his existing poker debt to Safai. (JA1631-1644, JA4054.) When the firm asked for its investment back, Goldstein had $175,000 sent from his law firm's account, which he improperly treated as a business expense. (JA1647-1654, JA3712.)

Goldstein omitted more than $300,000 in gambling winnings from his 2019 personal return. (JA2084-2086, JA3723, JA5443.) His 2019 law firm return was also false, again because Goldstein used firm funds to pay a poker debt and because the return omitted legal income from Paul Phua, an investor in Goldstein's poker matches. (JA2350-2351, JA175, JA3720-3721.) In October 2020, days after learning he was under criminal tax investigation, Goldstein asked how the Phua deposit was classified, was told it was classified as a distribution, not income to the firm, and responded, "Thanks very much." (JA3236-3237, JA3720-3721.)

Goldstein again omitted gambling winnings from his 2020 personal return. (JA3731-3732, JA5443, JA5450.) He also falsely reported that he engaged in no cryptocurrency transactions in 2020, despite having conducted hundreds of thousands of dollars in such transactions. (JA2386-2392, JA3016-3017, 3724-3726.)

In 2021, Goldstein's cryptocurrency use increased: he executed transactions totaling several million dollars, often using a virtual private network to access Binance, a foreign exchange that blocked U.S. customers. (JA2392-2404.) As in 2020, Goldstein falsely reported on his return that he used no cryptocurrency. (JA3732-3733.) Goldstein also did not report over $250,000 in gambling winnings. (JA5444, JA5450, JA5821.) Finally, Goldstein did not report $500,000 in legal fees he earned from actor Tobey Maguire. (JA3733-3734.) Maguire hired Goldstein to collect a poker debt; Goldstein directed Maguire to send the fees directly to Safai to pay down Goldstein's own poker debt. (JA2102-2103, JA2110-2112.)

**4. Tax years 2017, 2019-2021 (willful failure to pay)**

As with 2016, Goldstein failed to timely pay the taxes reported on his 2017, 2019, 2020, and 2021 returns, which totaled over $3.5 million. (JA5824.) Instead, he spent extravagantly, not only on gambling, but also on luxury vacations; property rentals in California, Florida, and Nevada; Bentley cars; a $200,000 Piguet watch, and nearly $1 million in Venmo and PayPal transactions. (JA2748-2750, JA5812.) Goldstein failed to pay even after an IRS revenue officer told him in 2018 he had

not paid his 2017 taxes (JA2027), and even after he learned of the IRS's criminal investigation in October 2020 (JA3236-3237).

**5. False mortgage applications**

In 2021, Goldstein wanted to buy a house in Washington, D.C., but he still owed poker debts of around $15 million to Safai and the Resnicks. (JA2780, JA3180-3183, JA4046.) Goldstein applied for several mortgages, but, as he admitted to a friend, he "understated his debts" on these applications, "especially the multiple millions of dollars that that he still owed to Resnick." (JA5457.)

These applications included two to First Savings Mortgage, which rejected them after discovering the tax liens on Goldstein's Maryland house. (JA2791-2792.) Again concealing his poker debts, Goldstein then induced a litigation funder he knew to loan him the money. (JA3181-3190, JA3205-3208.) After closing, Goldstein sought a nearly $2 million refinancing mortgage from NFM Lending, as required by his agreement with the litigation funder (JA3206), omitting not only his poker debts but also his new obligations to the funder. (JA124-129.) The NFM application was successful. (JA136.)

## SUMMARY OF ARGUMENT

I. The district court correctly found no *Brady* violation with respect to the government's disclosures about Deyhle. Goldstein knew the most important impeachment information for Deyhle: an email contradicting Deyhle's prior statements about what Goldstein told him about the 2016 gambling winnings. Goldstein received that email in discovery and identified it as a defense exhibit. Goldstein is limited to contending that the government did not disclose that Deyhle implicitly accepted the email at a mid-trial prep session a few days before he testified. But that implicit acceptance only confirmed what Goldstein already knew. And Goldstein learned of it anyway from Deyhle's first day of direct testimony, so he had ample time to prepare for cross-examination the next day.

Regardless, any nondisclosure was immaterial. Goldstein thoroughly cross-examined Deyhle on his inconsistent statements, getting him to repeatedly admit that his past statements were wrong. And the email documented what Goldstein told Deyhle, greatly diminishing the importance of Deyhle's credibility on this issue. Lastly,

any nondisclosure was material only to Count One, which covered tax year 2016.

II. The district court properly exercised its discretion by excluding as hearsay text messages purportedly showing Goldstein lost money gambling in 2016. Goldstein invoked the then-existing state-of-mind exception, contending the messages showed his prior beliefs about his 2016 winnings, but he testified that his belief at the time *contradicted* the messages and was instead consistent with what he told Deyhle: that he had $2.7 million in net winnings for 2016. Goldstein testified that it was only in preparing for trial that he realized he had been mistaken in what he told Deyhle and that he lost millions in 2016. Because Goldstein's own testimony demonstrates that the text messages did not show his past state of mind, they were properly excluded as hearsay.

Regardless, any error was harmless because Goldstein used the messages extensively to refresh his recollection at trial, in a way that made clear to the jury that his testimony was based on the messages. His counsel repeatedly emphasized this, telling the jury that Goldstein's testimony "was corroborated with text messages from the time," that

Goldstein "walked through all of these numbers," and that Goldstein "used contemporaneous documents to testify." Goldstein thus conveyed his point as effectively as if the messages had been introduced. Finally, as with his first argument, any error is limited to Count One.

III. The district court properly exercised its discretion not to read an instruction on aiding-and-abetting liability because the jury was not allowed to convict on a §2 theory. The government had proposed an instruction based on §2(a), which covers abetting a principal offender, but presented no §2(a) case. It had planned to invoke §2(b), which covers causing an intermediary to commit an act, for the limited purpose of supporting venue for Count 15, but the court precluded that theory. The government candidly admitted it had erroneously conflated the two subsections, a common mistake. Because the government ultimately presented no §2 case, the court correctly declined to instruct on §2.

Because this change came after closing, the court did not have time to wordsmith the instructions, and told the jury that Goldstein was charged with §2. But the court described these passing references as mere allegations. And after each §2 allegation, the jury was expressly

instructed on the elements of the offenses and told it must apply *those* tests in determining Goldstein's guilt. There was no way for the jury to convict under §2; any guilty vote it cast was because it found that Goldstein committed all the elements of a substantive offense. Lastly, any error is limited to Count 15, or to the mortgage-fraud convictions.

## ARGUMENT

### I. There was no *Brady* violation

#### A. Standard of review

This Court reviews "the district court's legal conclusions in a *Brady* ruling *de novo* and its factual findings under the clear error standard." *United States v. Kuehner*, 126 F.4th 319, 330 (4th Cir. 2025).

#### B. Background

##### 1. Deyhle's pre-trial statements and the emails

The government interviewed Deyhle several times before trial, and he testified before a grand jury. (JA5479-5542.) Among other things, Deyhle said that Goldstein orally provided his 2016 net gambling winnings and not his gross winnings. (E.g., JA5485, JA5513, JA5534-5535.) Goldstein received memoranda of these interviews and the grand jury transcript in discovery in 2025. (JA3277.)

On January 12, 2026 (the start of jury selection), Goldstein disclosed his exhibit list (JA3279), which included DX317, an October 2017 email thread between Goldstein and Deyhle ("the First Email"). (JA5473-5474.) Deyhle asked Goldstein for his 2016 "gains and losses." (JA5474.) Goldstein replied:

> The wins were 27,185,050. The losses and distributions were 24,436,700. So the net was 2,748,350.

(JA5474.)

Goldstein's firm produced this email in response to a grand jury subpoena, but the prosecutors first saw it while reviewing the defense exhibits. (JA3276-3277, JA3279.) Prosecutors then searched the discovery database, identifying a related email thread ("the Second Email"). (JA3279.) In that thread, on October 13, 2017, Deyhle asked Goldstein to "break out losses from distributions?" (JA5761.) Goldstein responded:

> $13,498,000 is losses. The rest is distributions.

