No. 26-4392

# In the United States Court of Appeals for the Fourth Circuit

**UNITED STATES OF AMERICA,**

*Plaintiff-Appellee*,

v.

**THOMAS C. GOLDSTEIN,**

*Defendant-Appellant*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND, NO. 8:25-CR-00006-LKG-1
HON. LYDIA KAY GRIGGSBY

## REPLY BRIEF FOR DEFENDANT-APPELLANT THOMAS C. GOLDSTEIN

JONATHAN KRAVIS
LIU SHUR KRAVIS LLP
607 Fourteenth Street, NW
Suite 625
Washington, DC 20005
(202) 240-7100

ELIZABETH B. PRELOGAR
*Counsel of Record*
ANDREW D. GOLDSTEIN
EPHRAIM A. MCDOWELL
ELIAS S. KIM
JADE FORD
SAHAR ATASSI
COOLEY LLP
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC 20004
(202) 842-7800

*Counsel for Defendant-Appellant*

## TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................... 1

ARGUMENT ............................................................................................... 2

I. THE *BRADY* VIOLATION REQUIRES A NEW TRIAL .................. 2

A. The Government Suppressed Material Impeachment Evidence ........................................................................... 3

B. A New Trial Is Required ............................................................ 9

II. THE EVIDENTIARY ERROR REQUIRES A NEW TRIAL .......... 11

A. The Messages Could Not Be Excluded As Hearsay ................ 12

B. The Government Cannot Show The Error Was Harmless ....... 15

III. THE INSTRUCTIONAL ERRORS REQUIRE A NEW TRIAL ..... 20

A. The Government's Prior Position Confirms It Is Reasonably Likely Jurors Understood The Instructions To Permit Conviction Under Section 2 .................................... 21

B. The Text Of The Instructions Forecloses The Government's *Post Hoc* Reading ........................................... 24

C. The District Court's Instructional Errors Affected Every Count ......................................................................... 28

CONCLUSION ........................................................................................... 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Boyde v. California*,
494 U.S. 370 (1990)....................21, 23

*Cheek v. United States*,
498 U.S. 192 (1991)....................9

*Gordon v. United States*,
344 U.S. 414 (1953)....................16

*Kyles v. Whitley*,
514 U.S. 419 (1995)....................3, 4, 5, 8

*Palazzo ex rel. Delmage v. Corio*,
232 F.3d 38 (2d Cir. 2000)....................13

*Pittman v. County of Madison*,
863 F.3d 734 (7th Cir. 2017)....................16

*Samia v. United States*,
599 U.S. 635 (2023)....................17, 27

*Spicer v. Roxbury Corr. Inst.*,
194 F.3d 547 (4th Cir. 1999)....................8

*United States v. Acker*,
52 F.3d 509 (4th Cir. 1995)....................6

*United States v. Cone*,
714 F.3d 197 (4th Cir. 2013)....................13

*United States v. Gallagher*,
90 F.4th 182 (4th Cir. 2024)....................12, 14, 15, 18, 19

*United States v. Harris*,
942 F.2d 1125 (7th Cir. 1991)....................2

*United States v. Hastings*,
134 F.3d 235 (4th Cir. 1998)....................21, 28

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*United States v. Horton*,
921 F.2d 540 (4th Cir. 1990) ....................29

*United States v. Ibisevic*,
675 F.3d 342 (4th Cir. 2012) ....................15, 18, 19

*United States v. Odum*,
65 F.4th 714 (4th Cir. 2023) ....................20, 25, 27

*United States v. Service Deli Inc.*,
151 F.3d 938 (9th Cir. 1998) ....................8

*United States v. Urbanik*,
801 F.2d 692 (4th Cir. 1986) ....................19

**Statutes and Rules**

18 U.S.C.
§ 2 ....................2, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29
§ 2(a) ....................21, 22, 23, 24, 28, 29
§ 2(b) ....................21, 22, 24, 25, 29

26 U.S.C. § 7201 ....................25

Fed. R. Crim. P. 30(b) ....................20, 28

**Other Authorities**

2 Wharton's Criminal Evidence § 8:16 (15th ed. 2025) ....................15

Mark P. Denbeaux et al., *Questioning Questions: Objections to Form in the Interrogation of Witnesses*, 33 Ark. L. Rev. 439 (1979) ....................17

## INTRODUCTION

The government does not dispute that its prosecution fell apart mid-trial. In trying to salvage the case, the government persuaded the district court to make three errors that led to Goldstein's wrongful conviction. Yet on appeal, the government does not meaningfully defend the court's rulings on those issues. And the new arguments it advances fail across the board.

Start with *Brady*: The government effectively concedes it suppressed evidence from preparation sessions with Walter Deyhle. But it insists the suppressed evidence was immaterial because the defense had other means to impeach Deyhle. That is incorrect. The government withheld until after cross-examination that prosecutors led Deyhle through a new testimony outline after discovering his original story was false—failing to disclose the existence of the conflicting outlines from the preparation sessions. That evidence would have provided powerful grounds to challenge Deyhle's credibility and the investigation's integrity. Although the government insists it ceased relying on Deyhle, its numerous references to Deyhle during closing argument show otherwise.