(JA5761.) This email was re-produced to Goldstein as a new government exhibit on January 27, 2026. (JA3279.)

In a pleading the next day, the government "noted that it had incorporated into its theory of the case th[is] newly discovered evidence." (JA3280.) In response, Goldstein confirmed that he knew this, including the government's discovery of the First Email. (JA3280.)

The same day, prosecutors conducted a prep session with Deyhle. (JA3280.) Deyhle explained how the First and Second Emails tied to the numbers on the 2016 return. (JA3281.) No one asked Deyhle about his prior statements; the prosecutors assumed that Deyhle's prior statements were "his best (if inaccurate) recollection." (JA3281.) No one took notes because Deyhle's statements were in "significant consistency" with his previous statements that "Goldstein provided Deyhle with the numbers that Deyhle used" on the return. (JA3282.) Because Goldstein himself had identified the First Email, and Goldstein had both emails, the government did not make any supplemental disclosure. (JA3282.)

**2. Deyhle's direct examination**

During direct examination on February 3, 2026, Deyhle was asked how the numbers Goldstein provided in the First and Second Emails related to Goldstein's 2016 tax return. That return reported

$13,687,050 in gambling winnings and $10,938,700 in losses, resulting in $2,748,350 in net gambling income. (JA2902-2903.) The gross winnings that Goldstein reported to Deyhle in the emails ($27,185,050), less the amount Goldstein said were losses ($13,498,000), equaled the $13,687,050 in gross winnings reported on the return. (JA2903.) And the amount reported as losses on the return ($10,938,700) matched the amount that Goldstein's email said were distributions to investors. (JA2903-04.) Thus, despite the transposition, the net amount reported on the return ($2,748,350) matched the net amount that Goldstein gave Deyhle. (JA2902, *compare* JA5474.)

Goldstein did not tell Deyhle that he had $49 million in gross winnings, nor does that amount appear in Goldstein's emails to Deyhle, so that figure did not appear on the return. (JA2904, JA5473-5474, JA5761.)

### 3. Deyhle's cross-examination

Deyhle's direct continued into the next day; Goldstein's cross-examination began later that day. (JA3040-3164.) His cross-examination about the 2016 return focused on Deyhle's prior inconsistent statements. (JA3040-3081.) Goldstein asserted that

Deyhle's testimony that "Goldstein e-mailed [Deyhle] his 2016 poker winnings and losses" was "completely inconsistent with everything [Deyhle] told the government and the grand jury before the start of this trial." (JA3040.) Deyhle acknowledged that, before seeing the email, he had told the government and grand jury that Goldstein only gave him some of the numbers and only gave them orally. (JA3040.)

Goldstein cross-examined Deyhle on his first government interview, in October 2020, at which he said that Goldstein only verbally provided the 2016 gambling numbers. (JA3042.) Goldstein questioned why Deyhle's testimony on direct about his first meeting in early 2017 with Goldstein was done "without hesitation" (JA3042), yet in October 2020, "he told the government something completely different" (JA3043). Deyhle responded: "wouldn't it make sense that I would be relying on my memory only then and then later seeing an e-mail that clarified my thought process?" (JA3043.) He acknowledged that his "recollection may have not been totally accurate." (JA3043.) Deyhle agreed again that his statements that Goldstein told him the amounts verbally, although his "recollection at the time," were "not accurate." (JA3044.) And he agreed that if he had told the government

that Goldstein never gave him information on investors, that would have been false. (JA3045.)

Goldstein turned to Deyhle's third interview, in August 2024, at which Deyhle did not mention the email and told the government that Goldstein said he had won about $2 million playing poker; Deyhle agreed that recollection was "not accurate." (JA3045-3046.) Goldstein pressed Deyhle on the falsity of the story he "told over and over and over again." (JA3047.) Deyhle testified that when he saw the email, "it clicked" and his "memory was clarified," but agreed that his earlier statements were "based on a false remembrance." (JA3047-3048.)

Goldstein questioned whether Deyhle realized, when the IRS contacted him, that he "had to find a way to make this Mr. Goldstein's fault." (JA3048.) Deyhle denied this but agreed that one incident could "look like [he] was helping Mr. Goldstein not pay the IRS taxes." (JA3048-3050.) Deyhle had authorized another accountant at his firm to email Goldstein, recommending that he open a new bank account to avoid IRS levies. (JA3053-3055.) Deyhle admitted telling the government that "he should not have said that" and that it "looks bad." (JA3057 (cleaned up), JA3060.)

Deyhle further admitted that his grand jury testimony that Goldstein only provided the 2016 numbers orally was "not accurate." (JA3062.) Similarly, Deyhle admitted that his testimony that Goldstein did not provide any more information after an initial meeting was "not true." (JA3063.) Deyhle agreed that his grand jury testimony that Goldstein said his net winnings were about $1.67 million "is not the truth." (JA3065.) And Deyhle admitted that telling the grand jury that Goldstein never provided a gross figure for his winnings was "not accurate." (JA3081.)

Deyhle was uncertain when the government first showed him the First Email (JA3065-3068) but agreed it was within the last couple of months (JA3070).[2] Goldstein's questioning emphasized that the government had not asked Deyhle during direct whether the email was inconsistent with his prior statements. (JA3071-3072.)

[2] The government clarified at sidebar that it was in January 2026. (JA3069.)

#### 4. The district court denied the *Brady* motion

After learning of the prep session, Goldstein requested the session's notes during a break in Deyhle's cross-examination. (JA3109.) The government explained that there were no notes. (JA3109.)

Goldstein contended that Deyhle's statements during the prep session must have been inconsistent and that not producing information about the session violated *Brady*. (JA3112-3113.) The district court, after briefing, denied Goldstein's *Brady* claim. (JA15.) The court offered Goldstein an opportunity to file a supplemental brief (JA15), but he never did.

### C. There was no *Brady* violation

The government did not suppress any *Brady* information about the prep sessions with Deyhle. Regardless, any suppressed information was immaterial because of Goldstein's thorough cross-examination of Deyhle and the documentary proof of Goldstein's lies to Deyhle furnished by the First Email.

1. To establish a *Brady* violation, Goldstein must show: (1) that the government knew of information and failed to disclose it; (2) that the information was favorable to him, because it was either exculpatory

or impeaching; and (3) that the information was material. *See, e.g.*, *Kuehner*, 126 F.4th at 330.

a. The government did not withhold any *Brady* information. Goldstein's claim is not that the government withheld the First Email, which contradicted some of Deyhle's pretrial statements. Goldstein knew about that email: it was identified as a defense exhibit, was produced in discovery, and originated with Goldstein's law firm. (JA3279, JA3276-3277.) What Goldstein contends the government had to disclose was information that, during a mid-trial prep session shortly before Deyhle's testimony, Deyhle had implicitly agreed that the email Goldstein identified was what Goldstein told him.

That is the opposite of a classic *Brady* situation. *United States v. George*, 95 F.4th 200 (4th Cir. 2024), which Goldstein heavily relies on (e.g., Br.18, 25-26), actually demonstrates why his claim is meritless. In *George*, a felon-in-possession prosecution based on a traffic stop, the key government witness changed his story during a pretrial prep session about the car's other occupants, offering new information that was withheld from the defense. *Id.* at 203. But here, Deyhle essentially agreed with the email that Goldstein already knew about. To the

extent that Deyhle's testimony surprised Goldstein, it could only be because he expected Deyhle to disavow the email. Put differently, some of Goldstein's work on cross-examination — getting Deyhle to agree that the First Email conveyed what Goldstein told Deyhle — was already done.

Goldstein implies that other bits of information were suppressed, but none are *Brady* material. He suggests (Br.21) that the government learning about the email and the inaccuracy of Deyhle's past statements is *Brady* material that was not disclosed until Deyhle's cross-examination. But Goldstein does not explain why the prosecutors' beliefs, rather than actual inconsistent statements, would be covered by *Brady*. And Goldstein admitted knowing that the government had learned of the email on the same day (January 28) as the first prep session, writing that the government had "finally discovered" this information. (JA3280.)