The government fares no better attempting to defend the exclusion of critical state-of-mind evidence as hearsay. The government's repeated refrain that the excluded messages would have contradicted Goldstein's testimony is factually wrong and legally irrelevant. And the government falls woefully short of

demonstrating harmlessness: The excluded messages were critical to rebutting the government's core theory of willfulness.

Finally, the government concedes its complete reversal on the instructional issue. It persuaded the district court that reading 18 U.S.C. § 2's text, without instructing on its elements, sufficed to instruct the jury on accessory liability for every count. Unable to defend that misstatement of law, the government now insists there is not even a "reasonable likelihood" the jury could have read the instructions the same way the government previously did—as permitting conviction based on accessory liability. That argument is as implausible as it sounds. And the government's *post hoc* effort to read Section 2 out of the jury charge lacks merit.

Goldstein is thus entitled to a new trial on every count and respectfully renews his request for release pending appeal. *United States v. Harris*, 942 F.2d 1125, 1135 n.7 (7th Cir. 1991).

## ARGUMENT

### I. THE *BRADY* VIOLATION REQUIRES A NEW TRIAL

The government initially presented its tax case based on Deyhle's story that Goldstein never disclosed $26 million in gross gambling winnings from Alec Gores. After discovering that story was false mid-trial, the government suppressed evidence that would have allowed the defense to impeach Deyhle in numerous ways. Because Deyhle was the government's key witness on willfulness, a new trial is required.

### A. The Government Suppressed Material Impeachment Evidence

1. The government conspicuously does not defend the district court's conclusion that prosecutors' failure to take notes means there was no evidence to suppress. Opening Brief ("OB") 22. While the government asserts (at 19) that Deyhle consistently represented that Goldstein provided the 2016 tax numbers, it does not dispute that Deyhle contradicted nine prior statements. OB19-20. Nor does it deny that the conflicting outlines prosecutors prepared detailing Deyhle's expected testimony—with checkmarks reflecting that Deyhle acceded—were themselves records under *Brady*. OB23.

The government instead contends it did not violate *Brady* because the only impeaching evidence it suppressed was Deyhle's admission that he received and used the October 2017 email. Government Brief ("GB") 25-27. According to the government, this was immaterial because the defense had the email. The government asserts that the "other bits of information" it suppressed were not "*Brady* material." GB26-27.

Those arguments misunderstand the law and ignore key facts. The "materiality" of "suppressed evidence [must be] considered collectively, not item by item." *Kyles v. Whitley*, 514 U.S. 419, 436 (1995). Thus, the question is whether the suppressed evidence *collectively* undermines the government's case. Instead, the

government attempts to explain why each piece of evidence would not have made a difference individually.

Viewed collectively, the suppressed evidence reveals an extreme level of coordination between Deyhle and prosecutors. At a meeting with Deyhle one month before trial to confirm Deyhle's story about the Gores winnings, prosecutors outlined the testimony they expected Deyhle to give and he agreed. Thus, they proceeded to trial intending to make Deyhle's story the center of their case. When they discovered the story was false mid-trial, it was too late to abandon Deyhle. So they called another meeting and walked Deyhle through an outline of new testimony that contradicted the original—and Deyhle agreed to that new testimony. Prosecutors did not ask why Deyhle told a false story for years, including shortly before trial, and they broke from prior practice by not taking notes.

Had the defense known about these events, it would have argued that prosecutors effectively dictated Deyhle's testimony. When a witness's "description" of events "evol[ves]" between meetings with prosecutors, it "impli[es] that the prosecutor[s] … coached him"—thereby "destroying confidence in [his] story." *Kyles*, 514 U.S. at 443-44. Here, the evidence does not just show that Deyhle's story evolved—it shows that prosecutors themselves prepared conflicting outlines to guide his testimony. Evidence of Deyhle's motive to curry favor to avoid prosecution would have bolstered this argument. OB26-28.

This argument would have been particularly persuasive because the government's first *Brady* violation also demonstrated coordination between the government and Deyhle's firm. JA2071. And it would have been persuasive because it revealed that Deyhle's inaccurate testimony about how he calculated the gambling loss figures came directly from the government's "math demonstration." JA3281-3282.

The government's only response is that Goldstein's bias claim would be stronger if the government had "challenged Deyhle about his prior statements." GB35. But the government cites no case requiring an explicit threat. And the government fails to address the outlines entirely, let alone explain why they do not show prosecutors dictated Deyhle's testimony.

Additionally, the defense could have attacked the investigation's reliability. OB28-29. When the government fails to interrogate a witness's inconsistencies, the defendant can use that failure to "attack[] the reliability of the investigation." *Kyles*, 514 U.S. at 445-46. And here, the suppressed evidence shows that "no one from [the] prosecution team asked or challenged Deyhle about his prior statements." JA3281. The government thus misses the point in arguing that the defense "brought out the inconsistencies," GB36; disclosing evidence of the government's inadequate investigation would have shown that *none* of the government's evidence was trustworthy. OB28-29.