Goldstein also speculates (Br.21-22), without record citation, that a second mid-trial prep session (on January 30) should have been disclosed because it had the same purpose as the first prep session. In fact, as the government explained below, that session did not involve

reviewing any of the emails or Deyhle's prior statements. (JA3282.) Finally, Goldstein implies (Br.18) that a December 2025 pre-trial prep session should have been disclosed, but as he acknowledges (Br.19), Deyhle's statements at that session were *consistent* with his previous, disclosed statements. (JA3278.)

b. Even if some information from or about the prep sessions should have been disclosed as impeaching, Goldstein learned about Deyhle's statements in time to effectively use them. A "belated disclosure" does not violate *Brady* if the defendant learns the information "in time for its effective use at trial." *United States v. Smith Grading & Paving, Inc.*, 760 F.2d 527, 532 (4th Cir. 1985). Because Deyhle's direct testimony was ongoing when the day ended, Goldstein was able to prepare a thorough cross-examination.

On February 3, 2026, Deyhle, testifying on direct, was shown the emails and explained how the numbers Goldstein provided mapped onto the numbers on the return. (JA2902-2904.) At that point, even in Goldstein's view (Br.21), he knew that Deyhle was essentially agreeing that the email reflected what Goldstein told him. And Deyhle's direct examination continued until the next day (JA3010), giving Goldstein

ample time to prepare to cross-examine Deyhle on this topic. This was especially true because Goldstein's cross-examination required little-to-no adjustment. The conflict between the First Email, which Goldstein identified as an exhibit, and Deyhle's previous statements was always going to be the cross-examination's centerpiece. Indeed, as discussed below, Goldstein's cross-examination on Deyhle's allegedly inconsistent stories was detailed and extensive, demonstrating the sufficiency of his preparation time.

Goldstein reads (Br.18) *George* as holding that disclosure during direct examination is categorically too late, but *George* articulated no such rule and is distinguishable. In *George*, the witness's story contained completely new information unknown to the defense, which was "ambushed." 95 F.4th at 209. Here, Deyhle simply agreed with the email that Goldstein already knew about.

Nor did *George* hold, contrary to *Smith Grading*, that the touchstone for the timing of disclosure is anything other than whether the defense can make effective use of the information. In fact, *George* cited *Smith Grading* for this point, but treated the timing issue under the *Brady* materiality prong rather than the suppression prong. 95

F.4th at 210. Whichever prong the "effective use" concept best fits, *George* confirms that what matters is whether the defense could make effective use of the information — which Goldstein could, and did, here.

2. Even if some information were not timely disclosed, it was immaterial. Materiality requires "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Dugan*, 136 F.4th 162, 170 (4th Cir. 2025) (cleaned up). "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Agurs*, 427 U.S. 97, 109-10 (1976).

The information here was immaterial for at least three reasons. First, Goldstein impeached Deyhle thoroughly about how Deyhle's testimony conflicted with his pretrial statements. Second, the marginal impeachment value of the supposedly suppressed information was minimal at best. Third, Deyhle's credibility had been rendered largely moot because the emails constituted an undisputed paper trail of what Goldstein told Deyhle.

a. Impeachment information is not material when the witness was impeached in other ways at trial. *United States v. Hoyte*, 51 F.3d 1239, 1243 (4th Cir. 1995). In *Hoyte*, for example, the defense learned about another changed story from the key witness only after jury deliberations began. *Id.*, 51 F.3d at 1242. But the witness was impeached with other inconsistent statements and with his motive to testify favorably for the government, so the nondisclosure was immaterial. *Id.* at 1243. And *George*, as Goldstein fails to mention, held that the suppressed statements were immaterial because the defense extensively impeached the witness's credibility and the jury learned of the witness's inconsistent statements. *See* 95 F.4th at 210.

The same is true here. Goldstein thoroughly impeached Deyhle, including with his inconsistent statements. Under cross-examination, Deyhle admitted many times that he was wrong when he had said that Goldstein only provided the 2016 gambling numbers orally. (JA3040, JA3042, JA3044-3045, JA3047-3048, JA3061-3062.) Deyhle acknowledged that his prior statements that Goldstein told him he only won $2 million or less were wrong. (JA3045-3046, JA3064-3065.) And Deyhle admitted he was wrong in testifying to the grand jury that

Goldstein never provided additional information on his gambling after an initial meeting about the 2016 tax return (JA3062-3063), that Goldstein never provided a number for his gross winnings (JA3081), and that Goldstein never told him about payments to investors (JA3045).

Goldstein also effectively cross-examined Deyhle on his bias and potential motive to shade his testimony for the government. After Deyhle testified that the First Email clarified his memory, Goldstein challenged this, questioning Deyhle whether he "knew that [he] had to find a way to make this Mr. Goldstein's fault" after the IRS contacted him in October 2020. (JA3048.) Goldstein also drew out the "very serious professional consequences" for Deyhle if he "screwed up a tax return involving millions of dollars in gambling," and the fact that Deyhle had to contact his professional insurance because of the investigation. (JA3048-3049.)

Goldstein further pressed Deyhle on how his situation got "worse" as prosecutors, not just agents, became involved. (JA3049.) Deyhle admitted that an email containing advice he authorized — for Goldstein to open a new bank account to avoid IRS levy — was brought up during

his government interviews and could make it "look like [he] was helping Mr. Goldstein not pay the IRS taxes." (JA3049-3050, JA3053-3055.) And Goldstein got Deyhle to admit that he told the government that "he should have not said that [i.e., the advice in the email]," (JA3057 (cleaned up)), and that the email "looks bad" (JA3060).

Goldstein comprehensively impeached Deyhle, covering Deyhle's inconsistencies and motive to testify favorably for the government to protect himself. And the inconsistencies at the heart of the cross-examination were the very ones involved in the supposedly withheld information. Earlier disclosure would not "have materially altered the course of the trial." *George*, 95 F.4th at 211.

Goldstein resists this conclusion, citing (Br.30) *Wearry v. Cain*, 577 U.S. 385 (2016), *Spicer v. Roxbury Correctional Institute*, 194 F.3d 547 (4th Cir. 1999), and *United States v. Service Deli Inc.*, 151 F.3d 938 (9th Cir. 1998), but these cases are inapt. For instance, in *Spicer*, a witness testified to seeing the defendant flee the scene of an assault, but the prosecution had not disclosed that the witness told his attorney, before a plea deal, that he was *not* an eyewitness. *See* 194 F.3d at 551-53. Although the witness was impeached in other ways, the undisclosed

prior statement would have been "a far more serious blow to the prosecution's case." *Id.* at 561. But here Goldstein was not only able to impeach Deyhle, he, unlike the *Spicer* defendant, could do so with the very inconsistency at issue: that Deyhle's story on the 2016 gambling numbers changed. *And compare Wearry*, 577 U.S. at 389, 392-93 (*Brady* violated by, *inter alia*, key witness's undisclosed statement in capital-murder case that he wanted to "make sure Wearry gets the needle cause he jacked over me") (cleaned up); *Service Deli*, 151 F.3d at 943-44 (suppressing key government witness's conflicting statements during an interview and inculpatory statements after learning he might go to jail violated *Brady*). Unlike in *Spicer* and the other cases he relies on, Goldstein had already dealt the most serious possible blow to Deyhle's credibility.

b. Moreover, there is little, if any, added value from the impeachment Goldstein claims he would have conducted with an earlier disclosure. Any additional impeachment "would have been only cumulative — and then only slightly so," and thus not material. *United States v. Taylor*, 942 F.3d 205, 226 (4th Cir. 2019).

*Taylor*, for example, involved a witness impeached with prior convictions for drug and firearms offenses. *See ibid.* But the witness was also under investigation for drug crimes. *See ibid.* Given the other impeachment, this Court found any nondisclosure of the current investigation immaterial. *See ibid.*

The allegedly withheld information here is of even less value than in *Taylor*. Because Deyhle was already thoroughly cross-examined on the specific inconsistencies, any additional impeachment would have been not just more of the same, it would have just been the same.