Finally, the government incorrectly argues that the October 2017 email was the only evidence the defense needed to cross-examine Deyhle about his inconsistencies. GB25-26. When Deyhle testified he received and used the email, the defense could expose the inconsistency only with evidence of Deyhle's *prior* statements, not with the email itself. And when Deyhle repeatedly professed he could not remember making those prior statements, OB26, the defense had no means to rebut that claim because the law-enforcement-interview memoranda documenting Deyhle's original statements were inadmissible. *United States v. Acker*, 52 F.3d 509, 517 (4th Cir. 1995). But disclosure of the December 28 outline—which reflected Deyhle's original story and demonstrated he repeated it shortly before trial—would have allowed the defense to question Deyhle about his feigned ignorance.

The government grossly exaggerates the extent to which Deyhle admitted he made inconsistent statements. GB34-35. For instance, the government quotes (at 21) the defense's question whether Deyhle's testimony was "completely inconsistent with everything [he] told the government and the grand jury before the start of … trial" but omits Deyhle's answer: "I don't recall that." JA3040. Similarly, the government emphasizes (at 21-22) that Deyhle agreed that a particular statement would have been false but omits he stated: "I don't think I would have told the government that." JA3045. Nor was Deyhle's statement that his "recollection may

not have been totally accurate," JA3043, an admission of his falsehoods—it was a careful hedge that revealed nothing. *See also* JA3044-3046; JA3061 (similar).

2. The government similarly errs in arguing the suppressed evidence was disclosed in time. According to the government, the defense had "ample time to prepare to cross-examine Deyhle" because his direct testimony revealed he used the email. GB27-28. But critical impeachment evidence was not disclosed then: The defense did not learn that the preparation sessions occurred until cross-examination (or later). JA3110-3113.

Moreover, prosecutors waited until *after* cross-examination to disclose the existence of the outline from the second session, which they used to lead Deyhle through his new expected testimony. JA3282. The defense therefore had no opportunity to question Deyhle about why he agreed to give conflicting versions of his testimony. And the government still has not disclosed the outlines themselves—and should be required to do so.[1]

3. The government errs in arguing (at 35) that any impeachment would have been cumulative because the defense "thoroughly cross-examined Deyhle" about his bias. Impeachment is not cumulative simply because the defense covered the

[1] At the very least, an evidentiary hearing is warranted to assess the government's claim that the conflicting outlines of Deyhle's testimony are immaterial. This Court could consider directing the government to supplement the record by providing the outlines prior to oral argument.

general "area[] of impeachment." *United States v. Service Deli Inc.*, 151 F.3d 938, 943-44 (9th Cir. 1998). And here, the suppressed evidence would have added an entirely new dimension. The defense was focused on Deyhle's incentive to avoid liability for suggesting Goldstein create a secret bank account, OB27; it did not question Deyhle *at all* on how prosecutors prepared his testimony. The suppressed evidence would have allowed the defense to argue that Deyhle was simply repeating the government's preferred testimony, which would have dealt "a far more serious blow to the prosecution's case." *Spicer v. Roxbury Corr. Inst.*, 194 F.3d 547, 561 (4th Cir. 1999).

The government similarly suggests that any effort to "challenge the thoroughness of the investigation" would have been cumulative. GB36. But it was not until after Deyhle testified that prosecutors disclosed *why* they did not question Deyhle about his false statements: They simply "presum[ed]" Deyhle made a mistake. JA3281-3282. This disclosure revealed their "remarkably uncritical attitude" and would have enabled a broader "attack[] [on] the reliability of the investigation." *Kyles*, 514 U.S. at 445-46.

Finally, the government argues that Deyhle was "thoroughly cross-examined" on his "inconsistencies." GB34. But, as explained, the defense could not rebut Deyhle's claim he did not remember his prior statements—and the suppressed evidence would have allowed it to do so.

### B. A New Trial Is Required

The *Brady* violation requires a new trial because Deyhle was the government's key witness on the issue of willfulness across the charges. OB24-25. The government counters that "Deyhle's credibility" was "nearly inconsequential." GB38. But the prosecutors' closing argument referred to Deyhle and his firm more than fifty times, repeatedly emphasizing that "Goldstein lied to Walter Deyhle." *E.g.*, JA4579; JA4587. The government's implausible new narrative rests on two related claims: (1) Deyhle's testimony was not relevant to willfulness for *any* charge; and (2) the government offered sufficient alternative evidence of willfulness for all charges. Again, the record squarely contradicts both.

Start with Count 1, which charged Goldstein with tax evasion related to his 2016 income. The government contends that the "core of Goldstein's willfulness [for Count 1] was that he lied to Deyhle about his gambling income." GB38. According to the government, Deyhle's testimony was irrelevant to that issue because Goldstein was generally aware he could not deduct certain expenses from his income but did so anyway. GB38-39.

But an improper deduction typically does not prove willfulness by itself. That is because "federal criminal tax offenses" require "specific intent to violate the law." *Cheek v. United States*, 498 U.S. 192, 200 (1991). And even an individual who generally knows the law can make mistakes. Here, for instance, Goldstein

mistakenly deducted an expense that was returned to his account. JA470. While Goldstein knew it was improper to deduct expenses that are not paid, it did not follow that he *intended* to violate the law. Instead, there was an innocent explanation: He was quickly scanning his bank records and missed the line-item indicating the expense was returned. JA470.