Goldstein's efforts (Br.23-29) to explain how he could have used the supposed additional information only underscore this point. First, Goldstein contends (Br.25) that he would have impeached Deyhle by emphasizing how Deyhle's story changed — but that *is* what he did, at great length. Goldstein's only explanation (Br.26) for how his exhaustive impeachment was impaired is to point to a few times that Deyhle testified that his memory faded, for which Goldstein contends the December 2025 prep session information would have helped him. But on each occasion Goldstein identifies, Goldstein — rather than

having "no ready means to rebut Deyhle's claim" (Br.26) — simply continued his questioning and established Deyhle's inconsistency.

Two instances Goldstein cites were overly broad questions asking Deyhle whether "everything" (JA3040) or "a bunch of things" (JA3061) he said before were false. In both cases, when Goldstein refined his questions Deyhle admitted that his previous statements were inaccurate. (JA3042-3043, JA3061-3063.) The same is true of a third example Goldstein cites. (JA3044.) And as for Goldstein's last example, regarding whether Deyhle said Goldstein never gave him numbers for his investors, Deyhle agreed that if he had made that statement, it was false. (JA3045.)

Second, Goldstein contends (Br.27) his bias argument would have been stronger if he had known about the recent change, because Deyhle would want to save himself from the consequences of making false statements in the past. But Goldstein thoroughly cross-examined Deyhle on exactly this point. (JA3048-3060.) Eliciting that Deyhle's story changed a few days earlier would have been cumulative at best. Moreover, as Goldstein agrees (Br.29), the government never challenged Deyhle about his prior statements. Such a confrontation, if undisclosed,

would better support Goldstein's claim about Deyhle's motive to curry favor, but it never occurred.

Goldstein also contends (Br.29) that he would have used the government's decision not to confront Deyhle with the prior statements to challenge the thoroughness of the investigation. But Goldstein did exactly that. (JA3071-3072.) If anything, the government's decision helped Goldstein because his cross-examination brought out the inconsistencies for the first time. *See United States v. Zorio,* 34 Fed. App'x 296, 297 (9th Cir. 2002) (defendant's cross was more effective when government did not "draw the sting" of the impeaching evidence). In short, Goldstein's proposed additional cross is insubstantial and cumulative at best.

Finally, Goldstein claims (Br.29) he could have noted this was the second *Brady* violation, but he had already emphasized the government's belated discovery of the First Email and how Deyhle's story changed. (JA4601-4602, JA4644.) And nothing prevented him from emphasizing any other nondisclosure he wanted. Moreover, although the district court had technically found a *Brady* violation earlier regarding a different email and witness, the court undercut that

ruling by explaining that the belated disclosure only "touched on materiality" and was "perhaps not the strongest" *Brady* claim. (JA2071.) And Goldstein had the email in time to use in the cross-examination of the relevant witness (JA4435).[3]

c. Lastly, the supposedly withheld information was not material because the First and Second Emails made Deyhle's credibility less salient. In his pretrial statements, Deyhle said that Goldstein only gave him the 2016 gambling numbers orally. Absent documentation, Deyhle's credibility was important. But because of the emails, what Goldstein said was undisputed. Deyhle's testimony simply followed the emails, explaining how the numbers on the tax return, despite erroneous transpositions, matched what Goldstein provided. (JA2895-JA2904.) The issue thus became whether what Goldstein wrote was true or false. And on that point, the government relied on Goldstein's

---

[3] Amicus Dowd lodges other accusations but consistently misstates the record. Amici cannot raise issues appellants forego; amici and appellants "may not split up the issues." *United States v. Buculei*, 262 F.3d 322, 333 n.11 (4th Cir. 2001) (cleaned up). Dowd's omissions, however, are another reason to reject his claims. For example, Dowd argues (Dowd.Br.19) the government was "forced to admit" inaccuracies in tolling applications, ignoring that the government itself corrected the inaccuracies (Docs.136-7, 136-8, ns.1) and that the court found no material misrepresentations. (Doc.237 at 16-19.)

own poker ledger and other evidence to prove falsity. *See* Statement of the Case B.1. Deyhle had no independent knowledge about the accuracy of Goldstein's figures.

Goldstein's contrary arguments (Br.9-10, 24-25) inflate Deyhle's importance and misunderstand the government's case. Goldstein's citation-free claim (Br.24) that Deyhle gave the most important evidence "across every tax charge" and "was the key witness on the central issue of willfulness" is false. As explained, the emails rendered Deyhle's credibility nearly inconsequential. The core of Goldstein's willfulness was that he lied to Deyhle about his gambling income. *See, e.g.*, *United States v. Bishop*, 264 F.3d 535, 552 (5th Cir. 2001) ("provid[ing] incomplete and inaccurate information to [a] return preparer" evidences willfulness). Proving the lie, however, did not involve Deyhle or his credibility. The same is true of the other tax years — Deyhle provided no evidence bearing on whether the information Goldstein provided was false.

In addition, Goldstein's claim (Br.24) that, other than the 2016 income, the "only evidence of willfulness" was Deyhle informing Goldstein of his tax obligations is false. Goldstein knew he needed to

track and report his gambling income after the IRS audited him in 2012. (JA1859-1868.) After firing his return preparer following that audit, supposedly because of the preparer's mistakes, Goldstein did not mention his gambling to Deyhle for several years. (JA1906-1907, JA2876-2877.) And Goldstein's own emails revealed his tax knowledge: he wrote, in 2016, before any of the charged returns were filed, that there was no "carry forward for gambling losses" (JA5674) and that a wire must be completed during the calendar year to be valid "for tax purposes" (JA3683). Another key piece of willfulness evidence came from Goldstein's own ledgers. After Deyhle emailed Goldstein the amount of his tax bill even before accounting for his gambling income, he added $3 million in improper deductions to his poker ledger. (JA2909-2912.)

Additionally, even for tax year 2016, Deyhle's credibility was immaterial to the evasion of payment allegations in Count One. Those allegations focused on Goldstein's lies to the IRS and his use of his IOLTA to avoid possible levies. (JA4565-JA4572.)

### D. Any error is limited to Count One

Goldstein's *Brady* claim concerns the gambling income on his 2016 personal return. Yet he apparently seeks (e.g., Br.31) a new trial on all counts. Goldstein, who "bears the burden of establishing a *Brady* violation," *Bowman v. Stirling*, 45 F.4th 740, 752 (4th Cir. 2022), must therefore establish materiality for each count. *See United States v. Wayne*, 903 F.2d 1188, 1192-95 (8th Cir. 1990) (affirming new-trial grant for *Brady* violation only for some counts); *United States v. Jordan*, 2021 WL 24778, at *9 (W.D. Va. 2021) (collecting cases that "analyzed each count separately for *Brady* materiality"). But even if there were an error, Goldstein would be entitled to a new trial only on Count One.[4]

Goldstein was convicted on three counts of making false statements on mortgage applications. Any *Brady* violation concerning Deyhle's statements about Goldstein's 2016 gambling income is unrelated to Goldstein's 2021 false mortgage applications. Deyhle had nothing to do with those applications, which Goldstein implicitly

---

[4] Even if the burden were on the government to show harmlessness, the result would not change.

concedes, recognizing (Br.24) that Deyhle was the key witness only for the tax charges.

Nor did any error infect the other tax counts. Goldstein's convictions for aiding the filing of false returns relied on false items distinct from his 2016 gambling income. And while Deyhle prepared all the returns, there is no dispute about the information Goldstein provided for those years, only whether Goldstein knew that the returns were false. (JA4660-4668.)

Goldstein's efforts to make 2016 the centerpiece of the government's case also fail. 2016 was important, but Goldstein inflates its importance and misstates the government's theory. As the government stated early in closing argument, what "motivated everything" was that Gores sent Goldstein a Form 1099 reflecting that he paid him $26.4 million in poker winnings in 2016, so Goldstein knew his poker activity would be exposed to the IRS and he needed to report at least some gambling income. (JA4549; *see also* JA4557 (Form 1099 was "catalyst".) The 2016 charge also included evasion of payment and was not limited to the falsehoods on the return.