Because the government knew the deductions could be explained as mistakes, it did not simply offer evidence of deductions. Instead, it attempted to prove Goldstein's explanations were lies. In particular, it argued that Goldstein's explanations could not be trusted because he had "lied to [Deyhle] year after year." JA2871. And to prove *that* theory, Deyhle's testimony and credibility were key.

The same logic applies to Counts 2 through 9, which charged Goldstein with filing false tax returns. For those counts, the government did not offer independent evidence of willfulness—and on appeal simply asserts those convictions "relied on false items distinct from [Goldstein's] 2016 gambling income." GB41.

But as with Count 1, the government relied heavily on Deyhle's testimony, both to discredit Goldstein generally and to rebut Goldstein's specific defenses. For instance, for every count that charged Goldstein with misclassifying personal expenses as business expenses, Goldstein argued that Deyhle's firm was responsible. JA4660-4661. Because the government was unable to identify a single instance in which Goldstein directed his assistants to misclassify an expense, it instead relied on

Deyhle's testimony that Goldstein was aware of the misclassifications. JA4563-4564. Deyhle's credibility was thus a critical issue.

The record also establishes that Deyhle's testimony was relevant to Counts 10 through 13, which charged Goldstein with willfully failing to pay taxes. For these counts, Goldstein's primary defense was that Deyhle told Goldstein he would not be breaking the law if he paid his taxes late with penalties and interest—again making Deyhle's credibility a key consideration. OB7.

In sum, logic and fact foreclose the government's claim that Deyhle—Goldstein's tax preparer—was unimportant to its effort to convict Goldstein as an alleged tax cheat. Prosecutors' suppression of critical impeachment evidence thus requires a new trial.

## II. THE EVIDENTIARY ERROR REQUIRES A NEW TRIAL

In its case in chief, the government relied extensively on messages showing Goldstein's gross gambling winnings to allege that he willfully failed to pay taxes on that income. In response, the defense sought to introduce messages showing Goldstein's awareness that he lost tens of millions in other games and had not received some of the winnings in 2016, meaning they were not taxable in that year. Because the government tried to prove Goldstein's willfulness by repeatedly suggesting that his $50 million in gross winnings was net income, it was critical for Goldstein to establish his beliefs that his net income was nowhere near that amount.

OB5-6. The messages were the only way to do that.

In defending the district court's decision to exclude those messages as hearsay, the government ignores the law and misrepresents the record. Most notably, the government contends it never suggested Goldstein acted willfully by seeking to evade taxes on $50 million in winnings. This Court should reject that attempt to rewrite the record and order a new trial.

### A. The Messages Could Not Be Excluded As Hearsay

Goldstein offered the text messages as evidence of his beliefs regarding his 2016 gambling winnings. OB33-34. Thus, because statements relevant to a defendant's beliefs "may not be excluded" as "hearsay," the district court erred by excluding them. *United States v. Gallagher*, 90 F.4th 182, 195 (4th Cir. 2024).

The government has no real answer to that straightforward logic. Indeed, it does not dispute that Goldstein offered the messages to prove his beliefs regarding his 2016 income or that a defendant's conversations about his income can be used to prove his beliefs. It instead argues (at 49-52) that Goldstein's true purpose was to prove he did not have net gambling income in 2016. But that argument lacks merit.

The government incorrectly asserts that because Goldstein "invoked the business-records exception," his real "goal [was] to use the messages to prove his net-loser argument." GB49. To be sure, the messages were relevant to the tax-

deficit element of Count 1 and Goldstein attempted to invoke a hearsay exception to use them for that purpose. But they were plainly relevant to Goldstein's state of mind as well, and a party's failed attempt to invoke a hearsay exception does not prevent it from using the evidence "for [a] non-hearsay purpose." *United States v. Cone*, 714 F.3d 197, 219 (4th Cir. 2013). Instead, the evidence should be admitted with a "limiting instruction." *Id.*

The government also asserts that Goldstein must have intended to use the messages for their truth to establish he was a net loser because the messages contradicted his 2017 statement to Deyhle that "he won $2.7 million in 2016." GB50. But any supposed "conflict" between the messages and Goldstein's 2017 statement to Deyhle "affects the weight of [the messages], not [their] admissibility." *Palazzo ex rel. Delmage v. Corio*, 232 F.3d 38, 44 (2d Cir. 2000). And in any event, the government's argument is factually wrong because Goldstein did not offer the messages to prove he believed his 2016 income was a net loss—or any specific amount. Instead, Goldstein offered the messages to establish his belief that he owed a significant share of his winnings to investors, that his winnings from Tango should not count as 2016 income, and that he had substantial losses in other games—such that he did not think his 2016 gambling income was anywhere close to $50 million. OB33-34. Establishing those beliefs was critical to rebutting the government's overarching theory of willfulness.