Moreover, Goldstein's pattern of not paying his taxes on time is powerful evidence of his willfulness. *See United States v. Gentner*, 177 F.4th 519, 531 (4th Cir. 2026). The fact that Goldstein's conduct continued even after learning he was under investigation further demonstrates his willfulness.

Goldstein's four convictions for willfully failing to pay his taxes are even farther removed from any error. The key willfulness evidence here (JA4584-4586) was Goldstein's decision to spend lavishly on himself rather than pay his taxes, his admission that he decided against using the "$800,000 still in Asia" to pay his taxes and said he would "just pay[] penalties instead" (JA5674), and his knowledge that penalties are imposed "when you are doing something wrong" (JA4584, JA4036).

Goldstein suggests (Br.24) that Deyhle's credibility was important for the other tax charges because Deyhle advised him he could pay taxes late with interest and penalties and could report only his net gambling winnings. But Deyhle never told Goldstein it was appropriate not to pay. As Goldstein's own references (Br.24, citing JA5843, JA3156-3157) make clear, Deyhle merely explained Goldstein's options,

such as seeking an installment plan. Similarly, Goldstein's reference (Br.24, citing JA5469, JA3074) to needing to report only net gambling income relies on a March 2017 email, sent when Deyhle was preparing an extension request. But as the First Email made clear, Deyhle requested *gross* income figures to prepare the actual tax return. (JA5474).

And even if Deyhle gave the advice Goldstein claims he did, Goldstein's reliance would not put Deyhle's credibility at issue. Whether Deyhle was a credible witness would not change Goldstein's claim to rely on his advice. If anything, Goldstein's impeachment undercuts this defense, because the less trustworthy Deyhle appeared, the more jurors would be skeptical that Goldstein could rely in good faith on Deyhle's advice.

There was no *Brady* error, and even if there were, it was limited to Count One.

## II. The district court correctly excluded text messages as inadmissible hearsay

### A. Standard of review

This Court reviews a district court's decision on a hearsay objection for abuse of discretion. *United States v. Kaixiang Zhu,* 854 F.3d 247, 256 (4th Cir. 2017).

### B. Background

Goldstein moved in limine to introduce certain text messages, including "ledger information" he exchanged with "Kids," an associate of foreign businessman Paul Phua. (JA3853.) Phua invested in Goldstein's 2016 matches, and Goldstein contended that Kids tracked Goldstein's "outstanding balance" with Phua. (JA3853.)

Goldstein made several arguments below about why the messages were not hearsay, including that they proved his then-existing state of mind regarding his "good faith belief about the numbers that he was reporting to his accountant[] and . . . what he owed . . . in taxes." (JA343.) But Goldstein also invoked hearsay exceptions, such as the business-records exception, based on offering the messages for the truth of their contents. (JA3853.) The district court excluded most messages,

without prejudice, leaving "the door open to" Goldstein explaining during his testimony why a message should be introduced. (JA350.)

Goldstein testified that in 2016 he lost money gambling (JA380) and that he incorrectly told Deyhle he won $2.7 million because he miscalculated. (JA389). Goldstein agreed that being a net loser was something he only "put together as [he] looked back on it for this case." (JA391.) But in 2016 and 2017, his "good faith belief" was that he won about $50 million gross in 2016, cleared about $12 million after investor shares, and won around $2 million after losses. (JA391-394.)

As his testimony continued, Goldstein repeatedly refreshed his recollection with the Kids messages. He reviewed "a photo of the ledger" and then testified he lost $1.787 million to Chairman in an earlier 2016 match. (JA399-400.) Goldstein again refreshed his recollection of his later winnings in September 2016 from Chairman by "look[ing] at the document[s]." (JA403.) And Goldstein continued refreshing his recollection about purported losses and investor shares by reviewing the "text messages from the time period." (JA414; *see also, e.g.*, JA501-502.)

Goldstein testified that he lost around $2.5 million in 2016. (JA428-429.) Because he reported $2.7 million in net winnings to Deyhle, Goldstein claimed that his 2016 return was "in the government's favor by $4.679 million." (JA489.) But he reiterated that in October 2017 he told Deyhle in good faith that he won $2.7 million. (JA522, JA524.)

After the government's closing, when Goldstein objected to three comments about the ledger, he emphasized a government statement that the defense had not asked its testifying financial expert to review the ledger. (JA4594-4595). Goldstein asserted another expert was going to do so but was cut after the court's hearsay ruling. (JA4594-4595). Goldstein requested a curative instruction and the government, while disputing any impropriety, consented. (JA549-550.)

In closing argument, Goldstein's counsel argued that Goldstein "lost money gambling" in 2016. (JA4626.) Throughout closing, counsel repeatedly emphasized that Goldstein's testimony about the 2016 figures was based directly on the text messages. He noted that the messages were extracted from Goldstein's phone, and that Goldstein "sat with those documents in front of him," refreshing his recollections.

(JA4620-4621.) He reminded the jurors that "[they] saw" how Goldstein's "testimony about what happened with the gambling income in 2016 was corroborated with text messages from the time." (JA4627.) Defense counsel returned to this theme repeatedly, telling the jury that Goldstein:

- "had the binder in front of him," and kept looking at those documents to refresh his recollection (JA4627-4628);
- "sat down with a binder in front of him and he walked through all of these numbers," (JA4630);
- "us[ed] documents from the time period to refresh his recollection" (JA4631);
- "sat with the documents in front of them as he testified" and "used the contemporaneous documents to testify about the numbers" (JA4633);
- testified "with the documents in front of him … extracted from his phone," (JA4636); and

- refreshed his recollection "with documents from the time period," (JA4644).

All told, Goldstein explicitly invoked the text messages at least eight times in closing.

Following closing arguments, the district court gave Goldstein's requested curative instruction. The court told the jury "not to speculate about why the ledger was not admitted into evidence." (JA614.) And the court prohibited the jury from "infer[ring] that the ledger or the fact that the ledger was not admitted into evidence supports the government's contention that Mr. Goldstein underreported his 2016 gambling winnings." (JA614.)

In denying Goldstein's new-trial motion, the district court found no error, observing that "Goldstein's testimony on direct examination support[ed] the Court's conclusion" that Goldstein intended to use the messages for their truth to show that "Goldstein suffered poker losses in 2016." (JA664.) The court also found any error harmless because Goldstein's testimony "presented the substance of the excluded text messages" and ledger to the jury and because "this was not a close

case." (JA665.) The court also found that any error would only implicate Count One. (JA665.)

### C. The text messages were inadmissible hearsay

The district court properly exercised its discretion to exclude the messages. Goldstein wanted to use them to show that he lost money in 2016, not to show his contemporaneous beliefs. Regardless, the way Goldstein repeatedly refreshed his recollection with the messages made both their existence and content abundantly clear to the jury. Any error was thus harmless and also limited to Count One.

#### 1. Goldstein intended to use the messages for the truth of the matters asserted

The messages were hearsay. Out-of-court statements used to prove the truth of the matters asserted are hearsay, Fed. R. Evid. 801(c)(2), and the record confirms the district court's finding that Goldstein wanted to use the messages' content to prove that he lost money gambling in 2016.

To start, Goldstein's motion in limine first invoked the business-records exception, revealing his goal to use the messages to prove his net-loser argument. (JA3853.) He also invoked the state-of-mind

exception, but both common sense and his trial testimony confirm that this was a fig leaf.

As Goldstein acknowledged, he told Deyhle he won $2.7 million in 2016. (JA389.) Goldstein's claim that he was a net loser contradicted this statement. If he told the jury that he believed at the time he lost over $2 million, he would be contending that he lied to Deyhle to cost himself a lot of money.

Unsurprisingly, Goldstein did not make that claim. Instead, he testified that he was mistaken about his winnings. (JA389.) But he was adamant that he believed in 2016 and 2017 that he won $2.7 million, testifying that his "good faith belief in October of 2017" was what he "sent to Walter," that is, the email with the $2.7 million net figure. (JA524, *see also* JA391, JA394, JA489.)