The government further errs in contending that the messages could not have informed Goldstein's beliefs unless "he lied to Deyhle" about winning $2.7 million. GB50. Again, Goldstein has never represented that he used the messages to calculate his specific income then. Instead, the messages are state-of-mind evidence because they "bear[] on the reasonableness [and] good faith" of Goldstein's calculations, giving him reason to think those calculations were accurate because he believed as a general matter that most of his 2016 winnings were offset by losses, owed to investors, or not paid until 2017. *Gallagher*, 90 F.4th at 195 (citation omitted).[2]

Recognizing that the overarching theory it used to secure a conviction is now a liability, the government insists that it "always maintained the $50 million was *gross* winnings" and that Goldstein's net income was "$6 million." GB51 n.5. That is a remarkable misrepresentation. The first sentence in the government's closing argument was: "In 2016, Tom Goldstein won almost $50 million playing poker." JA4548. The government then urged the jury to "reject Mr. Goldstein's claim" that he believed those winnings were "offset" by "unreported losses in Asia and set asides" for investors. JA4573-4574; *see* JA4570 (referring to "supposed investors"); JA4573 (arguing claimed losses were a "fabrication"). And it emphasized that

[2] The government misleadingly suggests it was implausible that the defense first calculated that Goldstein was a 2016 net loser during trial. But the defense undertook those calculations only when the government realized the Gores allegations were false and advanced its new theory that Goldstein's 2016 income was $50 million in the middle of trial. JA475-476.

Goldstein "secretly won $22 million in Asia" and "ke[pt] that money parked in Asia." JA4549. At no point did it suggest that Goldstein's net income was a fraction of these "secret" winnings.

### B. The Government Cannot Show The Error Was Harmless

1. The government cannot carry its burden to show harmlessness because the relevant factors overwhelmingly favor Goldstein. OB35-45. Indeed, this Court has repeatedly vacated convictions in cases where the district court erroneously excluded similar evidence. *E.g.*, *Gallagher*, 90 F.4th at 195-96; *United States v. Ibisevic*, 675 F.3d 342, 349-50 (4th Cir. 2012).

The government barely engages with this Court's precedent or the relevant factors. Instead, it focuses on a single argument: By using the messages to refresh his recollection, Goldstein effectively submitted the messages to the jury. The government concedes (at 56-57) that when a witness uses a document to refresh his recollection, "the evidence is the witness's present recollection, not the [document]." 2 Wharton's Criminal Evidence § 8:16 (15th ed. 2025). But it insists this case is different because Goldstein and defense counsel made clear that Goldstein's testimony was based on the messages.

That argument has numerous flaws. To start, the government cites no case suggesting that the improper exclusion of evidence can be harmless if a witness uses the evidence to refresh his recollection. Indeed, the only federal court of appeals to

have considered the government's argument rejected it. *See Pittman v. County of Madison*, 863 F.3d 734, 737 (7th Cir. 2017).

The government's argument is also inconsistent with a basic evidence principle: A "document is a more reliable, complete[,] and accurate source of information as to its contents and meaning than anyone's description." *Gordon v. United States*, 344 U.S. 414, 421 (1953). *Gordon* is instructive. There, the defendant requested that the government produce a document containing a witness's contradictory statements so he could impeach the witness. *Id.* at 416. Although the government admitted that the document existed and contradicted the witness's testimony, the Supreme Court determined that description was no substitute for the document itself—only the document could properly "inform [the jury] as to [its] impeaching weight and significance." *Id.* at 421.

Under that principle, Goldstein's references to the messages did not mitigate the harm from their exclusion. Indeed, the prejudice here was even greater than in *Gordon*, where the government conceded that the excluded document existed. Here, by contrast, the government repeatedly denied that the messages existed and asserted that Goldstein was lying about their contents. JA4561; JA4570. It was therefore critical that jurors be able to inspect the messages themselves.

The government also fails to account for the possibility that Goldstein's limited use of the messages *undermined* his credibility. "[U]sing [a document] to

refresh a person's memory" may cause the party to "pay[] a real price." Mark P. Denbeaux et al., *Questioning Questions: Objections to Form in the Interrogation of Witnesses*, 33 Ark. L. Rev. 439, 460 (1979). The witness must "demonstrat[e] an impaired memory" and "when the [document] is presented" there "is a significant break in the flow of the testimony." *Id.* This unnatural "procedure" creates a risk that the "trier of fact" will find the witness not credible. *Id.* That risk was heightened here because Goldstein's testimony was the only part of trial where a witness referenced messages but the jury did not see them. Lay jurors with no understanding of evidence rules likely were confused about why they did not see the messages.

Finally, the rule "that jurors can be relied upon to follow the trial judge's instructions" forecloses the government's position. *Samia v. United States*, 599 U.S. 635, 646 (2023). The district court expressly instructed that "[o]nly those exhibits received into evidence may be considered as evidence," JA573, so jurors would not have considered the messages. OB42.

In short, the argument that refreshing recollection eliminates the harm from excluding evidence contradicts multiple fundamental legal principles. This Court should not become the first to embrace that argument—especially because prosecutors accused Goldstein of lying about the existence of the messages.