Because a tax due and owing is an element of tax evasion, the net-loser defense was sensible. *See United States v. Jinwright*, 683 F.3d 471, 476 (4th Cir. 2012). And it supported his claim that he did not intentionally deceive Deyhle. But although the net-loser defense might have been reasonable, it doomed Goldstein's hearsay claim: using those

messages to prove he lost more than he won in 2016 (even if he did not realize it at the time) is classic hearsay.[5]

Goldstein's contrary contentions fail. His main argument (Br.33) is that the messages supported his belief that his 2016 winnings were offset. But this disregards Goldstein's own testimony (*e.g.*, JA524) that his good-faith belief at the time of return preparation was that he had $2.7 million net winnings, as he told Deyhle. To be admissible, the messages would have to support his contemporaneous state of mind, which, according to his testimony, directly contradicted the messages.

Goldstein also contends (Br.34) that the messages should have been admitted with a limiting instruction. That just repeats the same error. The problem is not that Goldstein *also* used the messages for their truth, it is that he *only* used them for that purpose because the messages contradicted his claimed good-faith belief at the time.

---

[5] To the extent that Goldstein now contends (Br.31-32) the messages showed he won $50 million *gross* and were to rebut a supposed new theory that Goldstein won $50 million *net*, that contention is false (and so rebuttal was unnecessary). The government always maintained the $50 million was *gross* winnings (e.g., JA763 (indictment alleges net was over $5 million)), even after Deyhle testified (e.g., JA3676 (calculating $6 million net)).

Goldstein largely ignores this central problem, asserting (Br.34) that the "court barely defended its decision" when denying the new-trial motion. But the district court was reaffirming its earlier ruling on the evidence and adding that "Goldstein's testimony on direct examination support[s] [its original] conclusion." (JA664.) That decision, however succinctly stated, was correct.

**2. Any error was harmless**

Any error was harmless given Goldstein's extensive use of the text messages. Evidentiary error is harmless when this Court can "say with fair assurance" that the judgment "was not substantially swayed by the error." *United States v. Joyner*, 187 F.4th 84, 97 (4th Cir. 2026) (cleaned up). This Court focuses on three factors: "'(1) the centrality of the issue affected by the error; (2) the steps taken to mitigate the effects of the error; and (3) the closeness of the case.'" *United States v. Ibisevic*, 675 F.3d 342, 352 (4th Cir. 2012) (quoting *United States v. Ince*, 21 F.3d 576, 583 (4th Cir. 1994)). The closeness of the evidence is "the single most important factor." *Id.* at 352 (cleaned up).

The verdict "was not substantially swayed" by any error because Goldstein used the messages extensively, and there was little difference

between what Goldstein wanted to introduce and what he was able to introduce. During his testimony, Goldstein often refreshed his recollection by consulting the messages. And he did so in a way that made clear he was just conveying what the messages said. Goldstein had the messages in a binder at the stand (*e.g.*, JA399-400, JA414) and it was evident that he repeated what he read. For example, Goldstein asked whether he "was allowed to write something down or" whether had had to "remember it"; when he was told he had to remember he asked for more time to review the document. (JA403.) The questions emphasized that Goldstein was reviewing "text messages from the time period" he was testifying about (JA414) and looking at "a photo of the ledger" (JA521). After reading the documents, Goldstein recited precise figures and amounts. (E.g., JA400, JA403, JA415, JA502, JA522.) All this made clear that Goldstein was parroting the documents.

Then, in closing, defense counsel repeatedly emphasized that Goldstein's testimony was based on, and corroborated by, the text messages. Counsel expressly claimed that Goldstein's "testimony about what happened with the gambling income in 2016 was corroborated

with text messages from the time." (JA4627.) And he told to the jury that Goldstein's testimony was directly derived from the messages:

> You may remember Mr. Goldstein testified to all of these numbers after using the documents from the time period to refresh his recollection. Remember he had the binder in front of him and I kept asking him to look at the document? Now tell me, is your recollection refreshed? He looked at the documents to refresh his recollection.

(JA4627.) Counsel repeated the point, emphasizing how Goldstein "testified, sat with those documents in front of him" (JA4620-4621), "sat down with a binder in front of him and he *walked through all of these numbers*" (JA4630), and "*used the contemporaneous documents to testify* about the numbers" (JA4633) (emphases added). All told, the closing argument expressly invoked the messages' direct support of Goldstein's testimony at least eight times. (JA4620-4621, JA4627, JA4628, JA4630, JA4631, JA4633, JA4636, JA4644.)

Between the manner of Goldstein's testimony and his closing argument's repeated, express references to the text messages' support of his testimony, Goldstein conveyed his point as effectively as if the messages were in evidence. Their exclusion had no impact on the judgment, let alone the possibility to "substantially sway" it.

The other harmless-error factors reinforce this conclusion. The text messages were not a central issue. By Goldstein's own admission, his good-faith belief when his tax return was being prepared was, as he told Deyhle, that he won $2.7 million. (JA524.) Even if the messages were admitted, they would contradict his claimed belief. Moreover, the government's case for Count One focused on Goldstein inflating his deductions based on three specific false items in his own "revised" ledger. (JA2910-13.) The government's tax loss calculations for the gambling winnings were largely based on these false deductions. (JA3709, JA3676-3677.) And Goldstein's six poker-related payments from his firm account were also unrelated to the text messages. (JA3699-3700, JA5823.)

The court also mitigated any error by instructing the jury "not to speculate about why the ledger was not admitted into evidence" and not to infer that the fact that the ledger was not in evidence supported the government's contentions. (JA614.) The court noted the ledger was used to refresh recollection and did not instruct the jury to disregard Goldstein's testimony in any way.

Goldstein's main contention (Br.37-38, 41-42) is that the text messages would have corroborated his testimony and bolstered his credibility, but he overlooks how, in practice, he did exactly that. Goldstein was not only able to testify about the messages' content, but he also did so in a way that made clear to the jury that his testimony was based on and corroborated by the messages. And this was reinforced by his closing argument.

This case is thus distinguishable from *Ibisevic* and *United States v. Gallagher*, 90 F.4th 182 (4th Cir. 2024), on which Goldstein primarily relies (e.g., Br.35, 37-38, 41-42). In both cases, the jury heard nothing about the excluded evidence. *Ibisevic*, 675 F.3d at 347 ("jury never heard" mother's testimony which corroborated defendant's claims); *Gallagher*, 90 F.4th at 195, 197 (Facebook messages excluded so jury only heard defendants' testimony). By contrast, Goldstein did not just testify about the information, he made clear that his testimony was based on the messages and "corroborated" by them. (JA4627.)

Goldstein only briefly acknowledges (Br.42) his use of the messages, claiming that his refreshed recollection is the evidence, not the underlying document. Although correct as an abstract legal matter,

Goldstein ignores how the record here makes clear that his testimony channeled the messages. Indeed, *United States v. Rydland*, 461 F. App'x 208, 210 (4th Cir. 2012), which Goldstein cites (Br.42), notes the impropriety of introducing evidence "under the guise of refreshing recollection," which accurately describes what Goldstein did.

Goldstein's contention (Br.43) that the evidence of false deductions is too weak to overcome the harm from excluding the text messages again depends on ignoring his extensive use of the text messages. He also repeats (Br.45) his incorrect claim that Deyhle provided the only willfulness evidence. And his claim that the split verdict (Br.44) supports a finding that the case was close rests on the erroneous understanding that all the counts rested on the same evidence.

Goldstein also contends (Br.39) that mitigation was impossible because a jury cannot be told to consider what it has not seen. But the court's curative instruction told the jurors not to speculate about *why* they did not see the messages. This instruction, combined with the way that Goldstein's testimony conveyed the content of the messages and his closing argument, meant that as a practical matter the jury heard what Goldstein wanted them to.