2. Most of the government's arguments about harmless error rise and fall with its refreshed-recollection argument. It asserts that the messages would not have

corroborated Goldstein's testimony because his oral references were sufficient, GB56; that *Ibisevic* and *Gallagher* are irrelevant because the defendants there did not refresh their recollection, *id.*; that Goldstein's closeness-of-the-case arguments "ignor[e] his extensive use of the text messages," GB57; and that mitigation was unnecessary because Goldstein's "testimony conveyed the content of the messages," *id.* Because the government's refreshed-recollection argument lacks merit, these arguments fail too.

The government's remaining arguments are equally meritless. It asserts (at 55) that the "text messages were not a central issue" because prosecutors presented other evidence to prove Goldstein's 2016 tax deficiency. But it does not matter that there was other evidence of a tax deficiency because the text messages were relevant to the *separate* element of willfulness for *every* tax count. OB38-39.

On the mitigation factor, the government cites the district court's limiting instruction. GB55. But the relevant harm was that the jury *did not see the evidence*, and the government does not explain how the limiting instruction could mitigate that harm. The government also disputes that prosecutors' reference to the "supposed" ledger suggested the ledger did not exist. GB58. But it does not explain why prosecutors called it a "supposed" ledger if they were conceding its existence—and the mitigation factor favors Goldstein notwithstanding prosecutors' inappropriate comments. OB41.

As for the closeness-of-the-case factor, the government simply repeats that it presented alternative sufficient willfulness evidence. GB57. That argument misunderstands the record, *supra* at 9-11, and is wrong on its own terms. An error is not harmless simply because there may have been "sufficient untainted evidence to convict." *United States v. Urbanik*, 801 F.2d 692, 698-99 (4th Cir. 1986). The government must demonstrate that the "'evidence is not only sufficient to convict, but [that] it is'" so "'powerful in relation' to the excluded [evidence]" that the court can be sure that "the error did not affect the outcome." *Ibisevic*, 675 F.3d at 354 (citation omitted). The government never attempts to make that showing.

3. Finally, the government asserts (at 59-60) that the messages were relevant only to Count 1. But that claim ignores the government's "overarching theory" of willfulness, *Gallagher*, 90 F.4th at 197—that Goldstein's desire to hide $50 million in 2016 income from the IRS "motivated everything [he] did from March 2016 through December 2022." JA4549. Based on that theory, the government argued that proving Goldstein was guilty of tax evasion would establish willfulness for the remaining tax charges as well. For that reason, the government spent "the bulk of [its] time" in closing "talking about Count One," JA4552, and addressed the other charges briefly "[f]or expediency," JA4576.

Seeking to escape the consequences of that theory, the government now argues that it focused on Count 1 only because "that count involved the most conduct

to discuss, including Goldstein's evasion of payment." GB60. But the record belies that misrepresentation. In closing argument, the government stressed to jurors that "the main question in your deliberations on the tax charges is whether he acted willfully"—not whether he committed evasion. JA4551. The government then discussed Count 1 at length, reiterating that "everything that happens is motivated by Mr. Goldstein's decision to cheat on his taxes in 2016." JA4565. When the government turned to the remaining tax charges, it once again explained that the jury could find willfulness based on the asserted 2016 tax evasion. JA4576 (asserting for "Counts Two through Nine" that "all of this is motivated by his tax evasion in 2016"). And the government urged jurors to find Goldstein not credible. OB38. The wrongly excluded evidence thus went to the central issues of willfulness and credibility—requiring a new trial.

## III. THE INSTRUCTIONAL ERRORS REQUIRE A NEW TRIAL

After closing arguments, the government persuaded the district court to instruct jurors only on Section 2's statutory text, while omitting its elements. That last-minute change violated due process and Rule 30(b).

The government's response only underscores those errors. The government does not dispute that it misstated the law: It argued that simply reading "the statute is sufficiently clear" to instruct on Section 2 liability, JA539, in direct contravention of *United States v. Odum*, 65 F.4th 714, 720 (4th Cir. 2023). Nor does the

government assert it can satisfy the harmless-error standard, which requires showing "beyond a reasonable doubt" that the jury "must have" found Goldstein guilty of the substantive offenses instead of accessory liability. *United States v. Hastings*, 134 F.3d 235, 241-42 (4th Cir. 1998). That means the dispositive question is whether there is a "reasonable likelihood" jurors understood the instructions to permit conviction under Section 2. *Boyde v. California*, 494 U.S. 370, 380 (1990). The answer is yes.

### A. The Government's Prior Position Confirms It Is Reasonably Likely Jurors Understood The Instructions To Permit Conviction Under Section 2

The government's own prior representations disprove its current position. The government repeatedly argued that the instructions permitted conviction under Section 2 based on the "language specifically quoting Section 2(a) and (b)," JA550—up until the government realized its error in post-trial briefing, *compare* JA552, *with* JA4947. The government cannot credibly claim that there is no reasonable likelihood jurors would have read the instructions in the very way the government previously insisted they would.

Perhaps realizing that its prior representations are fatal to its current position, the government attempts to rewrite the trial record. It claims it "erroneously conflated" Section 2(a) and (b), and so sought a last-minute change to remove

Section 2(a) from the case because the government had "ultimately presented no §2 case" to the jury at all. GB16.