Goldstein claims (Br.40) that three isolated statements in the government's closing "exacerbated the error," but he misstates the record. He contends (Br.40, quoting JA 4561) that the government's closing reference to the "'supposed' ledger" questioned the ledger's existence, but the full quotation belies this claim: the government argued that Goldstein never gave Deyhle the ledger "because that would have shown him receiving even more money in gambling income." And the other two statements — that jurors only heard from Goldstein himself and that the defense did not have the financial expert review the ledger (JA4574) — were both accurate. Nor did these statements affect the jurors' awareness that Goldstein's testimony was based on the messages because the district court gave the curative instruction Goldstein requested and because he repeatedly referred to the text messages in closing *after* the government's statements.[6]

[6] Goldstein's assertion (Br.40) that the government "misled the jury" by saying his financial expert did not review the ledger, when the government knew it had excluded a different expert who was to provide that testimony, is false. The uncalled expert's notice did not indicate that the expert would review or opine on the text messages or the Phua ledger (Docs. 290, 290-2), and Goldstein cites only his own argument below (JA4594-4595) for the idea that the government somehow knew he would.

Lastly, Goldstein cites (Br.41) *Joyner* for the proposition that a curative instruction is not dispositive. That may be correct in the abstract, but it only underscores that this Court must consider all the circumstances, which include not only the instruction, but also Goldstein's repeated statements in closing that the messages supported his credibility. And Goldstein fails to note that in *Joyner*, there was no curative instruction, and this Court nonetheless found no prejudice from the allegedly improper remarks. 187 F.4th at 105.

**D. Any error was limited to Count One**

As with his *Brady* argument, Goldstein overreaches with his apparent assertion (Br.35) that any error requires a new trial on all counts. Goldstein's argument about the text messages relates only to his 2016 gambling income, the subject of Count One, and any error would be limited to that count.

As explained (Argument I.D), Goldstein's contentions that Deyhle provided the only willfulness evidence and that Goldstein's 2016 poker winnings were the core of the government's entire case are wrong. The remaining counts, for false tax returns and willful failure to pay taxes in later years, are not affected by any error respecting the 2016

winnings. And there is no connection between the excluded messages and Goldstein's mortgage-fraud convictions (nor does he attempt to establish one). Nor is it significant (Br.36) that the government said it would spend most of the time in closing on Count One; that count involved the most conduct to discuss, including Goldstein's evasion of payment, which extended beyond 2016 and 2017. Even if there were prejudicial error, that error would only require reversal on Count One.

## III. There was no instructional error

### A. Standard of review

This Court reviews a district court's decision whether "to give a particular jury instruction for abuse of discretion." *Joyner*, 187 F.4th at 106.

### B. Background

1. Under 18 U.S.C. § 2, which is "implicit in all indictments," "an accessory will be punished as a principal." *United States v. Rashwan*, 328 F.3d 160, 165 (4th Cir. 2003) (cleaned up). This statute has two parts. Section 2(a) covers one who "aids [or] abets" an offense. Section 2(b) covers one who "willfully causes an act to be done" by another that would be criminal if performed directly.

Section 2(a) requires a primary offender whom the defendant aids, while §2(b) can involve an innocent "intermediary." *United States v. Richeson*, 825 F.2d 17, 20 (4th Cir. 1987) (cleaned up). Section 2(a) requires two guilty parties; §2(b) requires only one.

Both forms of liability are often lumped together as "aiding and abetting." *United States v. Ruffin*, 613 F.2d 408, 416 (2d Cir. 1979). This usage causes "much confusion." *Id.* (cleaned up).

2. The indictment charged §2 for each count. Accordingly, the court planned to give the government's proposed Accessory Instruction, which defined "aiding and abetting" in a manner relevant only to §2(a). (JA4259-4261.)

But the government never presented a §2(a) case, as its closing argument demonstrated. (JA4548-4593.) Neither the government nor Goldstein referred to the Accessory Instruction in closing, although both referenced other anticipated instructions. (*E.g.*, JA4552, JA4622, JA4624, JA4645.)

What the government had planned to argue was a §2(b) theory for venue on Count 15 (mortgage fraud). (JA540-542.). IP address information indicated Goldstein submitted the mortgage application

from Maryland; travel records suggested he was in the Virgin Islands. (JA4677-4678.) But there was also evidence that Goldstein had his wife submit the false application, which §2(b) would cover. (JA4483.)

The preliminary instructions, without objection by Goldstein (JA942, JA970), stated that the government must prove Goldstein "made *or caused to be made* a false statement" in the application. (JA1033 (emphasis added).) But Goldstein opposed that phrasing in the final instructions, and the court removed it. (JA4482-4484; 4490.)

During closing, Goldstein objected to the government's mention of an email Goldstein sent his wife. (JA4590, JA4707.) The government explained that it was not arguing Goldstein caused his wife to submit the application and told the jury that the application was submitted from Maryland. (JA4591-4592.) The government's rebuttal reiterated that, for Count 15, "the IP data is clear." (JA4706.)

After closing, both parties proposed changing the jury instructions. Goldstein requested an instruction that there was no venue if "Goldstein caused someone else" to make a statement from Maryland. (JA4750.) And the government asked the court not to give the Accessory Instruction because it was inappropriate for §2(b).

(JA4740.) Goldstein agreed to delete the Accessory Instruction only if other language referring to §2 for the substantive counts was removed. (JA536-537.) But the court declined to "wordsmith" at that stage. (JA537.)

The government clarified that its concern was the "intersection" of §2 and venue. (JA540.) The government had only wanted to invoke §2(b) for Count 15 venue and "never proceeded on a 2A theory,"[7] so the instruction should be removed. (JA542.) But the government acknowledged it had caused the misunderstanding by conflating §2(a) and §2(b), an error it had just caught. (JA542-545.)

Goldstein contended that he understood the government's theory for §1014 to be under §2(a) and that it was too late to make changes. (JA553.) The court, however, found the Accessory Instruction inapplicable and removed it. (JA555.)

When introducing most offenses, the court thus instructed the jury that Goldstein was charged with violating §2 and read §2. (JA584-

[7] Even before recognizing it conflated §2(a) and §2(b), the government's position was that third parties did nothing "illegal" and were "more like the victims." (JA4455.)

585 (26 U.S.C. §7201); JA589-590, JA593-594 (§7206(2); JA604-605, JA607-608 (18 U.S.C. §1014)). For §7203, the court noted that Goldstein was also charged with aiding and abetting but did not mention or read §2. (JA600.) The court instructed the jury that references to the charges were not evidence, even if read to the jury. (JA570.)

The district court denied Goldstein's new-trial motion because the jury instructions made "clear that the brief references to Section 2" simply summarized the allegations. (JA659.) The instructions "did not permit the Jury to convict Mr. Goldstein based on a Section 2 liability theory." (JA659.) And the Accessory Instruction's late deletion caused no prejudice because Goldstein's closing did not mention §2 liability. (JA660.) The court found that Goldstein's closing would have been the same without the Accessory Instruction. (JA660.)

### C. The jury instructions did not allow Goldstein to be convicted of 18 U.S.C. §2 liability

1. Deleting the Accessory Instruction was appropriate because the jury instructions did not allow a §2 conviction, they only mentioned §2 in describing the allegations. There was no need to instruct the jury on a theory of liability it was never asked to vote on.

For example, on Count One, the court said that Goldstein was charged with tax evasion, read that statute, then said, "The indictment also alleges" a §2 violation and read that statute. (JA584-585.) The jury was instructed that indictment references were "not evidence" but "merely a statement of charges." (JA570.) Jurors are presumed to "carefully follow instructions." *United States v. Covington*, 180 F.4th 576, 593 (4th Cir. 2026) (cleaned up). When told the indictment alleged Goldstein violated §2, the jury would have understood that as merely the allegations.

Immediately after that description, the court explained what "the government must" prove for Goldstein to be guilty of tax evasion. (JA585.) The court listed the elements of evasion and gave detailed definitions. (JA585-589.) This elements instruction, and the corresponding instructions for other counts, told the jury what legal tests to apply when deciding guilt. Those tests were mandatory, and jurors are presumed to follow the directive that they "must" decide guilt based on these tests.

Goldstein's argument largely disregards the elements instructions, but instructions must be read holistically. *See Gentner*,

177 F.4th at 530. So read, the instructions mentioned §2 as part of the allegations, but the only bases for conviction were the elements instructions for each offense. Goldstein's argument requires the illogical leap that jurors would understand a mere background reference as license to ignore the legal test they were told they "must" apply. No reasonable juror would understand the instructions this way.