The record refutes that account. The government needed to present Section 2 theories to the jury because it realized midway through trial that its own flight records showed that Goldstein was in the Virgin Islands when the mortgage application for Count 15 was submitted. JA4084-4085; JA4321-4324. Accordingly, the only basis for venue was through an accessory liability theory—that Goldstein caused his wife to submit the application in Maryland. OB52-53. That is why the government put on an entire rebuttal case directed at showing accessory liability for Count 15. OB52. And the government faced similar headwinds for the remaining mortgage fraud counts: Language in the Count 16 mortgage documents showed that Goldstein signed them in D.C., and the government had no direct evidence that Goldstein was in Maryland for the Count 14 conduct. *See* JA4677-4679. The government's mortgage fraud allegations thus hinged on Section 2.

Accordingly, after closing arguments, the government reiterated that "this is a § 2(b) case *(in addition to (a))*." JA4743 (emphasis added). And the government fought to keep the Section 2(a) *and* (b) language in the instructions while removing only the instruction containing Section 2(a)'s elements: It noted that the instructions included "language specifically quoting Section 2(a) and (b)," JA550, and argued the elements language "should come out," while "*the other aiding and abetting*

*language should stay in*," JA537 (emphasis added). Why would the government have opposed removing all Section 2 language if it had "presented no §2 case" to the jury and was not seeking a conviction based on accessory liability? GB16. The government offers no answer; it simply ignores the record evidence that does not fit with its new story.

The government tries to wave away its past representations by asserting that "what matters are the jury instructions, not the government's thoughts about them." GB68. But the fact that prosecutors *themselves* read the instructions to permit conviction under Section 2 proves a "reasonable likelihood" that lay jurors would have understood them the same way. *Boyde*, 494 U.S. at 380.

Moreover, the district court too previously read the instructions to permit conviction under Section 2. In deleting the Section 2(a) elements language, the court observed that "[t]he other language [on aiding and abetting liability] is in there," JA555—echoing the government's view that the necessary language to invite conviction under Section 2 was "already in the instructions," JA550. The government counters that the court retained that language "because the court would not 'wordsmith.'" GB69 (quoting JA537). But the government plucks that quote out of context. The court said it did not want to "wordsmith" in initially *rejecting* the government's request to keep in some but not all of the Section 2 language. JA537 ("It's either coming all the way out or I'm leaving it in at this point. I don't

have time to wordsmith.”). When the court eventually reversed course and sided with the government, it did so because it thought reading Section 2's text would suffice to instruct the jury on accessory liability. JA555.

Ultimately, the government's resort to revisionist history confirms the implausibility of its new position. It is reasonably likely jurors understood the instructions to permit conviction under Section 2—as the government and district court both did.

### B. The Text Of The Instructions Forecloses The Government's *Post Hoc* Reading

In any event, the government had it right the first time. The district court expressly told jurors to find Goldstein "guilty or not guilty" of the "offenses charged"; identified Section 2 liability as one such "charge[]" for every category of offense; and repeatedly recited the full statutory text of Section 2(a) and (b), which it described as "pertinent." JA571; JA584-585; JA594; JA601; JA607.[3] Based on those instructions, any reasonable juror would have understood her task as deciding Section 2 liability for every count using the statutory text as the relevant test. *See* OB50-53; Crespo Amicus Br. 7-8.

[3] The government claims the instructions did not describe Section 2's text as "pertinent," but instead stated "that Goldstein was charged with §2, 'which provides in pertinent part.'" GB70 (citation omitted). That is a distinction without a difference. Quoting the statutory text in "pertinent part" for the charges is another way of saying that statutory text is "pertinent" to the charges—and therefore pertinent to the jury's role in determining guilt or innocence on those charges.

The government's contrary reading rests on a false premise: It insists jurors would have deemed those passages on Section 2 "irrelevant" because the "elements instructions" told the jury what it "must" find to determine guilt. GB65. But the elements instructions merely set forth the test for the *substantive* offenses—as happens in every case involving Section 2. *See* JA585-587; JA594-595; JA601-602; JA608-609. For instance, on tax evasion under 26 U.S.C. § 7201, the elements instructions explained what jurors "must" find "[i]n order for the *crime of income tax evasion* to be proved." JA585 (emphasis added). Nothing in those elements passages overrode the court's prior instructions to determine guilt or innocence on the Section 2 charges *in addition to* the substantive offenses. *See* OB50-51. Accessory liability thus remained an alternative pathway for the jury to wrongfully convict.

Moreover, *Odum* establishes that it would be reasonable for jurors to assume the statutory text provides the relevant test for Section 2 liability. In *Odum*, the district court "'read directly from' 18 U.S.C. § 2," without instructing on its elements. 65 F.4th at 720. There, as here, the constitutional problem was that jurors would look to the statutory text to adjudicate guilt under Section 2, even though the statute does not set forth the full set of required elements. *Id.* at 720-21.