This case is unlike *United States v. Odum*, 65 F.4th 714 (4th Cir. 2023), and others Goldstein relies on (Br.46-48). The *Odum* jury was instructed that "it could convict" the defendant of robbery based on aiding and abetting another, and the court then misstated the elements. *Id.* at 720-21. That explicit invitation to convict on §2, based on the wrong legal test, is the opposite of this case.

2. That jurors were told they must apply the elements tests suffices to dispose of Goldstein's claim. But the details of the tax-count elements reinforce the absence of error for those counts. The tax-count instructions either discussed third parties or depended only on Goldstein's inaction.

Section 7203, willful failure to pay, depended solely on Goldstein's failures. Although the instruction referred in passing to aiding and

abetting (JA600), it neither quoted §2 nor said that Goldstein was charged with §2 (JA600-602). And the court's elements instructions clarified that §7203 concerned Goldstein's failure to pay his taxes. (JA601-603.) No juror would understand abetting others to be relevant.

Section 7206(2) has been called the Tax Code's "aiding and abetting provision." *United States v. Williams*, 644 F.2d 696, 701 (8th Cir. 1981). It covers those who "aided, assisted, or otherwise caused the preparation and presentation of a [false] return." *United States v. Aramony*, 88 F.3d 1369, 1382 (4th Cir. 1996) (cleaned up). Accordingly, the jury was told the government must prove that Goldstein "advised or assisted in the preparation of a tax return that was subsequently filed." (JA594.) If the jury had thought §2 was relevant, it would have understood the §7206(2) instructions to explain what it needed to know.

Finally, the §7201 instruction incorporates similar principles. The instruction required the jury to unanimously agree that Goldstein committed an evasive act specified in the indictment. (JA586-588.) Those acts, which the court listed, included "providing false and incomplete information" to an accounting firm and "causing the preparation" of two false returns. (JA587-588.) Once again, even if the

jury had thought that the reference to §2 meant that they should consider it, the elements instruction would have provided the test.

Only the §1014 instructions lacked similar language. To be clear, the jury was still instructed the government "must prove" the elements of §1014 to return a guilty verdict. (JA608.) But even if this language were inadequate, any instructional error would be limited to the §1014 counts. Indeed, Goldstein recognized below that his concerns only pertained to §1014. (JA553.)

And any error was limited to Count 15. The government never argued §2 to the jury, and the only statements even arguably suggesting a §2 theory are those to which Goldstein objected, which exclusively concerned Count 15. (JA4590, JA4707.)

3. Goldstein's contrary claims are unpersuasive. His lead argument (Br.48-50, Br.55) is that the government's position changed. But what matters are the jury instructions, not the government's thoughts about them, and the instructions given did not permit a §2 conviction.

Goldstein also overlooks *why* the government's position changed. As the government explained, it conflated §2(a) and §2(b), proposing a

§2(a) instruction despite not presenting a §2(a) case. (JA542-544.) It had hoped to rely on §2(b) for Count 15 but was prevented from doing so. (JA541-542.) And the §2 references remained because the court would not "wordsmith" at that stage. (JA536-537.)

The government's "confusion" of §2(a) and §2(b) is not uncommon. *Ruffin*, 613 F.2d at 416. Even this Court's *Rashwan* decision upheld a §2(b) conviction while repeatedly describing the defendant as having "aided and abetted," which is the language of §2(a). 328 F.3d at 165. The government's mistake here was understandable, and its correction took place outside the jury's presence.

Goldstein's contention (Br.50-51) that four points show the instructions invited a §2 conviction relies on an implausible reading and ignores the elements instructions. Three of those points — that the instructions said the jury was to vote on the charges, quoted §2, and said that Goldstein was charged with §2 — accurately describe the record but are irrelevant. Immediately after the §2 allegations, the court defined the elements of the offense that "must" be proven. (E.g. JA585.) Goldstein does not explain how the jury could understand the §2 references to allow it to disregard the offense elements. Even if, as

Goldstein claims (Br.51, 54), jurors had thought they were voting on §2, they would not have invented their own test. Rather, they would have understood the elements instructions to provide the applicable tests. For all the jurors knew, if §2 had not been charged the court would have described the elements differently.

In his fourth point, Goldstein misleadingly quotes (Br.51) the instructions, claiming they "described Section 2's text as 'pertinent.'" In fact, the court merely said (although not for the §7203 charges, JA600-601) that Goldstein was charged with §2, "which provides in pertinent part" (or similar phrasing), and then quoted the statute. (JA585, JA594, JA607.) "Pertinent" described what part of the statute was relevant to the allegations, it did not add to or displace the elements instructions that followed.

Goldstein also claims (Br.52) that the government's case often referred to third parties. But the government never referred to §2 in closing. And, as explained, the third-party references were consistent with the elements instructions, regardless of §2 liability.

Nor, as Goldstein claims (Br.53), did his Count 15 conviction depend on §2. As Goldstein recognized in closing argument, the

government relied on IP address information to "show[] that Mr. Goldstein was in Maryland when the applications were submitted." (JA4677.) Goldstein takes the government's rhetorical comment (which he interrupted) about the Virgin Islands out of context; as the government made clear, it was arguing that the application was "submitted from Maryland," not that Goldstein caused his wife to submit it. (JA4592.) The government reinforced the point in rebuttal, arguing "the IP data is clear" for Count 15. (JA4706.) The jury's verdict shows that it credited the IP data and Goldstein's admission that he personally signed the application (JA3979) over the travel records Goldstein emphasized.

Goldstein wrongly contends (Br.53) the district court ignored *Boyde v. California*'s standard. 494 U.S. 370 (1990). But the court grasped Goldstein's *Boyde* argument that "there [was] a 'reasonable likelihood' that a reasonable juror would have understood the Jury Instructions in this case to permit a conviction under Section 2." (JA656.) The court simply disagreed with it. (JA657-659.) That the court did not repeat *Boyde*'s precise language is immaterial.

Finally, Goldstein misses the point by claiming (Br.55) that the elements instructions cannot "cure" inadequate §2 instructions. Contrary to his assertion (Br.55), there were not "two separate paths for conviction." The elements instructions were the only instructions that told jurors what tests to apply in determining guilt.

4. Goldstein claims (Br.58) that deleting the Accessory Instruction prejudicially violated Federal Rule of Criminal Procedure 30(b), but this claim rises or falls with his first claim. If the instructions did not allow a §2 conviction — and they did not — then no prejudice resulted from deleting the §2 instruction after Goldstein's closing argument. Only if he prevails on his first argument would his second argument matter, but it would then be superfluous.

Regardless, Goldstein's argument fails. Rule 30 reversal requires prejudice. *See United States v. Horton*, 921 F.2d 540, 547 (4th Cir. 1990). But Goldstein's closing never mentioned the Accessory Instruction. (JA4599-JA4685.) As the district court held, Goldstein's closing "would have been the same regardless." (JA660.)

## CONCLUSION

This Court should affirm Goldstein's convictions.

## STATEMENT REGARDING ORAL ARGUMENT

Counsel for the United States respectfully submit that oral argument is unnecessary, as the written materials sufficiently present the issues, but given the voluminous record, this Court may find oral argument helpful.

Respectfully submitted,

COLIN M. MCDONALD
*Assistant Attorney General*
*National Fraud Enforcement Division*

s/ Jason Poole
KATIE BAGLEY
JOSEPH B. SYVERSON
SEAN BEATY
EMERSON GORDON-MARVIN
HAYTER WHITMAN
JASON POOLE
*Attorneys*
*U.S. Department of Justice*
*950 Pennsylvania Ave., NW*
*Washington, D.C. 20530-0001*

*Of Counsel:*
KELLY O. HAYES
*United States Attorney*

OCTOBER 27, 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 12,840 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) (and including 22 words contained in images).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a 14-point, proportionally spaced typeface (Century Schoolbook) using Word for Microsoft 365.

s/ Jason Poole
JASON POOLE
*Attorney for the United States*

DATED: October 27, 2026