The jury's conviction on Count 15 proves that is precisely what happened here. As noted, Section 2(b) cause liability provided the only basis for venue on that

count; indeed, the government conceded during closing arguments that Goldstein "was in the Virgin Islands" when the mortgage application was submitted. JA4590. The government remarkably now calls that statement a "rhetorical comment." GB71. But the government told the district court that "Mr. Goldstein was out of the country" at the relevant time, JA634; *see also* JA4591 (district court stating that it understood the government to be acknowledging Goldstein was "in the Virgin Islands"). And the government's own flight records showed that Goldstein was in the Virgin Islands when the mortgage application was submitted. JA4084; JA5849. The government's invocation of IP data (at 70-71)—which shows only that the application was submitted from Goldstein's home—underscores that the jury must have credited the government's rebuttal case that Goldstein caused his wife to submit the application. If the jury read the instructions for Count 15 to permit conviction under Section 2, as it must have, then the same is true for the other counts that featured materially identical language on Section 2. *See* JA585; JA593-594; JA607-608.

The government's remaining attempts to salvage its *post hoc* reading of the instructions fail. It contends that the failure-to-pay counts "neither quoted §2 nor said that Goldstein was charged with §2." GB67. But those instructions stated that Goldstein was "charge[d]" with the substantive offense "and aiding and abetting, counseling, commanding, inducing or procuring such an offense." JA600. That was

the same language effectively quoting Section 2 that appeared in the other counts, which the jury would have recognized. And the government errs in contending that "[n]o juror would understand abetting others to be relevant" to the failure-to-pay charges. GB67. The jury had seen evidence that Goldstein's tax preparer, Deyhle, advised him that he could pay his taxes later and simply pay penalties. JA3156-3157; JA5843. Without instructions on Section 2's elements, jurors would not have known they needed to find a guilty principal or that Goldstein acted willfully in relying on that advice and choosing to pay late—creating the opportunity for wrongful conviction.

The government next contends that jurors who deemed Section 2 relevant "would have understood the elements instructions" for the false-return and tax-evasion offenses to "provide the applicable test" because those instructions discussed the involvement of third parties. GB67-68, 70. That argument is nonsensical: If jurors "had thought §2 was relevant," GB67, they would have turned to the express instructions on Section 2, including its statutory text. *See Odum*, 65 F.4th at 720-21. The fact that jurors could have also considered third-party involvement in assessing primary liability does not mean they would have *ignored* the instructions' alternative pathway to conviction under Section 2. To the contrary, courts "presume[]" jurors "attend closely" to instructions and "'strive to … follow them.'" *Samia*, 599 U.S. at 646 (citation omitted).

### C. The District Court's Instructional Errors Affected Every Count

Lacking a coherent reading of the instructions, the government now claims "any error was limited to Count 15." GB68. But the instructions specified Goldstein was charged with Section 2 liability for every count—and the Section 2 language for Count 15 was identical to that for the tax evasion, false returns, and remaining mortgage fraud counts. JA585; JA593-594; JA607-608. If it is reasonably likely the jury understood that language to permit conviction under Section 2 for Count 15, then the same is true for those other counts.

Moreover, the government must prove "beyond a reasonable doubt" that the jury "must have" convicted Goldstein of the substantive offenses, rather than accessory liability. *Hastings*, 134 F.3d at 241-42. The government cannot meet that burden with conclusory assertions—especially given that it insisted at trial it had "introduced more than sufficient evidence to support an aiding and abetting instruction" for each count. JA4177; JA4204; JA4237.[4]

The government likewise fails to refute prejudice from the conceded Rule 30(b) violation. GB72. It asserts the defense's closing "would have been the same regardless." *Id.* (citation omitted). But that ignores that defense counsel expected the instructions to set forth Section 2(a)'s elements—which require a guilty

[4] Goldstein did not limit his instructional error arguments to mortgage fraud, *contra* GB68; instead, he consistently objected to instructing jurors on Section 2 for *all* counts throughout the trial, *e.g.*, JA536-537; JA4176; JA4454; JA4468; JA4493.

principal, shared willful intent, and an affirmative act. OB48. Had defense counsel known the court would invite conviction under both Section 2(a) and (b) while omitting their elements, it would have been "essential" to explain those elements to avert an erroneous accessory liability conviction. *United States v. Horton*, 921 F.2d 540, 547 (4th Cir. 1990).

## CONCLUSION

The Court should vacate Goldstein's convictions and remand for a new trial.

Dated: November 6, 2026

Respectfully submitted,

*/s/ Elizabeth B. Prelogar*

ELIZABETH B. PRELOGAR
ANDREW D. GOLDSTEIN
EPHRAIM A. MCDOWELL
ELIAS S. KIM
JADE FORD
SAHAR ATASSI
COOLEY LLP
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC 20004
(202) 842-7800
eprelogar@cooley.com

*Counsel for Defendant-Appellant*

JONATHAN KRAVIS
LIU SHUR KRAVIS LLP
607 Fourteenth Street, NW
Suite 625
Washington, DC 20005
(202) 240-7100
jonathan.kravis@lskllp.com

## CERTIFICATE OF SERVICE

I hereby certify that on November 6, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/ Elizabeth B. Prelogar*
Elizabeth B. Prelogar

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that:

1. This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it consists of 6,499 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced, serif typeface using Microsoft Word in 14-point Times New Roman font.

<u>*/s/ Elizabeth B. Prelogar*</u>
Elizabeth B. Prelogar